DEBORAH M. SMITH
Acting United States Attorney

STEPHEN COOPER
Assistant United States Attorney
Federal Building and U.S. Courthouse
101 12th Avenue, Room 310
Fairbanks, Alaska 99701-6282
Phone: (907) 456-0245
Fax: (907) 456-0577
E-mail: Stephen.Cooper@usdoj.gov

Attorneys for Defendant

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| CAROL BOLT, | ) | Case No. 4:02-cv-21-RRB |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | **MOTION FOR SUMMARY** |
| | ) | **JUDGMENT** |
| Defendant. | ) | |
| _____ | ) | |

## TABLE OF CONTENTS

Page

Motion For Summary Judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Points and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

I.  Standards for Summary Judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

II. This Action is Barred by 28 U.S.C. § 2680(a) Because, in Not Removing the
    Ice and Snow from the Place Where Plaintiff Fell, the Army Acted in
    Accordance with Defense Department and Army Policies, and with the Post
    Snow Removal Policy, All Established as Discretionary Functions . . . . . . . . .17

        a. The Test for Identifying a Discretionary Function . . . . . . . . . . . . . . . . 17

        b. Issuance of DoD Directives and Regulations, and the Post
           Commander's Snow Removal Policy and the Residents' Handbook
           Based on Those DoD Policies and Requirements, Including Assigning
           Last Priority to Housing Area Parking Lots and Requiring Self-help
           by Residents, Was a Discretionary Function. . . . . . . . . . . . . . . . . . . .24

        _____i. Military Policy, Directives and Regulations Committed
                    Housing Management to the Post Commander's Discretion, and
                    Expressly Encouraged Use of Self-Help by Residents in Snow
                    and Ice Removal For Reasons of Social, Economic and Political
                    Policy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

                ii. The Regulations on Housing Management and Self-Help
                    Expressly Authorized the Use of Policy Judgment and Discretion
                    By the Post Commander . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

i

iii.  Examples from Case Law Show that the Army's Inaction
      Regarding Snow and Ice Removal, in Reliance on
      Residents' Performance of that Duty, Was Discretionary,
      Under Regulations Providing For Discretion. . . . . . . . . . . . . . . . 36
                              i
iv.  The Post Commander's Reliance on Self-Help by Residents for
     Snow and Ice Removal Was Also a Discretionary Economic
     Policy Judgment Due to Budgetary Constraints.. . . . . . . . . . . . 39

v.  Actions and Inaction of Employees in Carrying Out These
    Policies Are Likewise Not Actionable.  . . . . . . . . . . . . . . . . . . . .40

vi.  Plaintiff's Notice Theory is Invalid . . . . . . . . . . . . . . . . . . . . . . . 40

III.  Tort Liability is Barred Because the United States is Not Liable for
      Dangerous Snow and Ice Conditions Resulting from Natural Causes . . . . . . . .42

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .45

DEBORAH M. SMITH
Acting United States Attorney

STEPHEN COOPER
Assistant United States Attorney
Federal Building and U.S. Courthouse
101 12th Avenue, Room 310
Fairbanks, Alaska 99701-6282
Phone: (907) 456-0245
Fax: (907) 456-0577
E-mail: Stephen.Cooper@usdoj.gov

Attorneys for Defendant

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| CAROL BOLT, | ) | Case No. 4:02-cv-21-RRB |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | **MOTION FOR SUMMARY** |
| | ) | **JUDGMENT** |
| Defendant. | ) | |
| _____ | ) | |

Defendant, the United States of America, moves for summary judgment pursuant to Rule 56, Federal Rules of Civil Procedure, based on the points and authorities following and the attached exhibits, on the grounds that (1) this Court lacks subject matter jurisdiction of this case because the United States has not waived sovereign immunity for its acts and inaction herein, in that these constitute the performance of a discretionary function under 28 U.S.C. § 2680(a); and (2) even if this Court has jurisdiction, the United States is not liable for plaintiff's injury as the condition of the ice and snow resulted from natural causes.

Each of these grounds separately constitutes a complete defense, and each is presented as an independent ground for judgment as to the entire action. There is no genuine issue of material fact as to any of these grounds, and defendant is entitled to judgment as a matter of law.

## **INTRODUCTION**

This action seeks damages from the United States of America for personal injuries sustained by the plaintiff, the wife of a military member, as a result of plaintiff's slipping and falling on an icy patch near a dumpster in the parking lot adjacent to her military housing unit on Fort Wainwright, Alaska. Plaintiff contends that the United States is liable under the Federal Tort Claims Act for negligently failing to perform snow removal from the parking lot at plaintiff's housing unit.

Defendant moves for summary judgment on the ground that defendant's actions and its inaction with regard to snow removal at the parking lot constituted the performance of a discretionary function immunized from tort liability by 28 U.S.C. § 2680(a), and alternatively, that in any event defendant is not liable for plaintiff's injuries under Alaska law as applied in this Circuit because the presence and condition of the snow and ice where plaintiff fell were the result of natural causes.

Because this motion seeks dismissal for lack of jurisdiction, and alternatively for lack of negligence and liability, it neither addresses damage issues nor recites the facts that relate to damages.

## **FACTS**

As plaintiff Carol Bolt was on her way to work in the morning on April 1, 1999, she went to throw her trash in the dumpster in the parking area at the military

housing apartment where she and her family resided, Building 4133, Apartment 8, on Fort Wainwright, and slipped and fell on ice "in front of the dumpster" and broke her right ankle. Plaintiff's Amended Complaint, August 29, 2003, ¶¶ 16, 5. While said ¶ 16 alleges that plaintiff used reasonable care and defendant's Answer to the Amended Complaint, March 11, 2005, denies ¶ 16 for lack of sufficient information, the portion of plaintiff's alleged facts here stated in this paragraph of the instant motion is not in dispute and should be deemed established.

The dumpster was situated in the common parking area which served the three apartment buildings surrounding it, one of which buildings housed plaintiff's apartment. Declaration of W. Mae Harrell, Chief, Housing Division, Fort Wainwright, January 30, 2006, at 3, attached hereto as Exhibit 1.

Attached hereto as Exhibit 2 are certified copies of the Local Climatological Data for Fairbanks for March and April 1999, 4 pp., published by the United States Department of Commerce. The low temperature on April 1 was 21 degrees F. Id. at 4. The day before, the low had been 4 degrees. Id. at 2. As the accident happened early in the morning of April 1, the high temperature that day is not significant. Two weeks before the accident, the daily high temperature had risen above freezing every day for more than one week, and the total snow depth on the ground had decreased from 14 inches to 11 inches. For six days immediately preceding the accident, however, the daily high temperature had not risen above freezing. During those six days the daily high had ranged from 31 to 19 degrees and the daily low ranged from 15 to -7 degrees. Just over one inch of snow had fallen four to five days before April 1. The total snow depth on the ground had not decreased during the six days preceding April 1. It had increased by one inch. Id.

Two and one-half years earlier, on October 1, 1996, plaintiff's husband Kevin Bolt signed the "Conditions of Occupancy for Military Family Housing IAW AR 210-50" for his and his family's occupancy of that apartment. A true copy of the Conditions is authenticated by and attached to the Harrell Decl., Ex. 1, as Attachment A. The Conditions of Occupancy include a statement that "The residents will at their own expense . . . c) promptly remove ice and snow as necessary or required." Attachment A of Ex. 1, at 2.

Department of Defense (DoD) Directive 4001.1, attached hereto as Exhibit 3, §§ 3.1 and 3.2, delegates "broad authority" to the post commander to decide how best to manage the installation and accomplish its assigned mission, and it nullifies all regulations that limit commanders' freedom to act on this basis.

DoD Directive 4165.63-M, attached hereto as Exhibit 4, applies this discretionary "broad authority" of post commanders to their decisions in providing military housing facilities and services. §§ C1.4.5.1. It requires them to provide "excellent living conditions" for personnel and families, and to manage family housing "in a way that will provide excellent housing facilities and services for the occupants" in "the most cost-effective manner." §§ C1.4.6.1 and C2.1. The Directive also requires commanders to "promote" self-help performed by housing residents, § C1.4.6.4, and "encourages" self-help programs as a means of improving living conditions and promoting pride of homeownership. § C2.8.1. This Directive also requires that "All housing occupants shall be informed and shall acknowledge in writing their responsibilities" at the time they are assigned to government housing. § C4.1.1.

