# EXHIBIT 8

DEBORAH M. SMITH
Acting United States Attorney

STEPHEN COOPER
Assistant United States Attorney
Federal Building & U.S. Courthouse
101 12th Avenue, Box 2, Room 310
Fairbanks, Alaska 99701
(907) 456-0245

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| CAROL BOLT, | ) No. F02-0021 CV (RRB) |
| Plaintiff, | ) |
| vs. | ) **DECLARATION OF MICHAEL T. MEEKS UNDER 28 U.S.C. § 1746** |
| UNITED STATES OF AMERICA, | ) |
| Defendant. | ) |

I, Michael T. Meeks, declare under penalty of perjury:

1. I have been the Director of Public Works at Fort Wainwright, Alaska, since 1997. The Directorate of Public Works (DPW) was responsible for conducting snow removal operations in accordance with the Snow Removal Policy issued each year by the Post Commander. As Director of Public Works I was

1

Exhibit 8   Page 1

familiar with the snow removal requirements and the resources available to meet them, and based on this, I proposed a snow removal plan for the post to the Post Commander in the fall of each year.

    2.    In September 1998, based on my proposals and on other applicable considerations, the then-Post Commander Lt. Col. John J. Curry issued the Snow Removal Policy governing snow removal during the winter of 1998-1999, setting a series of five priorities with health and safety requirements and military mission-related requirements in top priority, and with housing area parking lots in last priority to be cleared once per year, and assigning to residents of family housing all other responsibility for snow and ice removal and the sanding of hazardous areas at their quarters and common areas. The priorities and assignment of responsibilities set forth in the 1998-1999 Snow Removal Policy reflect my estimates of the requirements for the post under the terms of applicable directives and regulations and also my knowledge of Fort Wainwright and what is needed to keep the post functioning in winter conditions, as well as my knowledge of the limited manpower, equipment and other resources I had with which to meet those requirements.

    3.    Fort Wainwright had at that time over 3,286,000 square feet of surface requiring snow removal, over and above the housing area parking lots which contained over 406,000 square feet of area. Two years earlier, the Snow Removal Policy had provided for DPW to clear the parking lots in housing areas twice during the winter. In 1997-1998 this was reduced to once per winter, due to reductions in resources imposed on DPW by higher headquarters. Before the winter of 1998-1999 set in, DPW suffered yet a greater reduction, of 48% of the

prior year's staffing level for snow removal operations. DPW was without the resources in manpower and equipment to meet all the snow removal needs of the post and provide any more than the required once-per-year clearing of housing area parking lots in late winter. The purpose of this clearing was to get rid of the hard-pack before break-up renders the lot difficult to use.

    4.    DPW conducted snow removal using large heavy equipment such as graders, augurs and dump trucks, which are utilized in clearing only unoccupied parking lots and helicopter landing areas as well as streets, intersections, runways, taxiways, and the like. The equipment is not suited to sanding localized slippery spots such as driveways, walkways and dumpster pads. This unskilled hand work is not, and was not, a duty or function of DPW and was not required under the Snow Removal Policy. If it were added to DPW's responsibilities, the resulting demand in terms of manpower and time would have seriously impaired DPW's ability to meet its snow removal priorities under the 1998-1999 Snow Removal Policy with the conditions and resources then existing. The responsibility for slippery conditions in housing area parking lots and driveways was assigned to the residents under the post Snow Removal Policy, as has always been the case while I have been associated with DPW. DPW gives the residents the tools and supplies without cost, to carry out these duties. Sand, ice-melt, snow shovels and ice chippers are available to residents for this purpose at the self-help center on post.

    5.    If DPW had received any complaint of slippery conditions at the dumpster area or driveway in the parking lot at Building 4133 during the late winter of 1998-1999, DPW would not under the Snow Removal Policy and as a

practical matter, have responded by attempting to sand or otherwise correct the situation for the reasons stated above in ¶ 4 hereof. DPW would leave that task to the residents who have the responsibility and the capability to take care of it with supplies available from the self-help center. The only action DPW was authorized to take and could take as a practical matter was to schedule the lot for clearing and to use its heavy equipment to clear the hard-pack from the parking lot after all vehicles are removed from the lot.

      6.    The Snow Removal Policy as well as specific schedules for clearing of lots were in 1998-1999, and always are, widely publicized on post, by publication in the post newspaper, posting in public places such as the commissary and troop units, briefing at mandatory town hall meetings, and on a special telephone line at 353-SNOW. DPW adopted a set schedule for clearing housing area parking lots in the late winter. In addition to the other methods of notification, the Snow Removal Policy required a notice of the clearing of each particular lot to be posted with a distinctive sign three days in advance of clearing. If on the scheduled day any vehicle was left in the lot, that lot would not be cleared, and it was to be moved to the bottom of the list of lots to be cleared, at which time it would be posted again and cleared if all vehicles were removed.

      7.    Following publication of the Snow Removal Policy and the schedules for operations pursuant to it, residents hold DPW to the published terms. I have reviewed the one-page document testified to by Richard Lowe as applicable to DPW's winter operations in 1998-1999, showing that Building 4133 was scheduled for snow removal on March 9. I am familiar with these

Exhibit 8   Page 4

schedules, although I have no independent recollection of the clearing of the lot at Building 4133. My instructions and the practice of DPW were that all snow removal was carried out in accordance with the Snow Removal Policy then in force. That Policy was an order of the Post Commander and was required to be followed. If the lot at Building 4133 was not cleared on March 9, 1999, due to one or more vehicles left in the lot on that date, and was cleared at a later noticed date, with no other action taken by DPW regarding snow or ice at that housing area the entire winter season, that would have been in accord with my instructions and with the priorities and responsibilities assigned in the 1998-1999 Snow Removal Policy issued by the Post Commander. If DPW had deviated from the 1998-1999 Snow Removal Policy in any significant way such as failing to clear any housing area lot on the scheduled date when the lot was free of vehicles on that date, I would have known of it because I was fully and currently informed of operations at that level. No such deviation came to my attention.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 30th, 2006.

Michael T. Meeks