Robert A. Sparks
Law Office of Robert A. Sparks
1552 Noble Street
Fairbanks, Alaska  99701
Phone:  (907) 451-0875

Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| CAROL BOLT | ) | |
| | ) | |
| Plaintiff, | ) | case No. F02-0021cv (RRB) |
| | ) | |
| vs. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Carol Bolt, by and through her attorney, Robert A.

Sparks, Opposes the Motion for Summary Judgment filed herein by

the Defendant United States.  Defendant United States is liable

under the Federal Tort Claims Act in this case for its negligence

in failing to perform proper maintenance of the parking lot

serving Plaintiff Carol Bolt's multi-tenant residential apartment

complex on Ft. Wainwright.  Discretionary immunity does not

shield the U.S. from liability in the present situation where it

has failed to comply with mandatory policies requiring snow

removal.  Any exercise of discretion by the Army in formulating

Bolt v. U.S.
page 1

its snow removal plan were not the types of decisions shielded by discretionary immunity. The United States had constructive notice through prior similar incidents involving falls on snow and ice that failure to remove the snow from Plaintiff Bolt's parking lot could result in creation of a slippery hazardous condition for apartment residents during warmer temperatures, especially during breakup in March and April, and lead to serious personal injuries.

## FACTS

During the winter of 1998-99, Carol Bolt, wife of Kevin Bolt, a member of the U.S. Army, was living with her husband and young son in an apartment owned and managed by the U.S. Army for military members and their dependents at Ft. Wainwright, Alaska. The apartment building in which Ms. Bolt resided contained multiple apartments and the parking lot serving the complex was surrounded by two other similarly sized buildings in a U shaped arrangement.

Defendant's Exhibit "4" at page 4 states that the "Installation Commanders shall: . . . C1.4.6.9. Protect members and their families from environmental and safety hazards in housing areas." Defendant's Exhibit 4, p. 4. In executing this discretion, the Commander of Ft. Wainwright established mandatory installation snow removal policies, tenant handbook

Bolt v. U.S.
page 2

responsibilities for snow and ice removal and established a Senior Occupant Program to provide supervision and inspection of the military residential tenants' execution of their duties assigned to them in the Tenant Handbook.

The Army snow removal plan for 1998-99 assigned the following responsibilities for the removal of snow:

2.    **RESPONSIBILITIES**:

a.  The Directorate of Public Works is responsible for the overall snow and ice control operations on the Fort Wainwright cantonment area in accordance with the USARAK Snow Removal Policy dated 21 January 1997. Other area and unit responsibilities are as designated in subparagraphs b through f below.
. . .
c.   Family housing occupants are responsible for removing snow and ice on steps, porches, fire hydrants, post office box drops, driveways, and sidewalks to a point at least halfway to adjoining quarters. Occupants will sand hazardous areas.  Sand will be available for pickup from Public Works.  For further information call 353-7870.

d.  Housing area unit sponsors are responsible for the removal of snow and ice from sidewalks, post office drop boxes, bus stops, and mechanical room accesses within their areas of responsibility when it is not accomplished by area occupants.

. . .

3.    **PRIORITIES:**

a.  Snow removal operations are conducted on a sequential priority system which is subject to change during emergency situations, such as continuous heavy snowfall or high winds.

b.  The Post sequential priorities are as follows:

(1) *Priority 1*-**HEALTH AND SAFETY**.

. . .

    (2) *Priority 2*-MISSION RELATED.

. . .

    (3) *Priority 3*-ROADS & AIRFIELD PHASE II

. . .

    (4) *Priority 4*-PARKING AREAS FOR PUBLIC SERVICES &
       ADMIN.

. . .

    (b) Other Parking areas including Administrative Facilities
. . .; Unaccompanied Personnel Housing and Billeting . . ..

    (5) *Priority 5*-CLEANUP

    (a) Roads cleared of snow berms.

    (b) Family Housing Areas (cleared once per year in late
February or March). Lots will be posted in advance and will be
worked as priorities permit between snow storms.

    4. <u>**NOTIFICATION AND IMPLEMENTATION OF PLAN:**</u>

. . .

    d. <u>Special Notice</u>: The time and date of snow removal
operations in parking lots and other congested areas
will be posted with distinctive signs three days in
advance of clearing. Vehicles in areas to be cleared
will be removed to facilitate snow removal. Areas in
which vehicles have not been removed will be bypassed
and moved to the bottom of the list due to the
possibility of damage and Government liability.

<u>see</u> Appendix 1, 1998-99 Snow Removal Policy. This document was

signed by John L. Curry, LTC IN, Post Commander.

    The Occupant Handbook that was apparently in effect during

1998-99, was accompanied by a letter that identified the Senior

Occupant of the building and described his responsibilities:

Bolt v. U.S.
page 4

To help maintain effective communication with the residents of family quarters, the senior soldier of each building has been appointed as the Senior Occupant for the term of one year. The Senior Occupant's job is to assist in keeping our community a harmonious place to live, as well as assisting the elected mayor of your housing area. The Senior Occupant of your building/area will be contacting you within a few days to explain your responsibilities concerning the maintenance and policing of the area surrounding "your home," and other matters related to the residency of family quarters on Fort Wainwright. It is expected that a cooperative relationship be developed among all residents. Should an incident occur or conditions exist that are beyond your authority or capacity to resolve, please bring it to the attention of your Senior Occupant, Mayor or Post Services.

Appendix "2" Letter w/1998 Occupant Handbook. The Occupant

Handbook described the tenant's responsibility as:

Your area of responsibility includes the yard that falls within your logical lot line, i.e. one-half the distance to the next dwelling unit, but normally not more than fifty (50) feet from your unit, whichever is less. The area between the sidewalk and the streets to include front and side if on a corner lot, is also your responsibility. You should ensure that sidewalks, driveways and porches are kept clean and free of trash, snow, obstructions and other hazards such as pets.

Appendix "3" 1998 Housing Handbook page 3. The handbook

specifically stated regarding the removal of snow and ice:

During the winter season, residents are responsible for the removal (within 24 hours) of snow and ice from steps, porches, driveways, mailboxes, and sidewalks in the front and rear of their quarters to a point of at least halfway to the adjoining quarters. . . ..Ice melt is available through Self-Help; however, remove snow from the sidewalk prior to sprinkling the ice melt (Do not expect ice melt to melt the snow so that you do not have to shovel.) If you have a fire hydrant in your yard, you are responsible for shoveling the snow three

Bolt v. U.S.
page 5

(3) feet around the hydrant and include a two (2) foot
wide path from the hydrant to the nearest street.  The
Mayoral Program also sponsors a holiday decoration
competition during the December holiday season.

**It is the Senior Occupant's responsibility to insure
all resident's comply with these instructions.
Coordination of building residents is necessary to
insure all adjoining and common areas are free of
trash, snow and ice.**  It is expected that, by
performing these duties, a harmonious and cooperative
relationship be developed between all housing residents
of Ft. Wainwright.  See the Senior Occupant section on
page 55 for more information.

Appendix "4" 1998 Resident Handbook, pp. 3-4 (emphasis added).

The housing handbook further provides regarding snow removal

that:

Snow removal at your on-post quarters and duty sections
is the responsibility of the resident.  Keep ice and
snow cleared from your threshold, porches, parking area
and sidewalks on both sides of your "home".  These
areas must be kept clean at all times for access in
case of an emergency.  If you have a fire hydrant in
your yard it is **your** responsibility to keep the snow
shoveled within three (3) feet around the hydrant and
include a path at least two (2) feet wide from the
hydrant to the nearest road.  When an emergency is
called in, the Fire Department cannot put out fires
when the hydrants are buried under the snow.

Periodically, you will receive a notice to relocate
your vehicle.  Please move your vehicles before we get
to your street or parking area so we can clear the snow
from these areas.  For safety and legal reasons, we
cannot clear snow from parking areas with cars left in
the way.  **When your vehicle is not moved until after we
have plowed an area, we often do not come back until
the next snowfall.**  This causes an inconvenience to
yourself, your neighbors and guests.  If you have a
vehicle that is not operational, you *must* place it in
the recreation lot.  Please insure your children keep

Bolt v. U.S.
page 6

toys and sleds out of the roads, parking lots and sidewalks during snow removal. . . .