Army Regulation, 32 C.F.R. § 552.18(c), makes commanders responsible

in a general way for the "efficient and economical" operation, administration, service and supply of the individuals, units and activities assigned to the post.

The resident "responsibilities" referred to in DoD Directive 4165.63-M, Ex. 4, § C4.1.1, are provided in Army Regulation 210-50, February 26, 1999, relevant portions of which are attached hereto as Exhibit 5. This regulation was in force at the time of plaintiff's fall on April 1, 1999. The portions thereof included in Exhibit 5 and cited herein were also in the immediately preceding version that was in force in September 1998 when the post commander issued the Snow Removal Policy for the winter of 1998-1999, with the single exception of Appendix E (discussed below). See Ex. 5 at 3-6, "Summary of Changes", and "History" at 2.

This regulation requires post commanders, in providing military housing, to utilize self-help performed by residents "to the maximum extent practicable," and states the policy reasons for this: to reflect the "prudent landlord" concept, to optimize the use of scarce resources, and to give residents a feeling of "homeownership". Ex. 5, § 1-18h, § 1-14b. The February 1999 version of this regulation added a list of the basic self-help tasks which "can and should be performed by family housing residents," including the following: "Paved and stabilized areas . . . 4. Remove snow and ice." Id., Appendix E at 11, 13.

This snow removal duty listed in Appendix E was a particularization of the already-existing requirement in the same regulation for residents to "cooperate with area . . . coordinators on common area responsibilities," Ex. 5, § 8-3b(1)(*l*), which included the residents' duty, at their own expense, to "remove ice and snow as necessary or required." Att. A to Ex. 1, Conditions of Occupancy, October 1, 1996, citing this regulation, AR 210-50.

The snow removal duty in Appendix E was also a reiteration of that duty stated in the Handbook for Family Housing Occupants, DA PAM 210-2, issued September 15, 1971, and still in effect. Relevant portions of 210-2 are attached hereto as Exhibit 6. It makes residents "responsible for taking proper care of" grounds including "parking areas, walks, areas around garbage containers," in addition to any "common grounds . . . as directed" where housing units border common grounds. Id., § 6-1. It further requires residents to remove snow and ice from paved and stabilized areas such as private drives, carports and "similar areas" giving direct access to quarters, and requires them to apply sand or chemicals if ice cannot be removed. Id., § 7-5.

These duties of residents to remove ice and snow in common areas, parking areas, drives, walks and areas around dumpsters, as well as areas around their quarters were further explained in the Residents' Handbook and the Snow Removal Policy issued for this post by the post commander, and were testified to by witnesses. The regulation obligates residents to "be familiar with the contents of the family housing residents' handbook" provided by the post commander describing residents' responsibilities. Ex. 5, §§ 8-3a(2) and b(1)(a). The Residents' Handbook in force in April 1999, the time of the accident herein, is no longer available, but the snow removal duties of residents provided by the earlier and later editions thereof are the same with respect to these duties, and were in effect in April 1999. Ex. 1, Harrell Decl. at 3-4. See Residents' Handbook, 1995, relevant portions of which are attached as Attachment B to Ex. 1, the Harrell Decl., and Residents' Handbook, 2002, relevant portions of which are attached as Attachment C to Ex. 1.

The Residents' Handbook states:

> Snow removal at your quarters is the responsibility
> of the resident.  Keep ice and snow cleared from your
> threshold, porches, parking area and sidewalk on both sides
> of "your home".

Ex. 1, Att. C at 5, Att. B at 5.  The residents' removal of ice and snow in common areas requires coordination of their performance of these duties:

> Coordination of building residents is necessary to insure all
> adjoining and common areas are clear of trash, snow and
> ice.

Ex. 1, Att. C at 3, Att. B at 4. The "common areas" that residents must "police" expressly include "postal pads and dumpsters," Ex. 1, Att. C at 6, Att. B at 7, as well as "driveways" and "parking area" in which the dumpster was situated in this case. Ex. 1, Att. C at 4, 5, Att. B at 3, 5.  Under "Resident's Responsibilities" the Handbook provides that the Area Coordinator is to ensure that "all residents comply with these instructions."  Ex. 1, Att. C at 3, Att. B at 4.

The Handbook also contains a copy of the "Conditions of Occupancy" form like the one plaintiff's husband signed in 1996, showing the residents' duties to "remove ice and snow as necessary or required." Ex. 1, Att. C at 8, Att. B at 10, ¶ 11. It further advises residents that supplies to help in carrying out their snow and ice

removal duties are available through the self-help center, Ex. 1, Att. C at 4, Att. B at 4, and it includes a "health note" advising residents the best way to shovel snow. Ex. 1, Att. C at 5, Att. B at 6.

These common area responsibilities, including the removal of snow and ice, are duties enjoined upon residents by regulation. Ex. 5, AR 210-50, § 8-2b.

The Handbook notifies residents: a) that family housing parking lots are in last priority for snow removal by the Directorate of Public Works (DPW) and are cleared once each year in late winter; b) that advance notice is given of the date of such snow removal; and c) that if any vehicle is not removed from the lot by that day the lot will not be cleared until an undetermined later date. Ex. 1, Att. C at 5, Att. B at 5-6.

The snow removal priorities stated in the Residents' Handbook are derived from Army regulations and the post commander's Snow Removal Policy. Harrell Decl., Ex. 1 at 2. The Policy in force on April 1, 1999, was issued by then-Post Commander Lt. Col. John J. Curry on September 22, 1998. Declaration of John J. Curry, former Post Commander, Fort Wainwright, January 31, 2006, at 2, attached hereto as Exhibit 7; Attachment A thereto, the Snow Removal Policy issued September 22, 1998. The Snow Removal Policy begins by reciting that DPW staffing for snow removal operations "has been cut by 48% from the staffing level of the 1997-1998 winter season" due to restrictions "imposed by higher headquarters." Id. at 1. The Policy establishes the priorities for DPW's snow removal:

Priority 1 - "Health and Safety", i.e., major roadways for fire, ambulance and military police; fire stations; hospital emergency area; airfield fire lanes and medical evacuation area;

Priority 2 - "Mission Related" areas such as deployment facilities, training routes, access routes to headquarters, power plant, water plant, hospital, airfield hangars and other essential facilities;

Priority 3 - "Roads and Airfield Phase II" including the rest of the airfield and troop and residential area roads;

Priority 4 - "Parking Areas for Public Services and Administration," such as stores, hospital, offices and the like;

Priority 5 (last priority) - "Cleanup" to include clearing snow berms from roads, intersections and the airfield, and family housing parking lots to be "cleared once per year in late February or March."  Each such lot is to have the time and date of snow removal posted with a distinctive sign three days in advance of the clearing.  Vehicles are required to be removed from the lot before clearing can begin.  If any vehicles are not removed, that lot "will be bypassed and moved to the bottom of the list" of lots to be cleared, "due to the possibility of damage and Government liability."  Id. at 2-4.

The Policy provides that residents are responsible for removing snow and ice around their quarters and in such common areas as mail boxes, sidewalks and driveways, and are required to "sand hazardous areas."  "Sand will be available for pickup from Public Works."  A telephone number is given.  Id. 1-2.

The term "driveways" includes the parking lot and its entrances, and the dumpster area, in the case of housing areas such as plaintiff's where several apartment buildings surround a central parking lot containing a dumpster.  The residents' obligation to "sand hazardous areas" includes all areas the residents use between their own apartment and the public street, including common areas in the

parking lot, driveways and around the dumpster, as indicated in regulations and the Residents' Handbook.  Curry Decl., Ex. 7 at 2, 6; Harrell Decl., Ex. 1 at 3; Declaration of Michael T. Meeks, Director of Public Works, Fort Wainwright, January 30, 2006, at 3-4, attached hereto as Exhibit 8; Declaration of Richard Lowe, Foreman, Directorate of Public Works, Fort Wainwright, January 30, 2006, at 2-3, attached hereto as Exhibit 9; Deposition of Sajid Khan, Area Coordinator at plaintiff's housing area in 1999, June 29, 2005, at 13, 18-20, 25, 32, attached hereto as Exhibit 10.