Snow removal by Public Works begins when there is a 4" accumulation. The exception is the 2" requirement for C-12 landings at the airfields. Snow removal in housing areas is accomplished on a priority four (4) basis.

> Priority 1 - Fire stations and main fire and
>             emergency roads.
> Priority 2 - Mission essential and training roads
> Priority 3 - Troop/Housing Rds/consumer svcs
> Priority 4 - Public **services/parking areas for
>             housing**.
> Priority 5 - Parking lots

Appendix "5" 1998 Handbook at 17-18 (emphasis added).

The Handbook explains the Senior Occupant Program as follows:

The Senior Occupant's Position is appointed by the Post Commander for the term of one year. In the event the Senior Occupant clears quarters, the next senior person will be appointed as the Senior Occupant to complete the term. The Senior Occupant's responsibility will not be delegated to family members. The Senior Occupant is an additional duty which includes input to your OER/NCOER. The Senior Occupant sign must be posted at all times. To obtain a sign contact Post Services, 353-7663.

**Senior Occupants are responsible for the supervision, as necessary, of resident policing and appearance of your building.** Included in these duties are: policing of lawns, including the street in front, rear, and sides of quarters, maintenance of lawns and flower beds to include lawn mowing, ensuring areas adjacent to the postal pads and dumpsters are clean and free of debris at all times, timely **removal of snow and ice from steps, porches, driveways, and sidewalks in front and rear of their quarters to a point of at least halfway to adjoining quarters** and ensuring that all residents

Bolt v. U.S.
page 7

are aware of post regulations concerning registration and control of animals, daily policing of animal feces, parking in family quarters areas and maintaining quiet hours.

**The Senior Occupant is responsible for coordinating with the Senior Occupant(s) of adjacent buildings to ensure all adjoining grounds for which you have responsibility are policed.** It is expected that, in performing these duties, a harmonious and cooperative relationship will be developed between yourself as the Senior Occupant and the residents of the building you have been assigned.

In the event deficiencies occur or conditions exist that are beyond your authority or capability to handle, you need to report to your Mayor. If your Mayor is unable to resolve the problem, contact Post Services at 353-7663 or the Post Commander.

Appendix "6" 1998 Handbook, at 56 (emphasis added).

The Senior Occupant of Plaintiff Bolt's Building was Sajid Khan. Appendix "7" Khan depo. at 4-5, 31. Sgt. Khan was a Staff Sergeant in the Army during the Spring of 1999. Apprendix "7" Khan depo. at 5. Sgt. Khan lived in the same apartment building as Plaintiff Bolt. Appendix "7" Kahn depo. at 12. Sgt. Khan testified that the snow in Ms. Bolt's apartment parking lot was not removed during the entire winter of 1998-99. Appendix "7" Khan depo. at p. 28/l. 4 - 7.

Sgt. Khan testified at his deposition that the parking lot near the dumpster in the apartment parking lot was a "tricky spot":

A: Well, what happened was, again, as far as my memory – memory lane can take me, there was a sudden weather

Bolt v. U.S.
page 8

inversion, the temperature rose, and things started melting down, and then suddenly, you know, at night it cools down and it freezes.

So it froze, and I think that caused some kind of a black ice or more slippery kind of thing. And I know many times myself, you know, and other residents would kind of trip when walking. It's pretty tricky at that time of the year when this happens.

Appendix "7" Khan Depo. at p 12/l.23 - 13/l. 8. Sgt. Khan claimed that he had "throw in, you know, salt, dust, salt and stuff, you know to take care of that situation, sand." Appendix "7" Khan Depo. at p 13/l.9-14.

However, in Sgt. Khan 's statement that he gave to Plaintiff Bolt's private investigator during November 1999, Sgt. Khan did not mention that he or anyone else had spread any sand, gravel, salt or any other traction material in the apartment parking lot. See Appendix "8" Khan 11/99 statement transcript. Sgt. Khan stated to Plaintiff Bolt's private investigator:

Q: Do you (cough) excuse me . . .do you recall if the area near the dumpster was icy at the time of Mrs. Bolt's fall?

A: Ah, yes of course.

                        . . .

Q: Do you believe that the area near the dumpster where Mrs. Bolt fell would have been safer if the snow removal service had been performed as scheduled instead of cancelled.?

A: Absolutely.

Q: And ah, please explain.

Bolt v. U.S.
page 9

A: I mean, if you didn't have snow there, you know, ah, that's a very tricky spot we had. I had a couple of real close calls myself, you know. And, ah, it just the way it was there I think probably, um, the water which had collected there became. . had turned into ice, you know, had ice, and I think that's what made it very slippery and dangerous, you know to trudge on.

Appendix "8" Khan 11/99 statement transcript at 3-4. When Plaintiff Bolt's investigator asked Sgt. Khan to describe his duties as the Senior Occupant/Area Coordinator, Sgt. Khan did not mention spreading gravel or sand in the parking lot, but stated that he was responsible for ensuring a "healthy, safe environment, you know." Appendix "8" Khan 11/99 statement transcript at 4.

Discovery has shown that in the four years prior to Plaintiff Bolt's fall, that there were nine injury accidents reported from falls on walkways and parking lots at Ft. Wainwright. See Appendix "9" Tilly Affidavit; Appendix "10" Prior Incidents. At least five of the incidents occurred in parking lots. Three of the incidents occurred during the Spring of 1998, within two weeks of the same date as Plaintiff Bolt's incident 1999 fall. Appendix "10" Prior Incidents.

It is not surprising that there are no reported incidents involving military spouses or children in residential parking lots, because there are no requirements for reporting any injuries to civilian residents of Ft. Wainwright. Appendix "10"

Bolt v. U.S.
page 10

Ciclese depo at p. 10.    Even a soldier can slip on the ice at

Ft. Wainwright and be injured and it may never be reported.

Appendix "11" Cicilese depo. at 19.

    Plaintiff Bolt took the 30(b)(6) deposition of the Defendant

on the following subjects:

    1.  Any fall on ice or snow subsequent to April 1,
1999, that caused personal injury at Ft. Wainwright.

    2. Official policy regarding inspection of residential
housing units and grounds at Ft. Wainwright, to present
and back to five years prior to April 1, 1999.

    3.  Reports or reviews conducted by the Safety Office
or other offices at Ft. Wainwright regarding injuries
from or reduction of falls on ice or snow, to present
and back to five years prior to April 1, 1999.

    4.  Any actions taken by Post Safety Office or Army to
reduce personal injuries from falls on ice or snow at
Ft. Wainwright, to present and back to five years prior
to April 1, 1999.

    5.  Notice or knowledge of Ms. Bolt's fall at the Post
Safety Office and date of such notice.

    6.  Remedial actions taken by the Army following Ms.
Bolt's fall.

    7.  Remedial actions taken by the Army following any
other fall on ice or snow that resulted in personal
injuries, to present and within the five (5) years
preceding April 1, 1999.

Appendix "12" 30(b)(6) Deposition Notice.

    The Defendant's representative, John Cicilese testified that

he was not aware of any policy for inspection of residential

housing units and grounds at Ft. Wainwright at any time prior to

Bolt v. U.S.
page 11

the deposition.   Appendix "11" Cicilese Depo. at 5-6.[1]    Mr.
Cicilese was not aware of any reviews or reports prepared by the
Safety Office or any other office at Fort Wainwright concerning
reduction of falls on ice and snow, other than investigation of
individual complaints or discrete notices of concern received by
the Safety Office.   Cicilese Depo. at 6-11.   The Army Post
Safety Office has not changed any policies or taken any other
actions or steps to reduce injuries from falls on ice at Ft.
Wainwright during the five years prior to Plaintiff Bolt's fall.
Appendix "11" Cicilese Depo at 6-11, 14-15.   Mr. Cicilese
disputed that the snow would be cleared from residential parking
lots on Ft. Wainwright only once per year.   Appendix "11"
Cicilese Depo. at 16.  He testified "I don't know that.  It's not
– to my knowledge, it's removed as soon as they can get to those
areas after a snowfall."  Appendix "11" Cicilese depo at 16.