Lt. Col. Curry developed this policy in consultation with then-Lt. Col. Michael T. Meeks, Director of Public Works, and with the troop units at Fort Wainwright, Post Safety, Training, Logistics, Community Activities, the Staff Judge Advocate, and all directorates on the post, based on:

• DoD Directive 4001.1 granting the post commander broad authority to decide how best to accomplish the mission of the post;

• DoD Directive 4165.63-M granting the post commander broad authority and responsibility for providing housing facilities and services, requiring that housing be managed in a way that will provide excellent facilities and services in the most cost-effective manner, and requiring that self-help by residents be promoted and encouraged as a means of improving living conditions and promoting a feeling of homeownership;

• Army Regulation, 32 C.F.R. § 552.18(c), making commanders responsible for the "efficient and economical" operation, administration, service and supply of the individuals, units and activities assigned to the post;

• Army Regulation 210-50 requiring post commanders, in providing military

housing, to utilize self-help performed by residents to the maximum extent practicable, to assign residents the duty to maintain common areas as well as the areas around their own quarters, and stating that the underlying policy reasons for the self-help program are to reflect the "prudent landlord" concept, to optimize the use of scarce resources, and to give residents a feeling of "homeownership";

•     Army Handbook for Family Housing Occupants, DA PAM 210-2 requiring residents to maintain common areas adjacent to their quarters, including parking areas and areas around dumpsters, and to remove snow and ice and to spread sand on ice on paved and stabilized areas;

•     The limited available manpower and equipment in relation to the large size of the areas on Ft. Wainwright requiring snow removal, and the inability of DPW, particularly in light of the 48% cut in snow removal staffing recently imposed on DPW, to provide more or higher priority snow removal services for family housing than are provided for in the Policy, as indicated by the information provided by Lt. Col. Michael T. Meeks, Director of Public Works.

Curry Decl., Ex. 7 at 3-5.

      The combined result of these factors was both a Defense Department policy strongly favoring use of residents' self-help to the maximum extent practicable and an economic necessity existing at Fort Wainwright to curtail snow removal services and rely on residents for the full responsibility to carry out that function at their housing areas except for the once-a-year clearing of residential parking lots. Id. at 5, ¶ 5g; and 6-7, ¶ 8.

      Lt. Col. Meeks provided the manpower and logistical information relied

upon by Lt. Col. Curry in setting the priorities and assigning to residents the responsibility for ice and snow removal as provided in the Snow Removal Policy for 1998-1999.   The post had over 3,286,000 square feet of surface requiring snow removal each year, over and above the housing area parking lots which contained over 406,000 square feet of area.  Meeks Decl. at 2-3.  The snow removal policy two years earlier had provided for clearing of housing parking lots twice per winter, but steady reductions by higher headquarters, in the late 1990's, of the resources needed to operate the installation and to operate DPW had necessitated reduction of the clearing of housing parking lots to once per year.  Curry Decl., Ex. 7 at 2-3, 4-5; Meeks Decl., Ex. 8 at 2.  The problem was only increased by the 48% cut in DPW staffing for snow removal.  <u>Id.</u>

There was not enough time, manpower and equipment to clear the housing parking lots more than once a year, or for DPW to engage in sanding of such lots, in addition to its more pressing obligations for the rest of the post.  Sanding local slippery areas in parking lots, driveways and around dumpsters requires unskilled handwork, significantly different from the snow removal work done by DPW through the use of large heavy equipment such as graders, augurs and dump trucks.  The handwork of sanding slick spots in parking areas, driveways and around dumpsters was not a function or duty of DPW and was not required by the Snow Removal Policy, as it would cause a significant drain on DPW resources and jeopardize its ability to carry out the higher priorities assigned to DPW under the Snow Removal Policy.  Such tasks were the responsibility of housing residents.  Meeks Decl., Ex. 8 at 3; Lowe Decl., Ex. 9 at 2-3.

If DPW had received any complaints of such localized slippery

conditions in housing area parking lots, driveways and dumpster areas, it would not have attempted to sand those areas but would leave that task to residents who have the responsibility and the capability to handle it. DPW would advise residents that the tools and supplies to carry out that responsibility were provided free of charge at the self-help center on post. Ex. 8 at 3-4; Ex. 9 at 3. All that DPW could do, both under the Snow Removal Policy and as a practical matter, would be to clear the parking lot by use of its heavy equipment once per year, after all vehicles had been removed from the lot. That operation did not consist of identifying or sanding hazardous areas. Its purpose, rather, was to remove the hard-pack to prevent the lot from becoming difficult to use during break-up. Ex. 8 at 3, ¶ 3.

Army regulations and the Snow Removal Policy, by assigning to residents the entire responsibility for ice and snow removal in common areas, left DPW free to apply its resources to the higher health and safety and mission-related priorities identified in the Policy. The post commander relied on this resource of resident's self-help and accordingly did not provide any other snow and ice removal services or safety inspections relating to snow and ice in residential common areas. The only services of that kind were the once-per-year removal of the hard-pack, and inspections conducted by Post Services, not to identify hazardous areas for DPW to correct but to determine if residents were fulfilling their snow and ice removal responsibilities. Curry Decl., Ex. 7 at 6-7.

The responsibilities of residents with respect to maintenance at their housing areas were made known to all residents by several means, including their signing of the Conditions of Occupancy upon accepting assignment to quarters, their receipt of and signing for the Residents' Handbook further explaining their

obligations, the posting of notices and of the Snow Removal Policy itself in public places and at the units to which residents are assigned for duty as well as in the post newspaper and on a special telephone line 353-SNOW, and the residents' mandatory attendance at periodic town hall meetings at which the Snow Removal Policy and the residents' obligations were openly stated and explained.  Curry Decl., Ex. 7 at 5-6; Meeks Decl., Ex. 8 at 4.

Through these means, residents were advised that their obligation to conduct winter maintenance extended to common areas such as dumpsters, driveways and parking areas and walkways to and from those areas, by clearing snow and ice and by spreading sand or ice-melt on all hazardous areas, and that they could obtain the sand, salt, snow shovels, ice chippers and other tools for this maintenance from the self-help center.  Curry Decl., Ex. 7 at 4-5, ¶ 6; Meeks Decl., Ex.8 at 3-4, ¶¶ 4, 6; Harrell Decl., Ex 1 at 2-3, ¶¶ 2, 3, 4, Att. C at 3, 4, 5, 6, Att. B at 3, 4, 5, 7.  Lt. Col. Curry, as a resident, understood and practiced this winter maintenance of common areas by personally sanding pathways to dumpsters, and observed other residents doing likewise.  Curry Decl., Ex. 7 at 6, ¶ 7.

Sajid Khan was the area coordinator for the three buildings that included plaintiff's residence in 1998 and 1999.  He had an apartment in Building 4133, the building plaintiff resided in at that time.  The job was unpaid and was assigned to him as senior ranking occupant.  He was to see that residents took care of their responsibilities to keep grounds cleaned up, snow shoveled, and sand put on slick areas, including not only each resident's area but also common areas.  He excelled at this job and was selected as the best area coordinator of the year.  Khan Deposition, attached hereto as Exhibit 10, at 9, 11, 13, 29-30, 31, 35.  He and other residents of

those three buildings often spread sand or salt on slippery spots during the winter of 1998-1999, both in their own respective areas and in common areas, specifically including the area of the dumpster where plaintiff fell. Id., 13. The residents could obtain salt and sand for this purpose from the self-help center on post. Id.

"Good responsible residents" would sand these common areas, including the dumpster area, whenever it was needed, because they recognized their "mutual responsibility" to do so. Id. at 13, 16, 18-21, 26, 29, 36. They sanded the dumpster area both before and after plaintiff's fall, as well as any other slick spots. Id. at 32, 25. At times that year there had been some melting and re-freezing in a low spot near the dumpster, id., 12-13, 18, 22, 28-29, 32, and for this reason that was an area which Mr. Khan and other residents always tried to sand, whenever they felt is was slippery. Id. at 18-20.