     Mr. Cicilese was not aware of any remedial actions taken by
the Defendant following any prior fall on snow or ice that
resulted in personal injuries at any time within four years prior
to April 1, 1999.  Appendix "11" Cicilese depo. at 18.

     Mr. Cicilese testified that the weather conditions at the
time of Mrs. Bolt's fall were particularly hazardous because,

[1]Although Mr. Ciclese claimed to have no knowledge prior to
his arrival at Ft. Wainwright during August 1999, the Defendant
failed to produce any other deponent with more knowledge.

Bolt v. U.S.
page 12

> A: No.  We have a different ice because of the
> temperature.  I – roads and sidewalks are really more
> dangerous at temperatures between zero and thir – and
> 32.  When it gets below zero, it's not as – as
> slippery, because at that point, because of the
> temperature, as you walk over a patch of ice, you –
> you're basically melting it.  But it – since it's so
> cold, it ends up staying solid, so you're not walking
> on that sheen of water, you might say, on the ice.  And
> reduces the, you know, the slips. . . .

Appendix "11" Cicilese Depo. at 11.

Despite the prior incidents involving falls in parking lots and walkways, there was no provision in the snow removal plan for Ft. Wainwright for any sanding of any parking lot or walkway. Appendix "13" John Curry Depo. at 46-48.  The daycare center, the PX and Commissary and other parking lots serving the public were supposed to be sanded on an "as-needed" basis.  Appendix "13" John Curry Depo. at 46, 48-49.

Paul DeHaven, was the shop supervisor roads and grounds for the Ft. Wainwright DPW during 1998-99.  Appendix "14" Paul DeHaven depo. at 5.  He described the snow removal method in the residential parking lots as being conducted with road graders breaking up the hard-pack snow, it being piled up and loaded in dump trucks with loaders.  Appendix "14" Paul DeHaven depo. at 10.  Mr. DeHaven did not mention that a trouble call could not be made for correction of slippery conditions in a residential parking lot.  Appendix "14" Paul DeHaven depo. at 12.  10.  Mr. DeHaven testified that:

Bolt v. U.S.
page 13

Q: Did you have the ability to send sanding trucks out to sand in the entrances to the residential apartment parking areas at Fort Wainwright if you believed that they were hazardous?

A: I could have if I had known about it. We'd have probably responded to the first call and put it out and then after that, we'd have contacted housing the housing department and see if they wished to continue it because she had to sit there and pay for it. So all the work we did in housing area was reimbursable.

Appendix "14" Paul DeHaven depo. at 19-20 (and 16). Mr. Dehaven agreed that the areas in front of the dumpsters in the residential parking lots got icy from cars going in and out of the lots, similarly to other intersections on Ft. Wainwright that had traffic. Appendix "14" Paul DeHaven depo. at 15.

On April 1, 1999, on her way to work, Plaintiff Carol Bolt took her trash out to the dumpster at her apartment complex around 8:00 A.M. as she was preparing to go to work. Mrs. Bolt was wearing rubber soled tennis shoes and tried to walk as carefully as she could to the dumpster. Mrs. Bolt slipped and fell just a few feet from the dumpster, landing on her right ankle, breaking it. Appendix "15" Carol Bolt Affidavit. Ms. Bolt's ankle required an open reduction to set and due to her pregnancy, Mrs. Bolt was awake for the operation and could feel the surgeon sewing up her ankle. Appendix "15" Carol Bolt Affidavit. Mrs. Bolt's ankle has never completely healed and she still suffers from a permanent disability due to her broken

Bolt v. U.S.
page 14

ankle.  Appendix "15" Carol Bolt Affidavit; Appendix "16" Dr. Gaw Affidavit.

Mrs. Bolt testifies in her affidavit that when she fell near the dumpster at her apartment parking lot on Ft. Wainwright on April 1, 1999, that there was no sand, gravel, or any other traction material on the ground any place near where she fell. Appendix "15" Carol Bolt Affidavit.  Mrs. Bolt further states that the surface of the ice at the spot where she fell was uneven and very slippery and hazardous for walking.  Id.  Mrs. Bolt explains that she believes that it was unreasonable for the Army to fail to remove the snow from her parking lot prior to her fall, because they came after her fall and removed the snow without all of the vehicles being removed from the lot.  Appendix "15" Carol Bolt Affidavit.

Mrs. Bolt and her husband both deny that they were ever told that they or other apartment residents were responsible for removing the snow and ice from their apartment parking lot. Appendix "15" Carol Bolt Affidavit; Appendix "17" Kevin Bolt Affidavit.  In fact, the year prior to her fall, during the 1997-98 winter, Kevin and Carol Bolt testify in their affidavits that the apartment residents all chipped in and purchased a snow blade for one resident's four-wheeler to plow the snow out of the parking lot.  However, the Army did not let them plow the snow

with the plow. Appendix "15" Carol Bolt Affidavit; Appendix "17" Kevin Bolt Affidavit.

Kevin Bolt further states in his affidavit that when he talked to Mr Khan about Carol's fall, that Sgt. Khan  told Kevin that Sgt. Khan  had received numerous complaints about the icy conditions in the parking lot.  Appendix "17" Kevin Bolt Affidavit. Sgt. Khan  told Kevin that he had been trying to get the Army to do the parking lot. Appendix "17" Kevin Bolt Affidavit.  Mr. Bolt also testifies in his affidavit that he was aware that another parking lot in a residential area, the officer's parking lot, had been cleared by the Army with cars still in the parking lot.  Id.  Mr. Bolt knew that the officer's parking lot had been cleared by DPW prior to Carol's fall, because he saw that the snow had been removed and the vehicles in the lot still had ice and snow underneath them.  Id.

ARGUMENT

The United States Motion for Summary Judgment must be denied, because (1) there was no discretion under the snow removal plan and housing handbook for removal of the parking lot snow and remedying of hazardous areas and discretionary immunity does not apply, and (2) the fact that Army personnel were required to work within a budget did not make their failure to maintain Plaintiff Bolt's parking lot in a safe condition a

Bolt v. U.S.
page 16

discretionary function for purposes of the FTCA

I. The Scope of Discretionary Immunity.

The United States is not entitled to rely on discretionary immunity where "the challenged governmental activity involves safety considerations under an established policy rather than the balancing of competing public policy considerations, the rationale for the exception falls away and the United States will be held responsible for the negligence of its employees." See ARA Leisure Services v. U.S., 831 F.2d 193, 195-96 (9th Cir. 1987).

In Kennewick Irrigation District v. U.S., 880 F.2d 1018, 1021-1026, the Ninth Circuit considered the application of the discretionary immunity exception to the Federal Tort Claims Act to claims that the design and construction of irrigation canals were negligent. Id. The Appellate Court first analyzed the Supreme Court's decisions in Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953); United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Variq Airlines), 467 U.S. 797, 808, 104 S.Ct. 2755, 2762, 81 L.Ed.2d 660 (1984) and Berkovitz v. United States, 486 U.S. 531, 108 S.Ct. 1954, 1958, 100 L.Ed. 2d 531 (1988). In Dalehite, which involved claims arising out of a catastrophic ship explosion, the Ninth Circuit noted that the Supreme Court "held that all of the plaintiff's

claims fell within the discretionary function exception" but failed to define precisely where that discretion ends.  See Kennewick, 880 F.2d at 1022.

The Ninth Circuit then noted that in Variq, which involved claims of negligence against the FAA arising out of an air crash, the Supreme Court reaffirmed the continuing validity of Dalehite, but also identified two factors which were useful in determining whether acts of a governmental employee fell within the "discretionary function" exception.  See Kennewick, 880 F.2d at 1022-23.  The two factors were (1) the nature of the conduct and whether the challenged acts are of the *nature and quality* that Congress intended to shield from tort liability; and (2) that the discretionary function exception was aimed particularly at the government's actions "'in its role as a regulator'".  See Kennewick, 880 F.2d at 1023.  The protection of regulatory activities was an expression of the desire "'to prevent judicial second-guessing' of legislative and administrative decisions grounded in social, economic and political policy.'" Id.