However, although he knew that area was slick, id. at 31, he described its condition before plaintiff fell as "not that dangerous" that one would expect someone to get hurt. Id. at 24. No one had complained about that area before plaintiff fell. Nor had Khan, before the accident, transmitted any complaint about it to the "mayor" of the area, the resident next above the area coordinator. Id. at 16, 19, 29, 30.

During an interview on August 9, 2001, plaintiff indicated she had been aware of a problem with snow and ice in the parking lot earlier in the winter, and claimed she had complained to Sajid Khan about it. Exhibit 11, attached, is relevant portions of the Memorandum of Telephonic Interview with Carol Bolt, August 13, 2001; see ¶ 13. Plaintiff has admitted this Memorandum is a reasonably accurate summary of plaintiff's statements, Plaintiff's Response to Defendant's Request for

Admission No. 12, June 24, 2005. She commented that plowing the area once a year is not enough. Id. She said the accident occurred at about 8:00 a.m. Id. at 1, ¶ 3.

Mr. Khan had given an earlier telephonic interview, attached to the Deposition, Ex. 10, as Deposition Exhibit B, which he adopted with some clarifications. Ex. 10 at 7-9. The lot where plaintiff fell had been scheduled for the once-a-year snow removal on March 9, 1999, but was not cleared until a later date. Lowe Decl., Ex. 9 at 2, ¶¶ 2, 3, Attachment A consisting of the DPW schedule for clearing the housing area lots in 1999. One or more cars had been left in the lot on the scheduled date, and after they were moved out, the lot was eventually cleared of snow after the date of plaintiff's fall. Id.; Khan Dep., Ex. 10 at 7, Dep. Ex. B at 2-3; Ex. 11 at 2, ¶ 13. After plaintiff's fall, Mr. Khan told the mayor about it, in an attempt to get DPW to clear the lot. Ex. 10 at 19. The scheduled snow removal by DPW, that had previously been canceled, was eventually accomplished after plaintiff's fall. Id. at 8.

The snow removal at that lot was carried out that year in accordance with the Snow Removal Policy. Lowe Decl., Ex. 9 at 2, ¶¶ 1, 3. The lot was scheduled for snow removal for March 9, 1999, but was not cleared that day due to the presence of one or more vehicles in the lot. The snow removal was therefore delayed and accomplished at a later date after April 1. DPW did not conduct any other snow or ice removal or sanding at that lot that season. All these actions and inactions were in accord with the instructions of the Director of Public Works and with the priorities and responsibilities set forth in the Post Commander's Snow Removal Policy. Meeks Decl., Ex. 8 at 5; Snow Removal Policy, Ex. 7, Att. A at 1-2, ¶ 2c, and 3-4 at ¶¶ 3b(5)(b) and 4(d).

## **POINTS AND AUTHORITIES**

I.      STANDARDS FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) mandates the entry of summary judgment where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Facts are material where they "might affect the outcome of the suit under the governing law . . . . " Id. A fact issue is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

II.     THIS ACTION IS BARRED BY 28 U.S.C. § 2680(a) BECAUSE, IN NOT REMOVING THE ICE AND SNOW FROM THE PLACE WHERE PLAINTIFF FELL, THE ARMY ACTED IN ACCORDANCE WITH DEFENSE DEPARTMENT AND ARMY POLICIES, AND WITH THE POST SNOW REMOVAL POLICY, ALL ESTABLISHED AS DISCRETIONARY FUNCTIONS

a.      The Test for Identifying a Discretionary Function

The Federal Tort Claims Act (FTCA) confers original jurisdiction upon district courts over civil actions for money damages caused by the negligent or wrongful act or omission of any employee of the government acting within the scope

of his or her employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.  28 U.S.C. § 1346(b).

Title 28, United States Code, § 2680(a), provides certain exceptions to the FTCA, including the following:

> (a)  Any claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

Plaintiff, as the party asserting jurisdiction has the burden of pleading and proving that the court has subject matter jurisdiction, and must do so by a preponderance of the evidence.  McNutt v. General Motors Acceptance Corp., 298 U.S. 178 (1936); see also Thompson v. Gaskill, 315 U.S. 442 (1942); Gibbs v. Buck, 307 U.S. 66 (1939); Kvos, Inc. v. Associated Press, 299 U.S. 269 (1936).

Specifically with respect to the discretionary function exception, the Ninth Circuit holds that while plaintiff bears the burden of "pointing to an unequivocal waiver of immunity," which plaintiff's complaint herein fails to do,

> the United States is not entitled to summary judgment until it has established that the actionable conduct was the result of a choice grounded in social, economic or political policy.

Prescott v. United States, 973 F.2d 696, 702 (9th Cir. 1992).[1]

Thus, the defendant herein must show that its alleged conduct was a type of conduct considered discretionary within the meaning of 28 U.S.C. § 2680(a).  As discussed below, the evidence shows this to be the case.

The plaintiff alleges that defendant negligently failed to clear snow from plaintiff's military housing parking area or to take other corrective maintenance actions regarding snow and ice accumulation at the place where plaintiff fell.  (Pl.'s Am. Compl. ¶ 15.)  Defendant does not dispute that it had not cleared the snow from the parking lot that winter before plaintiff's fall.  However, this resulted not from negligence but from actions taken in conformity with the Snow Removal Policy issued by the Fort Wainwright Post Commander in the performance of a discretionary function, based on Defense Department directives and regulations committing management of housing to the discretion of the post commander and requiring the

---

[1]Under United States v. Gaubert, 499 U.S. 315, 324-325, 327, 113 L. Ed. 2d, 335, 348, 349, 111 S. Ct. 1267 (1991), and Berkovitz v. United States, 486 U.S. 531, 540, 547, 100 L. Ed. 2d 531, 108 S. Ct. 1954 (1988), plaintiff's complaint is subject to dismissal because it fails to allege jurisdictional facts specifically negating the discretionary function exception, such as an act in violation of regulations.  Since Gaubert involved a motion to dismiss, it considered sufficiency of allegations rather than burden of proof.  However, Berkovitz, 486 U.S. at 547-548, shows that what plaintiff must allege, plaintiff must also eventually prove.  These Supreme Court authorities cast doubt on the holding of Prescott, assigning to the defendant the burden of proof as to applicability of the discretionary function exception.  At least one Circuit has referred to Prescott as being "suspect" in this regard.  Kiehn v. United States, 984 F.2d 1100, 1105, n.7 (10th Cir. 1993).

commander to promote self-help by residents of military housing by means including assignment of snow removal duties to residents.  For this reason, this Court lacks subject matter jurisdiction of this action under 28 U.S.C. § 2680(a).

Dalehite v. United States, 346 U.S. 15 (1953), United States v. S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines) et al., 467 U.S. 797 (1984), Berkovitz v. United States and United States v. Gaubert are the landmark Supreme Court decisions construing the discretionary function exception.

The Court set forth a two-part test which determines the application of § 2680(a).  First, when determining whether challenged acts are of the appropriate nature, a court must "consider whether the action is a matter of choice for the acting employee . . . .  [C]onduct cannot be discretionary unless it involves an element of judgment or choice."  Berkovitz, 486 U.S. at 536.  See Dalehite, 346 U.S. at 42 ("To the extent, then, that the Army had a choice in the matter, its decision . . . was within the exception.").

Second, "assuming that the challenged conduct involves an element of judgment, a court must determine whether that judgment is of the kind that the discretionary function exception was designed to shield."  Id.  In enacting § 2680(a), "Congress wished to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy . . . ."  Varig Airlines, 467 U.S. at 814.  Thus, "[w]here there is room for policy judgment and decision there is discretion" of the kind protected by § 2680(a).  Dalehite, 346 U.S. at 36.

The issue is not whether a particular actor actually balanced social, economic or political considerations, that is, what the "agent's subjective intent" was.