The Ninth Circuit then reviewed the Supreme Court's decision in Berkovitz, which involved claims that a child had contracted polio after taking a dose of polio vaccine that had been licensed and approved by the National Institute of Health.  Kennewick, 880 F.2d at 1023.  The Ninth Circuit noted that the Supreme Court

Bolt v. U.S.
page 18

found that the plaintiff's claims of negligent licensing of the drug and negligent release of the particular lot that harmed the plaintiff were not within the discretionary function exception to the FTCA. Kennewick, 880 F.2d at 1023.

The Ninth Circuit explained that the Supreme Court in Berkovitz had held that discretionary immunity did not apply to the negligent licensing claim, because the NIH violated specific mandatory directives by failing to receive and evaluate certain test data. Kennewick, 880 F.2d at 1023. "[T]he Court reasoned that since the DBS had no discretion to violate these directives, DBS's conduct was not a discretionary function." Kennewick, 880 F.2d at 1023.

As to the plaintiff's second licensing claim related to other mandatory safety regulations, the Court held that if DBS licensed the drug without determining whether it met the mandatory safety regulations or after determining that the drug failed to meet the requirements, the discretionary function exception was no bar to the claim. Kennewick, 880 F.2d at 1024. However, if the claim was that the agency incorrectly determined that the drug met the standards, "the crucial issue would be whether that determination 'involve[d] the application of objective scientific standards . . . [or] 'policy judgment.'" Kennewick, 880 F.2d at 1024.

Bolt v. U.S.
page 19

As to Berkovitz' claim of negligent release of the particular lot of the drug, the Ninth Circuit noted that the Supreme Court held that this claim too was not barred by discretionary immunity, because the Plaintiff alleged that the Bureau "had 'adopted a policy of testing all vaccine lots for compliance with safety standards and preventing the distribution to the public of any lots that fail [ed] to comply.'" Kennewick, 880 F.2d at 1024.  "If the plaintiff's allegations are true, the decisionmaker would have had no discretion to release the lot, and so the discretionary function exception would not apply." Kennewick, 880 F.2d at 1024.

The Ninth Circuit in Kennewick then addressed the reference in a footnote of Berkovitz to the Indian Towing Co. Inc. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955). The Ninth Circuit observed that the Supreme Court stated that the initial decision to undertake and maintain lighthouse service was a discretionary judgment.  The Ninth Circuit then noted that the Supreme Court had then stated in its footnote that the failure to maintain the lighthouse in good condition subjected the Government to suit under the FTCA and that the government's conduct did not involve any permissible exercise of policy judgment.  Kennewick, 880 F.2d at 1024.

The Ninth Circuit determined that the U.S. Supreme Court's

Bolt v. U.S.
page 20

reference to Indian Towing in its footnote in Berkovitz either
meant that:

> failure to maintain the lighthouse is not protected
> under the discretionary function exception:
> (1) because it does not involve the exercise of *policy*
> judgment (i.e. judgment based on political, economic
> and social policy), or (2) because it *does* involve
> policy judgment but not *permissible* judgment (i.e. the
> government has no discretion to fail to replace the
> lighthouse bulb). Under the second interpretation, the
> lack of discretion must be attributable to some
> mandatory and specific directive removing the element
> of choice from the government decisionmaker. . . . We
> conclude that only the first reading is plausible.

Kennewick, 880 F.2d at 1024.  The Ninth Circuit concluded that

the failure to maintain the lighthouse was not protected, because

"it does not involve the exercise of *policy* judgment (i.e.

judgment based on political, economic or social policy), but

rather on technological or scientific considerations.

> The Ninth Circuit in Kennewick determined that Berkovitz:
> thus establishes that a safety or engineering standard
> operates to remove discretion under the FTCA when it is
> embodied in a *specific* and *mandatory* regulation or
> statute which creates clear duties incumbent upon the
> governmental actors.

Kennewick, 880 F.2d at 1026.

The Ninth Circuit then analyzed the plaintiff's claims in

Kennewick as to whether discretionary immunity barred the claim

for negligent design of the canal. Kennewick, 880 F.2d at 1027.

The Court determined that since there were no mandatory

regulations for design of the canal, to determine whether

Bolt v. U.S.
page 21

discretionary immunity could apply, "[w]e must now examine the nature of the discretion exercised by the Bureau in designing the canal."    Id. at 1027 The Ninth Circuit determined that the discretionary immunity applied to the claim of negligent design of the canal, because it involved design decisions that were discretionary functions involving consideration of the construction cost of the canal and water user's ability to repay those costs.

The Ninth Circuit next turned to the claim of negligence in construction of the canal.  Kennewick, 880 F.2d at 1030.  The Court noted that the contract language stated that "[w]here the ground surface under the embankment is not suitable, as determined by the contracting officer, for a foundation for the embankment, the contractor shall strip the area under the embankment of such unsuitable material to such depth as may be directed."  Id. at 1031.

The Ninth Circuit held that the direction to strip unsuitable materials only applied where the contracting officer had determined that the surface was not suitable.  Id. at 1031. The Ninth Circuit held that the contracting officer's discretion to determine whether unsuitable material was present was not based on policy judgments, but on technical, scientific, engineering considerations.  The Ninth Circuit determined that

Bolt v. U.S.
page 22

the contracting officer had no room for policy judgment and decision and that his on-site decisions were not "'of the nature and quality that Congress intended to shield from tort liability." Id.

The Ninth Circuit also rejected the argument that a decision not to excavate deeper to save money would have made the contracting officer's decision discretionary. Id at 1031. The Court observed that in ARA Leisure v United States, 831 F.3d , 193, 196 (9th Cir. 1987) the Court had held that "the mere fact that Park Service maintenance personnel were required to work within a budget did not bring their failure to maintain a park road within the discretionary function exception." Kennewick 880 F.2d at 1031. The court concluded that contracting officer's on-site decisions were not "of the nature and quality that Congress intended to shield from tort liability." . . They were not based on public policy and they are not entitled to immunity from lawsuit based on negligence under the discretionary function exception. The contracting officer had no "room for *policy* judgment and decision." Kennewick, 880 F.2d at 1031.

Also relevant to the court's consideration of this issue is the Ninth Circuit's decision in ARA Leisure Services v. United States, 831 F.2d 193 (9th Cir. 1987). This case involved a tour bus that had rolled off of the road killing and injuring

Bolt v. U.S.
page 23

passengers.  The tour operator, ARA, brought a contribution action against the United States, alleging that the roadway had been negligently designed and constructed.  The Ninth Circuit held that the Park Service's decision to construct the roadway without guard rails was "grounded in social and political policy."  Because the design was encouraged by a policy to be "'esthetically pleasing [and to] lie []lightly upon the land utilizing natural support whenever possible.'"  ARA Services, 831 F.2d at 195.

The Ninth Circuit rejected the Park Service's claim that its failure to maintain the roadway was protected.  The Court noted that Park Service maintenance work was not the kind of regulatory activity singled out by the Supreme Court in Varig.  ARA Services, 831 F.2d at 195.  The Court then noted that there was no clear link between any Park Service Policies and the failure to maintain the roadway.  ARA Services, 831 F.2d at 195.  The Ninth Circuit then noted that Park Service standards required roads to "'conform to original grades and alignments'" and required graded roads to be "'firm [and] of uniform cross section."  Id.  The Ninth Circuit then stated that it agreed with the Eighth Circuit that:

> [w]here the challenged governmental activity involves
> safety considerations under an established policy
> rather than the balancing of competing public policy
> considerations, the rationale for the exception falls

Bolt v. U.S.
page 24

> away and the United States will be held responsible for
> the negligence of its employees.

ARA Services, 831 F.2d at 195.