Gaubert, 499 U.S. at 325; see also In re Glacier Bay, 71 F.3d 1447, 1454 (9th Cir. 1995), and Kiehn v. United States, 984 F.2d at 1105.  Rather, the focus of the inquiry is on "the nature of the actions taken and on whether they are susceptible to policy analysis."  Gaubert at 325.  Thus, even a government agent's negligent failure to consider all aspects of the matter does not alter the discretionary character of the decision.  See Kennewick Irrigation District v.United States, 880 F.2d 1018, 1028 (9th Cir. 1989).  "In sum, the discretionary function exception insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment."  Berkovitz, 486 U.S. at 537.

Further, any attempt to distinguish between the "planning level" and "operational level" of decision making has been rejected.  Gaubert, 499 U.S. at 326 (calling this "a non-existent dichotomy"); Gasho v. United States, 39 F.3d 1420, 1435 (9th Cir. 1994) (calling it "specious").  The question is not at what level the decision was made, but whether it was discretionary in nature:

> Discretionary conduct is not confined to the policy or planning level.  "[I]t is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case."  *Varig Airlines*, *supra*, at 813.

Gaubert, 499 U.S. at 325.

Even assuming negligence exists, the discretionary function exception applies if the challenged conduct is of the nature and quality that Congress intended

to protect.  This principle is compelled by the language of the discretionary function exception, which applies regardless of "whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).  As stated in <u>Dalehite</u>, "[i]t is clear that the just-quoted clause as to abuse connotes both negligence and wrongful acts in the exercise of discretion . . . .  The exercise of discretion could not be abused without negligence or a wrongful act." <u>Dalehite</u>, 346 U.S. at 33.  Negligence and wrongful acts, therefore, are exempt from liability where they are part of a discretionary decision or action.

<u>United States v. Gaubert</u> adds a factor of special importance in the present case in identifying a discretionary function:

> [I]f a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations.

<u>Id.</u>, 499 U.S. at 324.  This kind of regulation, allowing policy judgment and discretion, must be distinguished from the kind of regulation that allows no choice but mandates specific action.  An example of the latter kind was the regulation in <u>Berkovitz</u>, 486 U.S. at 547, requiring the testing of all vaccine lots and prohibiting release of any lot that did not comply with safety standards:  the government employee had no choice but to inspect and to prevent the release of any non-complying lot.  <u>See</u> <u>Kennewick</u>, 880 F.2d at 1026-1027, distinguishing such a "*specific* and *mandatory* regulation or statute" which removes discretion, and a statute or regulation which leaves "room for the exercise of discretion" in carrying out its

mandate.

       All of the regulations and directives in the instant case, cited below, are of the kind described in the above-quoted holding of <u>Gaubert</u>, that is, they delegated authority to the post commander to make discretionary decisions regarding the subject matter involved, i.e., "to act according to one's judgment of the best course." <u>Dalehite</u>, 346 U.S. at 34. The very existence of these directives and regulations, therefore, "creates a strong presumption that a discretionary act authorized by the regulation [i.e., the setting of priorities and allocation of resources for snow removal in relation to managing family housing] involves consideration of the same policies which led to the promulgation of the regulations." <u>Gaubert</u>, 449 U.S. at 324.

       Therefore, a tort action is barred by § 2680(a) if, as here, it is based on an attack on the discretionary decision itself and the acts of employees in carrying it out, rather than claiming employees were negligent performing a specific duty. The Supreme Court explains:

> It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable. If it were not so, the protection of § 2680(a) would fail at the time it would be needed, that is, when a subordinate performs or fails to perform a causal step, each action or nonaction being directed by the superior, exercising, perhaps abusing, discretion.

<u>Dalehite</u>, 346 U.S. at 36.

   b. <u>Issuance of DoD Directives and Regulations, and the Post Commander's Snow Removal Policy and the Residents' Handbook Based on Those DoD Policies and Requirements, Including Assigning Last Priority to Housing Area Parking Lots and Requiring Self-help by Residents, Was a Discretionary Function.</u>

   What plaintiff here attacks is the decision not to maintain the parking lot where plaintiff fell, except for plowing it once a year, and to assign to the residents, including plaintiff and her family, the responsibility for all other snow and ice removal as needed.  That decision, however, was not made by the employees who performed snow removal.  They were only carrying out the decision already made binding on them by the post commander in the Snow Removal Policy.  That Policy was based on Defense Department policy, directives and regulations committing housing management to the post commander's broad authority and discretion, and also encouraging him to promote self-help by residents, including assignment of snow removal duties at family housing to the residents, to the maximum extent practicable. Because that decision  –  both at the regulatory level and in the post commander's formulation of the Snow Removal Policy – was discretionary, the actions or inaction of subordinates in accordance with it are not subject to tort recovery.  <u>Dalehite</u>, 346 U.S. at 36.

i.    <u>Military Policy, Directives and Regulations
Committed Housing Management to the
Post Commander's Discretion, and Expressly
Encouraged Use of Self-Help by Residents in
Snow and Ice Removal For Reasons of Social,
Economic and Political Policy.</u>

Defense Department directives committed post management and the balancing of competing requirements to the commander's best judgment and discretion.  The highest authority in this regard is Defense Department Directive Number 4001.1, "Installation Management," September 4, 1986 (certified as current as of November 24, 2003, and therefore in effect at relevant times in this case), attached hereto as Exhibit 3, which includes the following:

3.1    The Commanding Officer of an installation is responsible for accomplishing the mission assigned to the installation, and should be delegated broad authority to decide how best to accomplish the mission, and is accountable for all resources applied to the mission.

3.2    Headquarters staff activities shall be directed toward facilitating any installation commander's ability to accomplish the mission.  Regulations that limit installation commanders' freedom to do their jobs are contrary to the basic DoD installation management policy, and shall be canceled or revised.  Exceptions should be rare.

Id., § 3 Policy.  This Directive is a political policy judgment giving top priority to the military mission and allowing the commander to decide how best to accomplish it.

Citing this Policy of broad authority and expressly applying it to military housing management, DoD Directive 4165.63-M, DOD Housing Management, Exhibit 4, was reissued in September 1993, accompanied by the statement of the Under Secretary of Defense that it

> complies with DoD Directive 4001.1, "Installation Management," September 4, 1986, which gives installation commanders broad authority to decide how best to accomplish their mission.

Id., Foreword, 2.  This Directive, 4165.63-M, further provides:

> The Heads of DoD Components, or designees, shall: Delegate to installation commanders broad authority, responsibility, and accountability for providing housing facilities and services in accordance with DoD Directive 4001.1 . . ..
>
> . . .
>
> The Installation Commanders shall:
>
> Provide excellent living conditions . . . for all military personnel, eligible civilians, and their families.

Id., C1.4.5.1, C1.4.6.1.

> Family housing shall be managed in a way that will
> provide excellent housing facilities and services for the
> occupants. Program evaluation shall be accomplished . . .
> to assure that operation, maintenance, and repair of DoD
> family housing are being performed to provide excellent
> facilities in the most cost-effective manner.

C2.1. The Directive also requires installation commanders to

> Promote self-help projects by housing occupants. Ensure
> that maintenance contracts allow for self-help work
> performed by occupants.

Id., C1.4.6.4. This Directive then states, at C2.8.1, the social policy reasons for
encouraging the promotion of the self-help program:

> Occupant self-help programs are encouraged as a
> means of improving living conditions while promoting a
> greater feeling of pride and homeownership.

The Directive further requires that "All housing occupants shall be informed and shall
acknowledge in writing their responsibilities" at the time they are assigned to

government housing.  C4.1.1.

Implementing these Directives, the Army as a component of the Defense Department issued on February 26, 1999, its latest version of Army Regulation 210-50, Installations, Housing Management, Exhibit 5.  The portions of this Regulation which are cited and relied on herein were also contained in the previous version issued in 1997and were in force at the time the 1998-1999 Snow Removal Policy for Fort Wainwright was issued in the fall of 1998, with the single exception of Appendix E itemizing self-help tasks.  See Ex. 5 at 3-6, "Summary of Changes", and "History" at 2.  This regulation requires installation commanders to "[p]rovide adequate housing facilities and services" and to operate their housing programs in accordance with the regulation.  § 1-14a and b.  It further requires that

> The basic Self-help program, which is in concert with the "prudent landlord" concept, optimizes the use of scarce resources, and gives residents a feeling of "homeownership", will be employed to the maximum extent practicable.