The Ninth Circuit also rejected the argument that the fact that park service personnel were required to work within a budget did not make their failure to maintain the roadway a discretionary function for purposes of the FTCA. Id. at 195. The Ninth Circuit rejected the position that some choice is sufficient, and instead held that the balancing of policy considerations is a necessary prerequisite. Id. at 195. The Court held that the Park Service balanced the relevant policy considerations when it established its standards for graded roads. "The allocation of funds among projects aimed at bringing Denali National Park roads up to the standards is not a decision 'of the nature and quality that Congress intended to shield from tort liability." Id. at 196. "To hold otherwise would permit the discretionary function exception to all but swallow the Federal Tort Claims Act."

Defendant errs when it makes the statement that "Thus, even a government agent's negligent failure to consider all aspects of the matter does not alter the discretionary character of the decision." Defendant's Memorandum at 21. Defendant cites this allegation to Kennewick, 880 F.2 at 1028. Defendant fails to inform the court that the portion of the Kennewick decision

Bolt v. U.S.
page 25

Defendant relies on for this quote is the portion of the opinion holding that the decisions about how to design the canal were policy based and entitled to protection under discretionary immunity.  See Kennewick, 880 F.2d at 1028.  Cited by the court in Kennewick in this section of the opinion, was Alabama Electric Cooperative, Inc. v. United States, 769 F.2d 1523 1531, 1536-37 (11th Cir. 1985) for the proposition that the 11th Circuit decision "conducting exhaustive review of FTCA cases involving negligence in design and concluding that whether particular decision is insulated as discretionary turns on whether designer actually weighed social, economic and political factors.  Kennewick, 880 F.2d at 1028-29.

Defendant cites Prescott v. United States, 973 F.3d 696 (9th Cir. 1992).  Prescott is not favorable to the Defendant.  Prescott involved a claim of negligence by workers at a nuclear test site for alleged radiation injuries.  Id.  The Ninth Circuit agreed with two other circuits that the United States has the burden of establishing its affirmative defense.  Id. at 701 The Ninth Circuit also refused to apply discretionary immunity to all aspects of the United States' nuclear testing operations. The Court reaffirmed its earlier ruling in Roberts v. United States, 887 F.2d 889, 901 (9th Cir. 1989) that:

> We thus declined to immunize government conduct unless
> the government proved that the exercise of a discretion

> to make policy choices had been explicitly delegated to
> the test site officials and that the officials'
> allegedly negligent actions flowed from choices based
> on social, economic and political policy
> considerations.

Id. at 700.

Defendant cites to In Re Glacier Bay, 71 F.3d 1447, (9th Cir. 1995).  In Re Glacier Bay is not favorable to Defendant.  The Court in In Re Glacier Bay stated that:

> It is by now firmly established that the determination
> whether the exception applies requires a two-step
> analysis.  First, does the challenged action involve an
> element of choice or judgment?  If not, when a "federal
> statute, regulation, or policy specifically prescribes
> a course of action for an employee to follow,'" the
> exception will not apply.  Kennewick Irrigation Dist.
> v. United States, 880 F.2d 1018, 1025 (9th Cir. 1989)
> (quoting Berkovitz v. United States, 486 U.S. 531, 536,
> 108 S.Ct. 1954, 1958, 100 L.Ed.2d 531 (1988)) Second,
> is any judgment at issue of the sort Congress intended
> to shield?  If the judgment involves considerations of
> social, economic or political policy, the exception
> applies.  Sutton v. Earles, 26 F.3d 903, 907 (9th Cir.
> 1994); Summers v. United States, 905 F.2d 1212, 1214
> (9th Cir. 1990). . . .When the record does not show that
> a decision is based on such policy considerations, the
> exception does not apply.  Summers, 905 F.2d 1215.

In Re Glacier Bay, 71 F.3d at 1450.  The Ninth Circuit then held that:

> [t]he proper question to ask is not whether the
> Government as a whole had discretion at any point, but
> whether its allegedly negligent agents did in each
> instance.  Each separate action must be examined to
> determine whether the specific actor had discretion of
> a type Congress intended to shield.

Id. at 1451.   The court found that there was no discretionary

Bolt v. U.S.
page 27

immunity for the alleged hydrographer's negligence in failing to maintain proper linespacing and to run splits to correct deviations, because NOAA's manuals and instructions carefully regulate the separation of sounding lines and the running of splits.  Id. at 1451-2  "Because what discretion is left is of a scientific nature, we conclude that these actions are not covered by the discretionary function exception."  Id. at 1452.  "An element of judgment is involved here, but the decision nevertheless falls outside the types of public policy decisions intended to be shielded by the discretionary function exception." Id. at 1452-53.  The court held that the plaintiff's claim that the hydrographers had actual indications of the Glacier Bay Rock's existence which they were required to develop, but did not, could have involved weighing of social, economic or political public policy, but that the changes to the regulations in 1964 superceded the discretion with mandatory requirements. Id.

## II.  The U.S. Is Responsible For Failure to Follow Its Plan

As discussed above, where the United States fails to follow a specific mandatory regulation or statute which creates clear duties upon the governmental actors, the safety standard operates to remove discretion under the FTCA.  See Kennewick, 880 F.2d at 1027.  In this case, Sgt. Khan and the resident soldiers were

Bolt v. U.S.
page 28

negligent, because they failed to comply with mandatory safety regulations that are comprised of the Army snow removal plan for 1998-99, the Resident housing handbook provisions for removal of snow and ice, the Senior Occupant regulations and Army regulation 358-10 (requiring report of hazardous situations).

A. **The Army Snow Removal Plan and Handbook Create Duties**

Both the Army Snow Removal Plan for 1998-99 and the Tenant Handbook create clear duties upon governmental employees regarding removal of ice and snow from the common area in Plaintiff Bolt's parking lot. The handbook specifically stated regarding the removal of snow and ice:

> During the winter season, residents are responsible for the removal (within 24 hours) of snow and ice from steps, porches, driveways, mailboxes, and sidewalks in the front and rear of their quarters to a point of at least halfway to the adjoining quarters. . . . .Ice melt is available through Self-Help; however, remove snow from the sidewalk prior to sprinkling the ice melt (Do not expect ice melt to melt the snow so that you do not have to shovel.)  If you have a fire hydrant in your yard, you are responsible for shoveling the snow three (3) feet around the hydrant and include a two (2) foot wide path from the hydrant to the nearest street.  The Mayoral Program also sponsors a holiday decoration competition during the December holiday season.

Appendix "4" 1998 Resident Handbook, pp. 3-4 (emphasis added). Defendant admits that the Handbook responsibilities were mandatory and authorized by regulation. See Defendant's Memo at 5-7.

The Handbook further defined the Senior Occupant's duties:

Bolt v. U.S.
page 29

**It is the Senior Occupant's responsibility to insure all resident's comply with these instructions. Coordination of building residents is necessary to insure all adjoining and common areas are free of trash, snow and ice.** It is expected that, by performing these duties, a harmonious and cooperative relationship be developed between all housing residents of Ft. Wainwright. See the Senior Occupant section on page 55 for more information.

Appendix "4" 1998 Resident Handbook, pp. 3-4 (emphasis added).

### B. **The Army Employees Negligently Failed to Perform**

It is undisputed that no snow and ice were removed from Carol Bolt's apartment parking lot during the winter of 1998-99. There is also undisputed that Sgt. Khan had prior notice that the area near the dumpster in Plaintiff Bolt's parking lot, where Plaintiff Bolt, fell was slippery and hazardous. Sgt. Khan described the situation as being accumulations from melting snow that had turned to ice. The Defendant's failure to have its employees execute their additional duties to remove the snow and ice from the parking lot was negligence, especially in light of the constructive notice to the Defendant from the nine reported injuries caused by slips on snow and ice in the prior 4 years.