§ 1-18h.  This reveals political, economic and social policy reasons underlying the self-help program, and commits to commanders' judgment the determination of the extent to which use of the program is "practicable."

The February 1999 version of this regulation added a list of the basic self-help tasks which "can and should be performed by family housing residents," including the following: "Paved and stabilized areas . . .  4. Remove snow and ice."

Id., Appendix E at 11, 13.

This snow removal duty was not new when it appeared in Appendix E in February 1999. Appendix E particularized the already-existing requirement in the same regulation for residents to "cooperate with area . . . coordinators on common area responsibilities," Ex. 5, § 8-3b(1)(*l*), which included the residents' duty, at their own expense, to "remove ice and snow as necessary or required." Att. A to Ex. 1, Conditions of Occupancy, October 1, 1996, citing this regulation, AR 210-50. Appendix E was also a reiteration of the snow removal duty stated in the Handbook for Family Housing Occupants, DA PAM 210-2, issued September 15, 1971, and still in effect, Exhibit 6, making residents "responsible for taking proper care of" grounds including "parking areas, walks, areas around garbage containers," in addition to any "common grounds . . . as directed" where housing units border common grounds, id., § 6-1, and further requiring residents to remove snow and ice from paved and stabilized areas such as private drives, carports and "similar areas" giving direct access to quarters, and to apply sand or chemicals if ice cannot be removed. Id., § 7-5.

Thus, the residents' duty to "remove snow and ice" extends both to their own assigned premises and to "common areas" used by other residents in the neighborhood. They are obligated to "cooperate with area, building, and/or stairwell coordinators on common area responsibilities." Ex. 5, AR 210-50, § 8-3b(1)(*l*). The Residents' Handbook reflects this, and states that these responsibilities include ensuring that "all adjoining and common areas are clear of trash, snow and ice." Ex. 1, Att. B at 4, Att. C at 3. Residents are required to satisfy these obligations, AR 210-50, § 8-2b, and to "be familiar with the contents of the family housing residents'

handbook" provided by the post commander describing residents' responsibilities. §§ 8-3a(2) and b(1)(a).

When plaintiff and her family in 1996 moved into the family housing unit they occupied at the time of the accident, her husband signed the Conditions of Occupancy, acknowledging the residents' duty to conduct general maintenance at their own expense, including the duty to "promptly remove ice and snow as necessary or required." Ex. 1, Att. A at 2.

Hence, leaving to the family housing residents the responsibility for snow and ice removal in common areas such as the dumpster area in the parking lot where plaintiff fell was well-established in Defense Department and Army regulations and policy statements before the post commander, in his discretion, included it as an integral part of the total policy regarding snow removal on Fort Wainwright in 1998 and 1999.

Witnesses' testimony uniformly shows the general understanding that family housing residents are responsible for snow and ice removal in common areas such as the place where plaintiff fell. The area coordinator, Sajid Khan, testified repeatedly that he and others, "as a good resident" and as a matter of "our mutual responsibility," spread sand, salt and the like on all slippery conditions whenever these were observed in "common areas" including specifically the dumpster area where plaintiff fell. Khan Dep., Ex. 10, at 13, 16, 18, 19, 20, 21, 24, 25, 26, 29. He stated that the self-help center provided sand to residents for this purpose. Id. at 13. Post Commander John Curry testifies that residents are responsible to make slick areas safe, including not only their own quarters but common areas such as their parking areas, driveways and the area around dumpsters, and that he personally has

sanded the dumpster area serving his residence, and the path from his residence to the dumpster, and has encountered his neighbors doing the same. Curry Decl., Ex. 7 at 2, 6, ¶¶ 2, 7. Chief of the Housing Division Mae Harrell states that residents are responsible for parking lots, driveways and dumpster areas, Harrell Decl., Ex. 1 at 3, ¶ 5, and that the tools and supplies to carry out these duties are provided free of charge by the self-help center. Id. at 2, ¶ 2. The Director and the Foreman in DPW state that DPW sands roads but not housing area parking lots, driveways and dumpster areas and that residents are responsible for these areas, and can obtain sand, snow shovels and ice chippers for this purpose free of charge from the self-help center. Meeks Decl., Ex. 8 at 3, ¶ 4; Lowe Decl., Ex. 9 at 2-3, ¶ 4. As a practical matter, and under the Snow Removal Policy, DPW would not attempt to sand such localized slippery conditions in housing areas, but is limited to removing the hard-pack from the parking lot once in late winter. Ex. 8 at 3-4, ¶ 5; Ex. 9 at 3, ¶ 5.

The post commander properly relied upon this obligation on the part of residents – originating in Defense Department and Army policies which were well established, well known, and of long duration – and utilized it as an available resource in meeting the needs of the post and its mission as reflected in the Snow Removal Policy. Curry Decl., Ex. 7 at 6-7, ¶ 8.

      ii.      The Regulations on Housing Management
               And Self-Help Expressly Authorized the
               Use of Policy Judgment and Discretion
               By the Post Commander.

The policy statements, directives and regulations here were not of the

kind that excluded the exercise of discretion by the post commander. See Berkovitz, 486 U.S. at 547. Rather, they expressly committed installation management, housing management and use of self-help by residents to the discretion of the post commanders, while strongly encouraging the self-help program. See Gaubert, 499 U.S. at 324.

Army Regulation, 32 C.F.R. § 552.18(c), imposes a management obligation in terms which require commanders to make discretionary choices regarding how to manage installations efficiently and economically:

> The installation commander is responsible for the efficient and economical operation, administration, service, and supply of all individuals, units, and activities assigned to or under the jurisdiction of the installation unless specifically exempted by higher authority.

Army Regulation 210-50, § 1-18h, Ex. 5, requiring the post commander to utilize self-help by residents does not eliminate discretion. It grants discretion by adding the subjective judgment factor, "to the maximum extent practicable." These army regulations could not do otherwise, because they must conform to the higher authority, DoD Directive 4001.1, granting commanders broad authority to decide how best to accomplish their mission, and overriding any regulations to the contrary. The commander was thereby provided the discretion to determine the extent of snow removal the Army would conduct at family housing parking lots in view of the limited resources available for that purpose, and the extent to which self-help would

be required and relied upon in the maintenance of family housing areas.

DoD Directive 4165.63-M, Ex. 4, provides that self-help by residents is to be "promoted" and is "encouraged." §§ C1.4.6.4 and C2.8.1. It applies the "broad authority" for post management under DoD Directive 4001.1 to post commanders' housing management decisions. § C1.4.5.1. It calls for discretionary policy judgments by the commander by requiring that "excellent" facilities be provided in "the most cost-effective manner." § C2.1.

DA PAM 210-2 (1971), Ex. 6, is specific regarding residents' responsibility to take care of parking areas, drives, areas of garbage containers, and the like, and to carry out snow removal and sanding of ice on paved and stabilized areas. The commander was given discretion to utilize that duty as he thought best.

The entire regulatory regime required the post commander to balance post housing management and the conservation of economic resources with the paramount obligation to carry out the mission assigned to the installation, and it expressly encouraged utilizing residents' maintenance responsibilities in common areas as a resource in accomplishing this. It granted the commander broad authority to decide best how to meet these goals, and thus it committed the decision to his discretion.

Thus, the discretionary nature of the decision of the post commander is evident. It is of secondary importance what the post commander actually thought or did in carrying out the housing management function, or what his decisions were. His "subjective intent," whether he actually balanced social, economic or political considerations, is not the issue. Rather, the issue is "the nature of the actions taken and . . . whether they are susceptible to policy analysis." Gaubert, 499 U.S. at 325;

see also In re Glacier Bay, 71 F.3d at 1454; Kiehn v. United States, 984 F.2d at 1105.