The United States is responsible for the negligent failure of the soldiers who occupied the residential housing to remove the snow and ice from Carol Bolt's parking lot prior to

Bolt v. U.S.
page 30

April 1, 1999.  See 28 U.S.C. §2671[2].  The housing handbook
provides that the military affiliated sponsor is the one with the
responsibility to perform maintenance tasks.  The handbook
states:

> Please keep your home and grounds in a clean, orderly,
> sanitary and safe condition.  As a **sponsor,** you are
> responsible for ensuring that your quarters, grounds,
> and equipment are not subject to abuse or neglect, and
> that the premises are not used for commercial, illegal
> or immoral purposes.  The care and cleaning of your
> home's appliances and fixtures is strictly your
> responsibility. . . .

Appendix "4" Resident Handbook at 3 (emphasis added).  The
failure of the Army's employees to complete all of their work,

---

[2]28 U.S.C. §2671, provides in part:

Employee of the government" includes
(1) officers or employees of any federal agency, members
of the military or naval forces of the United States,
members of the National Guard while engaged in training
or duty under section 115, 316, 502, 503, 504, or 505 of
title 32, and persons acting on behalf of a federal
agency in an official capacity, temporarily or
permanently in the service of the United States, whether
with or without compensation, and

(2) any officer or employee of a Federal public defender
organization, except when such officer or employee
performs professional services in the course of
providing representation under section 3006A of title
18.

"Acting within the scope of his office or employment",
in the case of a member of the military or naval forces
of the United States or a member of the National Guard
as defined in section 101 (3) of title 32, means acting
in line of duty

Bolt v. U.S.
page 31

which included snow and ice removal in Carol Bolt's apartment parking lot during 1998-99 constitutes a negligent failure to comply with the snow removal plan and resident handbook regulations that was a proximate cause of Plaintiff Bolt's injuries.

Furthermore, the Army is responsible for the negligent failure of Sgt. Khan to do his job as Senior Occupant to ensure that the residents performed the snow removal work and his failure to report the hazardous situation in the parking lot. Sgt. Khan was required by the Handbook to "insure all resident's comply with these instructions. Coordination of building residents is necessary to insure all adjoining and common areas are free of trash, snow and ice." Appendix "6" Handbook p 56 There is no evidence that Sgt. Khan did anything to execute his duty to insure that all resident's complied with the mandatory snow removal policy and resident handbook requirements that they remove the snow from Plaintiff Bolt's residential apartment parking lot and make the area near the dumpster safe.

Sgt. Khan was required to report a hazardous condition under the terms of the resident handbook and by Army regulation 385-10. Appendix "11" Cicilese Depo. at 17.

Under Alaska law, "[u]nder the doctrine of respondeat superior, an employer is liable for the negligent acts or

Bolt v. U.S.
page 32

omissions of his employee committed within the scope of his employment." <u>Powell v. Tanner</u>, 59 P.3d 246, 248 (Alaska 2002). The employer is liable for torts committed by the employee that are within the scope of employment, which requires that the conduct "is actuated, at least in part, by a purpose to serve the master." <u>Doe v. Samaritan Counseling Center</u>, 791 P.2d 344, 350 (Alaska 1990) <u>see</u> <u>also</u> Defendant's Memorandum at p. 14 (admitting Khan was the senior occupant and this was an additional employment duty for him).

There can be no question that the snow removal plan for 1998-99 and resident handbook established mandatory specific regulations requiring the apartment residents to perform the snow removal in Carol Bolt's parking lot. The failure to perform the snow removal is negligence that is attributable to the United States under the doctrine of vicarious liability. Further, the United States is liable for the Senior Occupant, Sgt. Khan's, failure to require the apartment residents to remove the snow from the parking lot, Sgt. Khan's failure to report the hazardous condition that he admits he had prior notice existed near the dumpster in the parking lot and his negligent failure to remove the snow and ice or spread traction material in the hazardous area near the dumpster.

<u>III.  Any Discretion Exercised by the Army is Not Protected</u>

Bolt v. U.S.
page 33

Based on the constructive knowledge imputed to the Defendant from its knowledge of the hazards of allowing hard-packed snow to melt during breakup periods during March and April, the Army mandatory regulations[3] requiring snow and ice removal from common areas of residential apartment parking lots, and the nine prior reported injury related falls on ice in the four years prior to Plaintiff Bolt's fall, any discretion exercised by the Army in formulating its snow removal plan is not of the type that should be protected by discretionary immunity, because there is no evidence that it actually involved any weighing of any social, economic or political policy.

The question is not whether discretion was exercised by the United States employee in deciding not to remove snow or ice from Bolt's parking lot prior to April 1, 1999, or to take any other remedial action, instead the question is whether any discretion that was exercised is entitled to protection.  See <u>ARA Leisure</u> 831 F.2d 195; <u>Kennewick</u>, 880 F.2d at 1030-31.

The statement in John Curry's affidavit that he "weighed these respective factors and decided on the most efficient and effective way to balance the snow removal needs and the available resources" is conclusory and fails to show that any policy analysis was employed in setting the snow removal policy.

---

[3]See Defendant's Memorandum at p. 9.

Bolt v. U.S.
page 34

Financial considerations based on budgetary issues are insufficient to justify protection of any discretion exercised, and that is what the evidence shows occurred here.  See ARA Leisure 831 F.2d at 195-65.

There is no evidence that the Army's discretionary decision to fail to remove snow and ice from Plaintiff Bolt's parking lot prior to April 1, due to vehicles left in the lot, or its failure to sand hazardous areas, was motivated by any legitimate policy of the Army.  See ARA Leisure, 831 F.2d at 195; Kennewick, 880 F.2d at 1031.  The Ninth Circuit noted in ARA Leisure that "maintenance work is not the kind of regulatory activity the Supreme Court singled out in *Varig Airlines*."  ARA Leisure, 831 F.2d at 195.  The Ninth Circuit further noted in ARA Leisure that there was:

> no clear link between Park Service road policies and the condition of Throughfare Pass, which had eroded from an original width of twenty-eight feet to a width of 14.6 feet at the accident site and which had edges so soft as to be dangerous.  In fact, there is evidence in the record that Park Service standards explicitly required that park roads "conform to the original grades and alignments and that graded roads be "firm [and] of uniform cross section."

Id. at 195; see also Raymond v. United States, 923 F.Supp. 1419, 1422-239(failure to install handrail not shown to be result of policy judgment by postal service).  Similarly, in the present case, the Army Resident Handbook and snow removal policy

Bolt v. U.S.
page 35

establish standards explicitly requiring removal of snow and ice from common areas in residential apartment parking lots at Ft. Wainwright.

Finally, the fact that the Army snow removal is required to be done within a budget does not make its failure to properly maintain Plaintiff Bolt's residential apartment parking lot "a discretionary function for purposes of the FTCA." <u>ARA Leisure</u> at 195-96. The record is devoid of any evidence showing any balancing of policy considerations in reaching the decison to fail to properly maintain Plaintiff Bolt's residential apartment parking lot.

Further, Defendant attempts to mislead the court with the argument and quotation starting at the middle of page 23 of its brief. If the Army has formulated mandatory policies or regulations, discretionary immunity does not apply, because the government agent has no discretion to fail to follow a mandatory policy or regulation. <u>See</u>, <u>e.g.</u>, <u>Glacier Bay</u>, 71 F.3d at 1450.

The Defendant's argument that the policy of requiring the apartment residents to remove snow and ice from a residential apartment parking lot was "well-established in Defense Department and Army Regulations" is completely ridiculous. The limited expressions of allowing self-help for limited functions for residential tenants contained in various regulations cited by

Defendant in no way specifically authorized the Base Commander to require the residential apartment tenant in 3 buildings of at least 8 apartments each to clear a huge common parking area.

It is undisputed that no snow was removed from the parking lot common areas at Mrs. Bolt's complex the entire winter, Mr. Khan admitted this in his deposition. The 30(b)(6) Deponent from the Post Safety Office was not aware that snow was not removed from residential apartment parking lots on a regular basis. Furthermore, Mrs. Bolt and her husband have both testified that there was no sand or any other type of traction material that had been applied anywhere near where Ms. Bolt fell.

There is no evidence that any legitimate consideration motivated the lack of periodic snow removal in the residential housing apartment parking lots, or lack of sanding of any hazardous areas, except for pure financial and budgetary reasoning that has previously been rejected by the Ninth Circuit in ARA Leisure as being worthy of discretionary function protection. See ARA Leisure, 831 F.2d at 195.