However, the discretionary nature of the decision here is also evident, in any event, in the subjective decision-making process by which the post commander, using his best judgment, formulated the Snow Removal Policy, setting clear priorities, putting health and safety and military mission-related requirements at the top, and housing area parking lots at the lowest priority, to be cleared only once a year as "cleanup" shortly before break-up, and utilizing self-help by residents to the maximum extent practicable, for the military, economic and social policy reasons expressed by higher authority.  This was exactly the kind of discretionary authority in balancing of requirements and resources that was provided for in departmental directives and regulations.    The priorities and assignments of responsibility established in the Snow Removal Policy are evidence of this balancing process and of the commander's use of his best judgment on how to give precedence to the military mission, while accomplishing the other management functions within the limits of scarce economic resources, in accordance with the policy of utilizing residents' self-help as a means of conserving those resources.  The commander's resolution of these issues and responsibilities was a discretionary function within the meaning of § 2680(a).

Under the two-part test, this was clearly a process that presented the post commander with choices involving policy judgment; and that judgment involved social, economic and political policy not appropriate for "judicial second-guessing." Varig Airlines, 467 U.S. at 814.  The judgment involved was military, and therefore had political ramifications, in that the post commander was charged with deciding how best to accomplish the mission assigned to that installation.  DoD Directive

4001.1.  The policy judgment was also social, in that it required simultaneously that the commander must serve the survival interests of those persons residing and working on the installation and promote DoD's "pride-of-ownership" policy underlying the self-help program.  And the policy judgment was economic in that it also required judicious allocation of very limited resources to serve all these interests, as well as the regulatory mandate to save resources "to the maximum extent practicable" by the use of self-help to be performed by residents.

> [I]f a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations.
>
> . . .
>
> When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion.

Gaubert, 499 U.S. at 324.  The directives and regulations here fit the Supreme Court's description.  They all provide and ensure the broad authority, freedom of decision and therefore the discretion of the post commander.  The strong presumption applies in this case, that the commander's decisions in pursuance of these regulations "involve[d] consideration of the same policies which led to the promulgation of the

regulations." Therefore, the establishment and implementation of the Snow Removal Policy, reflecting the policies stated in DoD and Army regulations, that resulted in no plowing of the snow and no other winter maintenance at the parking lot prior to plaintiff's fall, and placing on the residents themselves the responsibility to deal with snow and ice problems at their own quarters and common areas, was a discretionary decision and function within the meaning of § 2680(a), and was exempted from liability under the FTCA.

      iii.    <u>Examples from Case Law Show that the Army's Inaction Regarding Snow and Ice Removal, in Reliance on Residents' Performance of that Duty, Was Discretionary, Under Regulations Providing For Discretion.</u>

While factual scenarios in the case law are not precisely the same as the instant case, they involve the same principles which support application of the discretionary function exception in this case where regulations committed the matter to the post commander's discretion.

In <u>Angle v. United States</u>, 931 F.Supp. 1386 (W.D.Mich 1994), affirmed 89 F.3d 832 (6th Cir. 1996), a small child suffered lead poisoning from ingesting chips of lead-based paint within the family's military housing unit on an Air Force base. As in the instant case, plaintiff asserted a claim arising under state tort law for the landlord's negligent failure to maintain the premises in a reasonably safe condition. The court, citing DoD Directive 4165.63 (an earlier version not materially different from the same directive cited hereinabove), held that the base commander was "vested with broad discretion and authority concerning the effective and efficient

management, use, and administration of military housing programs;" that the discretion "was also limited by budgetary constraints;" that the decision of how to deal with the lead-based paint hazard "impacted military resources, such as property, personnel, equipment and finances" and "had economic policy ramifications" and "political ramifications in that it affected the military housing program and, thus, the objective of the military;" and that "the defendant's inaction, therefore, was a judgment call" protected from liability as a discretionary function. Id. at 1396-1397. These are exactly the considerations underlying the judgment call of the post commander in the instant case, under the same DoD directive. The same kind of judgment call was also made by the Departments of Defense and of the Army in issuing the above-cited directives and regulations that promote and encourage the use of self-help by residents to deal with local issues like ice and snow, rather than committing scarce military resources to those problems. The post commander's "inaction" here in not dealing with a slippery spot at plaintiff's dumpster was discretionary in the same way, and under the same regulation, as the "inaction" of the military with regard to the lead paint hazard in Angle.

The court in Ayer v. United States, 902 F.2d 1038 (1st Cir. 1990), found discretionary a decision by an Air Force base commander not to put a safety railing around the edge of a platform in the control chamber of a launch facility. Plaintiff, a visitor, fell off the edge and was injured. Applicable safety standards required military departments "to achieve the optimum degree of safety within the constraints of operational effectiveness." This language was held to permit the exercise of judgment balancing technical, military and social considerations, and therefore involved "the exercise of policy-based discretion." Id. at 1043-1044. The regulations

in the instant case permitted discretion in much the same way, by granting "broad authority" in housing management, "promoting" and "encouraging" the use of residents' self-help, requiring use of self-help "to the maximum extent practicable," including the use of residents' self-help duties in dealing with local snow and ice control, and requiring housing to be "excellent" and to be provided in "the most cost-effective manner."

In <u>Aragon v. United States</u>, 146 F.3d 819 (10th Cir. 1998), plaintiffs complained of water wells contaminated by a toxic chemical used by a neighboring Air Force base to wash down aircraft during training as well as in wartime conditions. Plaintiffs cited Air Force manuals and an executive order allegedly requiring the military to use care in disposal of the toxic waste so as to avoid contaminating groundwater. The court found that these documents used terms such as "should", "insofar as practicable," "intended for guidance," and the like, and therefore allowed room for judgment. This reflected the military's need for "flexibility to weigh its groundwater protection policies against broader public and military policies." The court applied the holding of <u>Gaubert</u> that "when established governmental policy, as expressed or implied by statute, regulation or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." 146 F.3d at 826-827. Similarly, the directives and regulations here stated the established military, social and economic policies regarding the military mission, housing management, and the use of residents' self-help in that regard, and their language was equally unmistakable and distinctive as having committed these matters to the post commander's best judgment and discretion. It must be presumed that his discretionary acts under those directives

were grounded in those stated policies.

        iv.      <u>The Post Commander's Reliance on
             Self-Help by Residents for Snow and Ice
             Removal Was Also a Discretionary Economic
             Policy Judgment Due to Budgetary Constraints.</u>

Besides the policy reasons given in the directives and regulations, part of the reason for assigning to residents at Ft. Wainwright the responsibility for ice and snow removal was the economic necessity arising from budgetary constraints combined with the large amount of surface area on the post that required clearing. The post had over 3,286,000 square feet of surface requiring snow removal each year, over and above the housing area parking lots which contain over 406,000 square feet of area. In 1998-1999, DPW staffing for snow removal had suffered a 48% cut from the staffing level for the previous year, due to restrictions imposed by higher headquarters. Ex. 8 at 2-3, ¶ 3; Ex. 7, Att. A at 1. There was simply not enough time, manpower and equipment to clear the housing parking lots more than once a year, or for DPW to engage in sanding of such lots, in addition to their more pressing obligations for the rest of the post. Had DPW been assigned those tasks, the resulting demand in terms of manpower and time would have seriously jeopardized its ability to meet its higher priorities under the 1998-1999 Snow Removal Policy. Ex. 8 at 3, ¶ 4. Due to economic necessity, therefore, to meet military objectives, the ice and snow removal requirements at family housing areas were transferred to the residents, except for DPW's clearing the hard-pack once a year in late winter. Ex. 7 at 4-5, 6, ¶¶ 5f, 8. This was an economic policy judgment involving an exercise of discretion,

as one of several discretionary bases for the decision.  See Angle v. United States.

       v.     Actions and Inaction of Employees in
                Carrying Out These Policies Are
                Likewise Not Actionable.

        The fact that employees within the Fort Wainwright Directorate of Public Works (DPW) were the individuals who carried out the Snow Removal Policy does not alter this result.  The evidence is beyond dispute that those employees' actions and inaction were fully in accord with the terms of the Snow Removal Policy.  No snow plowing or other snow or ice removal activity was required before plaintiff fell on April 1, 1999.  The once-a-year plowing had been scheduled for March 9, but was postponed because vehicles had not been removed from the lot on that date.  Therefore, the lot was moved to the end of the list of lots to be plowed.  It was plowed sometime after plaintiff's April 1 fall.  This was exactly as prescribed in the Snow Removal Policy, Ex. 7, Att. A, ¶ 4d, pp. 3-4; Meeks Decl., Ex. 8 at 5.  The employees carrying out the terms of the Policy cannot be held accountable for its terms.  Accordingly, recovery is barred by § 2680(a) because "acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable."  Dalehite, 346 U.S. at 36.

       vi.     Plaintiff's Notice Theory is Invalid.