Defendant's citation to Angle v. United States, 931 F.Supp. 1386 (W.D. Mich 1994) can be distinguished as being directly contrary to the holding of ARA Leisure. See ARA Leisure, 831 F.2d at 195 [compare] Angle,m 931 F.Supp at 1396-97. In addition, there was no violation of a mandatory Army policy involved in

Bolt v. U.S.
page 37

Angle, as there is in this case.

Ayer v. United States, 902 F.2d 1038 (1st Cir. 1990) is another out of circuit case relied upon by Defendant.  In Ayer the United States established that it did not install a safety railing in the missile launch control chamber, because "[t]he control chamber was designed without an attached floor so that it could withstand reverberations from a near-miss nuclear detonation; . . .." Ayer, 902 F.2d at 1040.  The Commander did not want to change the layout of the chamber, because it was identical to other control chambers and any changes might have impeded training.  Id.  Ayers can be distinguished as involving actual policy issues that were weighed in reaching the decision. In addition, there were no mandatory policies or regulations discussed in the opinion.

Defendant similarly errs in its reliance on Aragon v. United States, 146 F.3d 819 (10th Cir. 1998), another out of circuit case, which involved a negligence claim for disposal of chemicals used by the Air Force to wash down aircraft.  The holding in Aaragon, that the court would presume that actions are grounded in policy when a government agent exercises discretion, is directly contrary to relevant Ninth Circuit authority.  See, e.g., ARA Services, 831 F.2d at 195

The Defendant's Motion for Summary Judgment should be denied

Bolt v. U.S.
page 38

in all respects, because it is responsible for the failure of the soldiers to clear the snow from the parking lot and is responsible for Sgt. Khan's failure to do his job to enforce the mandatory Resident Handbook and Snow Removal Policy. Any discretion exercised in formulation of the snow removal plan was based on pure budgetary reasoning that is unworthy of protection.

IV. The Army Was Negligent in Maintaining Bolt's Parking Lot

Negligence consists of four elements: duty, breach, causal connection between negligent conduct and injury, and damage resulting from the negligence. See generally Power Constructors, Inc. v. Taylor & Hintze, 960 P.2d 20, 31 (Alaska 1998).

The Army has a duty to its residential tenants, such as Plaintiff Bolt, because of its status as a residential landlord. See A.S. 34.03.100 Landlord to maintain fit Premises. Under A.S. 34.03.100, the Landlord has the obligation to "keep all common areas of the premises in a clean and safe condition; [.]" A.S. 34.03.100(a)(2). A residential landlord is Alaska is prohibited from delegating any responsibility for safety of common areas to tenants. See A.S. 34.03.100(c)(not allowing delegation to tenant of Landlord's duty under (a)(2) to keep common areas in a safe condition. The tenants can agree to do the work, but the Landlord remains responsible if the work is not done.

Landlords in Alaska have a duty to reasonable care to

Bolt v. U.S.
page 39

discover and remedy conditions which present an unreasonable risk of harm under the circumstances.  Newton v. Magill, 872 P.2d 1213, 1217 (Alaska 1994)("Instead, we adopted a rule based on general tort law that an owner "must act as a reasonable person in maintaining his property in a reasonably safe condition in view of all the circumstances, including the likelihood of injury to others, the seriousness of the injury, and the burden on the respective parties of avoiding the risk.").

The primary obligation to remove snow and ice from common areas falls on the landlord.  Coburn v. Burton, 790 P.2d 1355, 1358 (Alaska 1990)("Under URLTA as under the common law, the primary obligation to remove snow and ice in common areas falls upon the landlord;  on leased premises, this duty is the tenant's.")

Defendant's reliance on Hale v. City of Anchorage, 389 P.2d 434 (Alaska 1964) and Hollinger v. United States, 651 F.2d 636 (9th Cir. 1981) are unavailing.  The Alaska Supreme Court has limited its holding in Hale and expressly held that it does not apply to a claim against a business by an invitee, and would only apply to claims against the state or a municipality for streets or sidewalk conditions.  Kremer v. Carr's Food Center, Inc., 462 P.2d 747, 752 (Alaska 1969).  As the Alaska Supreme Court also observed:

Bolt v. U.S.
page 40

> The mere fact that snow and ice conditions prevail for many months throughout various locations in Alaska is not in and of itself sufficient rationale for the insulation of the possessor of land from liability to his business invitee. Nor do such climatic conditions negate the possibility that the possessor should have anticipated harm to the business invitee despite the latter's personal knowledge of the dangerous snow and ice conditions or the general obviousness of such conditions.

Id. at 752.

Plaintiff Bolt also relies on the affidavit of her expert witness, Robert Tilly. Mr. Tilly is Professional Engineer licensed by the State of Alaska. Appendix "9". Mr. Tilly has over 40 years of engineering and management experience in the State of Alaska, including formerly being the Chief Engineer, Manager O & M and Facilities Civil Engineer for the Operations and Maintenance of the Ballistic Missile Early Warning System at Clear Air Force Base and formerly the Public Works Director for the City of Fairbanks, where he was responsible for the planning, directing and managing all maintenance, repair and minor construction for the city streets, buildings, grounds and equipment. Appendix "9" Tilly Affidavit. Mr. Tilly has extensive experience with the requirements in Fairbanks, Alaska, for maintenance of parking lots during the winter season.

Mr. Tilly states that the dumpster in Ms. Bolt's lot was located in the parking lot on a corner at the entrance to the lot from the street, where vehicle tires could polish the surface of

the snow or ice as they entered and exited the lot.  Mr. Tilly further states that it is apparent from Mr. Khan's testimony that he did not perform his duty to require the residents to remove the snow from Ms. Bolt's apartment parking lot, as required by the Defendant's 1998-1999 snow removal policy.

Mr. Tilly next notes that Mr. Khan had prior notice, prior to Mrs. Bolt's fall, that the area near the dumpster was hazardous and icy, due to a low spot that allowed accumulation of water during warmer thawing periods, but that Mr. Khan did not report this condition to the Mayor of the complex or Public Safety until after Ms. Bolt's fall.  Mr. Tilly also notes that Mr. Kahn also testified that he did not require the apartment residents to take any action to remedy the icy hazardous condition that Mr. Khan knew existed near the dumpster prior to Ms. Bolt's fall, although that was his responsibility under the housing handbook and snow removal program.  Appendix "9" Tilly Affidavit.

Mr. Tilly further states that April and March are important months to spread sand in parking lots to provide traction for walking, because this is the time period that hard-packed snow can be expected to melt and it can become extremely slick and icy and hazardous for walking.  _Id_. Mr. Tilly further states that sand must be frequently reapplied, because of vehicles rubbing it

Bolt v. U.S.
page 42

away. Id. Mr. Tilly states that during March and April when the weather is melting, sand and gravel may need to be frequently reapplied, because sand and gravel that are used for traction can gain heat during the day and melt into the snow and ice. Id. Mr. Tilly states that if the traction control material melts into the snow or ice and is not longer on the surface, it can lose its effectiveness. Id. Mr. Tilly further observes in his affidavit that, other than Sgt. Khan, the Army had no other established inspection process to check the residential parking lots at Ft. Wainwright for hazardous conditions caused by ice and snow.

Mr. Tilly states in his affidavit that it is his opinion that Mr. Khan was negligent in failing to immediately report the extremely hazardous condition in Ms. Bolt's apartment parking lot to the Mayor or the Public Safety Office so that it could be addressed by the Ft. Wainwright Department of Public Works. Under the housing policy, Mr. Khan was the eyes and ears for the Army at the housing complex. Id. If it had been reported, the DPW might have been able to remove the snow with a loader, sand the area throughly with vehicle mounted sanding equipment or hand sand the area. Id. Mr. Tilly further states that if Sgt. Khan was not responsible for inspecting the conditions of Ms. Bolt's residential parking lot and reporting hazardous conditions to the appropriate authorities for correction, the Army was negligent in

failing to conduct these inspections.