        Plaintiff claims (Am. Cmplt. ¶ 12) that Sajid Khan reported the slippery condition before plaintiff fell, and DPW was thus obligated under tort law to respond

with a corrective measure.  This theory is faulty for several reasons.  The factual record refutes plaintiff's contention.  No one had complained about that area before plaintiff fell.  Nor had Khan, before the accident, transmitted any complaint about it to the "mayor."  Khan Dep., Ex. 10 at 16, 19, 30.  And DPW had no knowledge of the problem.  Lowe Decl., Ex. 9 at 3.  Further, notice could have made no difference because the discretionary policy decision had already been made, to place on the residents alone the duty and responsibility to sand hazardous conditions in their common areas, which included driveways and dumpster areas.  That decision, seen in the Snow Removal Policy and the Residents' Handbook, was supported by Army Regulation 210-50, § 8-3b(1)(*l*), and DA PAM 210-2, §§ 6-1 and 7-5, making residents responsible for those areas.  DPW was not required to jeopardize higher priorities by dealing with local slick spots at housing areas.  These were left entirely to plaintiff, her husband and her neighbors to correct.  If this was an abuse of discretion, it was still a discretionary policy judgment.  Notice was immaterial for that reason and also because DPW would not as a practical matter have provided the unskilled hand work needed for a problem as ordinary as a slippery condition at the dumpster.  This was due to the post's large demand for snow removal services and DPW's extremely limited snow removal resources, and due to the residents' capability to handle the problem.  Meeks Decl., Ex. 8 at 3, ¶4.  In addition, it would have been impossible under these conditions for DPW to correct all such problems before people walked in those areas, whether or not DPW was given notice.

In order for the instant action to survive a motion for summary judgment, the record must show the existence of "facts which would support a finding that the

challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." <u>Gaubert</u>, 499 U.S. 324-425.  The record provides no such facts.  This action is barred by 28 U.S.C. § 2680(a).  Defendant is therefore entitled to judgment as a matter of law.

III.    TORT LIABILITY IS BARRED BECAUSE
        THE UNITED STATES IS NOT LIABLE FOR
        <u>DANGEROUS SNOW AND ICE CONDITIONS
        RESULTING FROM NATURAL CAUSES</u>

Plaintiff does not allege that the United States Army created a dangerous condition other than by failing to remove the natural accumulation of snow and ice in the parking lot at 4133 Neely Road.  Nor is there any evidence of a dangerous condition other than naturally caused accumulations of snow and ice, some amount of freezing and thawing, and the normal passage of vehicular and foot traffic.

The Alaska Supreme Court in <u>Hale v. City of Anchorage</u>, 389 P.2d 434 (Alaska 1964), held that the City of Anchorage was not liable for injuries sustained by a person who fell due to ice and snow on the sidewalk, where the ice and snow were the result of natural causes combined with the passage of vehicular and foot traffic and a weather pattern of snow aggravated by thawing and freezing.  The sidewalk sloped toward the street because of a curb-cut giving vehicles access from the street across the sidewalk to adjacent property.  The city was too busy to clear that area before the plaintiff fell on it.  Due to the weather patterns and the large volume of streets, sidewalks, unpaved walks and curb-cuts or driveways which the city had

to clear, "[i]t would be an impossible task" for the city to clear all such areas before they were used by pedestrians and vehicles and made more dangerous.  Id. at 437. The city was held to be

> not liable for injuries sustained by persons due to ice and
> snow on sidewalks, where climatic conditions such as we
> have discussed are prevalent and where the presence and
> condition of the ice and snow are the result of natural
> causes.

Id. at 437-438.

The court reaffirmed this standard in Morrison v. City of Anchorage, 390 P.2d 782 (Alaska 1964), applying it to a slip-and-fall involving both the sidewalk and the street.  The sidewalk had fairly smooth ice, and the street had slush next to the curb.  The court held that it would be impossible for the city to remedy all such conditions, and observed that most of the sidewalks and gutters in the city were as bad or worse, "through no lack of diligence on the part of the city."  Id. at 783-784.

Similarly in the instant case, Fort Wainwright has over 3,286,000 square feet of surface that requires snow removal each year before the Army could begin to conduct snow removal operations in the housing area parking lots.  Those parking lots alone contained another 406,000 square feet or more.  Public health and safety, and military and economic necessity, required attending to all other snow removal duties on the post before dealing with housing area parking lots.  DPW's limited resources had previously, in 1997-1998, required reduction of the clearing of housing

area lots from twice per winter to once per winter.  In 1998, DPW suffered yet another cut in snow removal resources, amounting to a 48% reduction from the prior year's level.  In addition, snow was still falling at Fort Wainwright up to and including March 28, 1999.  There were 3.5 inches of new snow in March, and approximately 12 inches of snow on the ground on April 1, 1999. Ex. 2 at 2, 4.  The result was that DPW could not do any more than the once-a-year clearing of plaintiff's parking lot which occurred in this case, without seriously impairing DPW's ability to meet the higher priorities assigned by the post Snow Removal Policy which reflected the needs of the post.  Meeks Decl., Ex. 8 at 3, ¶ 4.

In short, "it would be an impossible task" for DPW to have cleared or remedied all the slick spots like the one on which plaintiff fell, before anyone used them, in the more than 400,000 square feet of housing area parking lots DPW had to deal with, after meeting all other higher priority snow and ice removal requirements on the post. Hale; Morrison.  Under Alaska law, these entirely natural accumulations of ice and snow, aggravated by alternate freezing and thawing and by the passage of vehicular and foot traffic, do not result in liability for slip-and-fall injuries in light of the large amount of area on Fort Wainwright requiring snow and ice removal and the extremely limited resources available with which to do so.  The United States is not negligent and not liable in this situation.  Id.

The Ninth Circuit has previously approved application of the Hale rule in federal tort claim suits.  In Hollinger v. United States, 651 F.2d 636 (9th Cir. 1981), the surface on which plaintiff fell, a slightly snow-covered re-fueling platform on Elmendorf Air Force Base, was rendered slippery not only by natural causes but also by the fact that it had been previously painted with high gloss enamel paint

which made the surface extremely slippery.  The court observed:

> If the district court's finding of negligence was based
> exclusively on the presence of ice and snow on the
> platform,  Hale [v. City of Anchorage]  would be
> controlling.

Id. at 639.

Likewise, here, the slippery condition "was based exclusively on the presence of ice and snow" in the dumpster area where plaintiff fell.  Hale is controlling.  The United States is not liable for plaintiff's injuries under Alaska tort law and the Federal Tort Claims Act.

## CONCLUSION

The decision to clear snow from plaintiff's parking lot only once a year and to assign all other snow and ice removal to plaintiff and her neighbors was discretionary and not subject to tort liability.  This action is therefore beyond this Court's jurisdiction.  28 U.S.C. § 2680(a).  In any event, the United States is not liable under Alaska law because the condition of the snow and ice where plaintiff fell resulted from natural causes and it would have been impossible for DPW to remedy it considering the large volume of area on post requiring snow removal.  On both of

the foregoing grounds, or on either ground separately, this Court should enter summary judgment for defendant, dismissing plaintiff's complaint.

DATED this 31st day of January, 2006, at Fairbanks, Alaska.

DEBORAH M. SMITH
Acting United States Attorney

s//STEPHEN COOPER
STEPHEN COOPER
Assistant United States Attorney
Federal Building and U.S. Courthouse
101 12th Avenue, Room 310
Fairbanks, Alaska 99701-6282
Phone: (907) 456-0245
Fax: (907) 456-0577
E-mail: Stephen.Cooper@usdoj.gov
Alaska #6911028

**CERTIFICATE OF SERVICE**
I certify that a true copy of the foregoing
**MOTION FOR SUMMARY JUDGMENT**,
and **ORDER** were sent to Robert A. Sparks
on January 31, 2006, via electronic means.

_____ s//STEPHEN COOPER