Mr. Tilly further states in his affidavit that it is his opinion that the Army was negligent in failing to remove the snow from Ms. Bolt's apartment parking lot prior to April 1, 1999. Id. Mr. Tilly explains that if the Army plan was to have the residents remove the snow from the residential parking lots during the winter, Mr. Khan, whose job it was to ensure that these duties were accomplished by the residents was negligent in failing to make sure this work was done. Id. Mr. Tilly further explains that if the Army plan was to leave the snow in Ms. Bolt's residential parking lot for one removal in March of 1999, that that would have been negligent as well.

Mr. Tilly explains in his affidavit that the Army was negligent in failing to remove the snow from Ms. Bolt's residential parking lot periodically during the winter of 1998-99, because during the winter season in Alaska the weather warms up to above-freezing from time to time, causing thawing and melting that can create slick icy areas that are extremely hazardous for walking. Regularly scheduled snow removal also helps to prevent the development of uneven surfaces that can develop as snow melts and vehicles travel over it. Uneven surfaces that are slick and icy can also be extremely hazardous for walking. Id.

Bolt v. U.S.
page 44

Mr. Tilly further explains in his affidavit that Mr. Dehaven's deposition testimony is that the only scheduled snow removal scheduled for Ms. Bolt's residential apartment parking lot during March 1999, was canceled, because vehicles were probably left in the parking lot, and the removal operation was delayed, due to liability concerns about possible damage to vehicles. Mr. Tilly states that the Army's failure to remove the vehicles put property damage concerns ahead of the personal safety of the apartment occupants who had to use the parking lot that had not been cleared. Id

Mr. Tilly states that it was negligent for the Army to fail to remove the cars in Ms. Bolt's parking lot and perform the snow removal as scheduled during March 1999, because it was critical to remove the hardpack snow before it melted and became more icy and hazardous for walking from melting and refreezing, which could make the surface uneven and allow the formation of hazardous slippery conditions. Id.

Mr. Tilly further explains in his affidavit that it is his opinion that the Army's failure to remove the snow from Ms. Bolt's parking lot periodically during the 1998-99 winter season was negligent, because the snow accumulation in the Fairbanks, Alaska, area is usually greater at the beginning of the winter, less in the middle of the winter and more at the end of the

Bolt v. U.S.
page 45

winter.  Id.  Mr. Tilly explains in his affidavit that allowing the accumulation of snow during the entire winter in a parking lot allows it to become hard packed.  The hard pack melts during the periodic thawing periods when temperatures rise to above 32 degrees during the winter and can lead to the creation of uneven surfaces and icy slippery hazardous conditions.  Id.

Mr. Tilly further explains in his affidavit that it was reasonably foreseeable to the Army that allowing the snow to accumulate in Ms. Bolt's residential  parking lot would create a very hazardous walking environment for the tenants of the building who had to use the parking lot to park their vehicles and access the dumpster to dispose of their garbage during the winter of 1998-99 and especially during the breakup period of March and April 1999.

Mr. Tilly further explains in his affidavit that the snow removal scheduled by the Army for Ms. Bolt's parking lot during March was critical, because that is usually the beginning of serious warming in interior Alaska, usually called "breakup".  Mr. Tilly explains that the temperature records for March 1999, show that the temperatures were in the 40s and 50s, 7 to 10 days prior to Ms. Bolt's fall on April 1, 1999.  There were light fresh snows on March 26, 27.  Mr. Tilly explains in his affidavit that it has been his experience working in Alaska that fresh snow

Bolt v. U.S.
page 46

in vehicle pathways, such as Ms. Bolt's parking lot, can frequently lead to a polishing action that enhances the danger and slickness of the ice. Id

Finally, Mr. Tilly states:

I have reviewed the prior incidents reported to the Army involving falls on snow and ice at Ft. Wainwright for time periods from 1995 to the time of Ms. Bolt's fall on April 1, 1999. I have attached a summary of these incidents to this Affidavit as Exhibit "1". The records produced by the Defendant show that there were prior reported injury incidents involving falls on snow and ice at Ft. Wainwright in parking lots on 5 occasions in the four years prior to Ms. Bolt's fall in this case.

Appendix "9" Tilly Affidavit.

## V. Serious Credibility Issues Exist Regarding Defendants Evidence

Defendant's witness John J. Curry testified that there is no snow removal performed in the residential housing parking lot areas at Ft. Wainwright, except for the one time annual snow removal scheduled during February or March each year. See Defendant's Exhibit "7" Curry Affidavit at p. 2 -7; Defendant's Exhibit "9" Lowe Affidavit at 2-3. However, the Army's designated 30(b)(6) deponent, from the Post Safety Office, testified:

Q: Do you have any idea why the snow on the – in the residential areas at Fort Wainwright is only removed once a year in the parking lots?

A: I don't know that. It's not – to my knowledge, it's removed as soon as they can get to those areas after a snowfall. You have certain areas that are priority areas. Your major roads and thoroughfares are

Bolt v. U.S.
page 47

imperative to be cleared.  They're the first ones to be cleared.  We have an airfield and it has to be cleared.  So a residential area may not get cleared immediately, but they have people going out there.  You'd have to contact the Department of Public Works to find out what their schedule is as far as laying down gravel, but they lay gravel down in parking lots at a – anytime anyone, whether it's a family member or a soldier or a civilian employee can contact DPW and say this is – this is a problem and could you put some – throw some gravel down and they're usually pretty – DPW is pretty responsive in the wintertime.

Exhibit 11, Cicilese Depo. at 16-17.[4]  Defendant's witnesses deny that the DPW sends sanding trucks into residential parking lots.

    Mr. DeHaven testified that:

        Q: Did you have the ability to send sanding trucks out to sand in the entrances to the residential apartment parking areas at Fort Wainwright if you believed that they were hazardous?

        A: I could have if I had known about it.  We'd have probably responded to the first call and put it out and then after that, we'd have contacted housing the housing department and see if they wished to continue it because she had to sit there and pay for it.  So all the work we did in housing area was reimbursable.

Appendix "14" Paul DeHaven depo. at 19-20.  Credibility issues arise as to the statements made by Defendant's witnesses John J. Curry, Michael T. Meeks and Richard Lowe, regarding the snow removal policy at Ft. Wainwright and the removal of snow from residential apartment parking areas and use of sanding equipment

---

[4]

Defendant had an obligation to prepare the 30(b)(6) deponent to testify regarding the subjects listed in the 30(b)(6) deposition notice, which included

Bolt v. U.S.
page 48

by DPW to address hazardous conditions.

Mr. Khan testified as follows about availability of sand and traction materials from the Army:

> Q: Did you put any salt or sand at the dumpster in April of 1999?
>
> A: Quite a few times, I did, too, yes.
>
> Q: Where did you get that at?
>
> A: We would have a quota from Self-Help out there, every individual family had seven quota. **Usually they would give very limited, so I ended up buying my own, you know.  And I recall many times I would buy my own and just do it myself.**  And this is out of common courtesy, if you will, taking care of each other, you know.

Appendix "7" Khan Depo. at 13 (emphasis added).  However, Khan had never told Plaintiff Bolt's investigator had he he had done any sanding.  <u>Id</u>. at 17, 21-22; Appendix "8" Khan statement transcript.  Mr. Khan thought the area was slippery and dangerous, even after he had supposedly sanded it.  Appendix "7" Khan Depo. at 23-24.  Mr. Khan was not sure what month he had even allegedly sanded.  Appendix "7" Khan Depo. at 25-26, 28 - 29.

<u>VI.  Conclusion</u>

The Defendant's Motion for Summary Judgment should be denied in all respects.

DATED this _____ day of March, 2006, at Fairbanks, Alaska.

THE LAW OFFICE OF ROBERT A. SPARKS

_____
Robert A. Sparks
Attorney for Plaintiff Bolt
Membership No.: 8611139


I certify that on March 7, 2006
that the foregoing document,
appendices and affidavits were
served on Stephen Cooper,
Asst. U.S. Attorney
/s/ Robert A. Sparks