TIMOTHY M. BURGESS
United States Attorney

STEPHEN COOPER
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
101 12th Avenue, Box 2, Room 310
Fairbanks, Alaska 99701
(907) 456-0245

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| CAROL BOLT, | ) | No. F02-0021 CV (RRB) |
| | ) | |
| Plaintiff, | ) | |
| | ) | **TRANSCRIPT OF SAJID KHAN** |
| vs. | ) | **INTERVIEW** |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Wayne: My name is Ron Wayne. It's...ah... November 15, 1999 and I'm talking with Mr. Kahn. Mr. Kahn do I have permission to tape recorder this?

Sajid Khan: Ah...will do.

Wayne: And how do you pronounce your first and last name?

Mr. Khan: Ah...Sajid and ah....Han.

Wayne: Ok and Sajid is spelled S A J I D?

Mr. Khan: That's a roger.

Wayne: Ok and do you know Carol Bolt?

Mr. Khan: Yeah, he was my...ah...one of the residents of my..ah....what do you call ah...court, you know that I was the area coordinator for.

Wayne: Uh huh.

Wayne: Mrs. Bolt fell on the ice near a... the dumpster at her housing unit on or about April 1st, 1999. Were you aware of that incident?

Mr. Khan: Yeah, they had told me about it, you know, ah, she had fallen, right she was pregnant at that time yeah.

Wayne: She told you or...?

Mr. Khan: Well, I think her husband had told because we ended up taking care of it, you know getting the thing...there was a lot of kind of, you know, black ice kind of thing out there, a lot of ice so we got rid of the snow you know.

Wayne: Ok, so her husband told you about her accident?

Mr. Khan: Yeah.

Wayne: Ok. Are you aware of anyone else who had fallen on the area or in the rest of the parking lot in the same period of time?

Mr. Khan: Well, later, I think there was a couple of people who did but not at the same spot. In the parking area, you know, on the other side. Like we have this building, you know, so Mr...Mr. And Mrs. Bolt were on one side of the building and on the other end, you know, of the building, yes I recall there were a couple of case.

Wayne: Ok. Had there been any snow removal services in the area of the dumspter in the Spring of 1999?

Mr. Khan: Well yes, there was actually. They had come, I think, one time and people had not left their car moved out, you know. So that's the reason why, I think there was a delay.

Wayne: Ok, so...

Mr. Khan: And finally they got everybody together, you know and then all the cars were removed and eventually this was taken care of, yes.

Wayne: Ok. Do you..(cough)excuse me...do you recall if the area near the dumpster was icy at the time of Mrs. Bolt's fall?

Mr. Khan: Ah, yes, of course.

Wayne: Prior to Mrs. Bolt's fall, had there been any complaints from Mrs. Bolt or any other tenants about the condition of the parking lot?

Mr. Khan: Well, after the incident, yes, she had told and I had as a matter of fact call up the mayor myself, you know, and informed about the same so, you know, I think they press hard to get the snow removal done and that's what eventually happened, yeah.

Wayne: You called up who?

Mr. Khan: The Mayor. A Mayor of community Southern Cross, you know. We belong to the Southern Cross community and I'm ...(inaudible) now, I'm at Eielson Air Force Base now

Wayne: Uh huh.

Mr. Khan:... but when I was at Wainwright, you know, ah living in this residence so at that time, yes I had called up my mayor and informed her. Normally I'm very prompt in helping my residents, you know, and also in informing the mayor about what's going on so I did inform her too.

Wayne: Ok. So you have area where different communities are?

Mr. Khan: Yes.

Wayne: Ok. Do you know if snow removal services that were scheduled for the area near the dumpster were cancelled prior to Mrs. Bolt's fall?

Mr. Khan: No I don't know. It's ah ....it's kind of hard for me to remember about that but...ah, I don't recall, but I do know there was a delay. A couple of times people have come, I'm not sure before or after, but, ah, ah, eventually we got it done, but I know for sure it was after the accident yes.

Wayne: Ok. Do you know why the snow removal service that was scheduled for the area was cancelled?

Wayne: You answered that earlier in the, ah, the car in the way.

Mr. Khan: Roger that, yeah.

Wayne: Ok. Do you believe that the area near the dumpster where Mrs. Bolt fell would have been safer if the snow removal service had been performed as scheduled instead of cancelled?

Mr. Khan: Absolutely.

Wayne: And ah, please explain.

Mr. Khan: I mean, if you didn't have snow there, you know, ah, that's a very tricky spot we had. I had a couple of real close calls myself, you know. And, ah, it just the way it was there I think probably, um, the water which had collected there became.. had turned into ice, you know, hard ice, and I think that's what made it very slippery and dangerous, you know, to trudge on.

Wayne: Right. The snow kinda kept the ice in the, or water in the area.

Mr. Khan: Right, right. It's kinda like a low lying area, you know, there near the dumpster, so, yeah.

Wayne: It was our understanding that you were the area coordinator for Mrs. Bolt's building. Can you explain what your duties were as area coordinator?

Mr. Khan: Oh my god (laughs) I had a lot duty, yeah. I had to ensure (inaudible) people kept their yards clean, you know, of the snow, or get it mowed with the lawnmower regularly during the summertime and to make sure that if there was any, ah, you know, try to get social gathering together for them and try to warm up the street pretty much and have a healthy, safe environment, you know.

Wayne: Ok.

# ROBERT A. SPARKS

ATTORNEY AT LAW
1552 NOBLE STREET
FAIRBANKS, ALASKA 99701
PH: (907) 451-0875
FAX: (907) 451-9385

March 19, 2002

Captain Matthew Miller
Chief Claims Division
Dept of Army
1060 Gaffney Road
Ft. Wainwright, Alaska 99703

Claim No.: 00-432-T022
Claimant: Carol Bolt

Dear Capt. Miller:

   As you know this office represents Carol Bolt regarding her personal injury claim arising from her slip and fall at her housing unit at Ft. Wainwright.

   Liability for negligence and unsafe conditions is clear on the part of the U.S. Army and should be admitted.

   In the process of taking her garbage straight across her parking lot to the dumpster provided for her apartment house, Ms. Bolt, wearing boots with treaded bottoms, got approximately 5 feet from the dumpster when her feet went out from under her on an icy patch and she fell down. Ms. Bolt had heard her ankle pop several times and was in extreme pain and unable to move. She was positioned such that persons circling the parking lot in vehicles would have been unable to see her, due to the dumpster location, until it was too late to stop. Carol was initially afraid that she would be run over and killed while waiting for assistance. Ms. Bolt's husband was warming up their car and she began screaming for help.

   Ms. Bolt's cries for help were heard by her husband Kevin Bolt, and her neighbors, Billie Clark and her husband. Mr. Clark stated that he had slipped on the ice in the parking lot several times prior to Ms. Bolt's fall, but that he had not fallen or been injured. Ms. Clark stated that she believed that her neighbor, Jennie Tillet had also complained about the icy condition in the parking lot. Mr. and Mrs. Clark stated that the snow removal would have alleviated the icy conditions in front of

01

received
22 Mar 02
MATTHEW A. MILLER
CHIEF, CLAIMS DIVISION

ATTACHMENT 3 DEFENDANT'S
REQUESTS FOR ADMISSIONS

Capt. Miller Letter
March 19, 2002
Page 2

the dumpster, where Ms. Bolt fell, because the dumpster is in a low spot that collects water when the snow melts and is blocked from draining away.

Ms. Bolt was also seen on the ground with her leg broken by another tenant, Rodney Glaze. Mr. Glaze also stated that a snow removal was scheduled immediately prior to Ms. Bolt's fall, but that the snow removal was canceled, due to vehicles in the parking lot. Mr. Glaze recalled that the notices posted in the parking lot had stated that any vehicles left in the lot would be towed away.

The U.S. Army's area coordinator, Sajid Khan, admitted that prior to Ms. Bolt's fall that he had called the mayor for the area and reported the slippery conditions in the parking lot. Mr. Khan admitted that the parking lot had been posted for snow removal on two occasions prior to Ms. Bolt's fall, but that the Army had failed to tow off vehicles left in the lot and had canceled the snow removal on both occasions prior to Ms. Bolt's fall. Mr. Khan admitted that the area near the dumpster was a low spot and if any snow was left in the lot, it allowed water to collect and become icy overnight.

Kevin Bolt carefully removed Carol's shoe and exclaimed "Oh my god" because of the shock of seeing her foot laying sideways on the ground with her ankle obviously broken.

Kevin Bolt was unable get Carol into their car, because of her broken ankle. After waiting several minutes for the Army ambulance that did not come in a timely manner, Kevin, and Mr. and Mrs. Clark managed to load Carol into Ms. Clark's van to take Carol to Basset Army Hospital.

Ms. Bolt was six months pregnant at the time of her fall. She was not given pain medication, because of her pregnancy. The doctor's initially attempted to set Carol's ankle without pain medication. Ms. Bolt relates that during the attempted resetting process she experienced intense pain that caused her to see stars, curse and nearly pass out. Following the attempted resetting of her ankle, she was taken to surgery and an open reduction of her ankle fracture was performed. She was given a spinal for pain medication and was awake speaking with the doctors during the entire operation.

Carol returned home following her surgery. She was unable to climb the 13 steps of the stairs to access the bathroom and

Capt. Miller Letter
March 19, 2002
Page 3

her bedroom in her apartment and was confined to the ground floor of her apartment for several weeks. In addition to being pregnant, Carol also was responsible for caring for her 3 ½ year old son Trevor. Mr. Bolt was immediately forced by the Army to leave to attend leadership training classes. Carol was forced to go to the bathroom in a rented port-a-potty, bathe in a pan in her kitchen and sleep on the couch for 3 weeks. Carol's mother in law came and stayed with her for 3 weeks to help her take care of her son and herself. Carol was unable to even help with doing laundry, because her washer and dryer were 12 steps down stairs in the basement of her apartment.

   Carol was originally in a soft cast when she was released from the hospital. After approximately 7 - 10 days, she was put into a hard cast. Carol found the hard cast to be very slick on the bottom and caused her to be afraid that she would fall again.

   Eventually, Carol's mother in law had to go back to Tennessee. Since Carol had no one else that could care for her and her son, and her husband was still in his training class, she talked with her parents and they bought her a ticket to fly to Tennessee.

   Carol and her son left Alaska about 3 weeks after her fall and flew to Tennessee, where Carol and Trevor stayed with Carol's parents. Her soft cast was removed the same day that she left to Tennessee. Carol was placed in a long brace at that time and she found it to be extremely uncomfortable on the airplane, because she could not straighten her leg out. She was not able to ambulate very well on crutches and was forced to use a wheelchair instead.

   Carol stayed with her parents in Tennessee for approximately 12 days. Their bathroom was on the ground floor. She returned to Fairbanks from Tennessee one day after her husband returned from his training class. Carol's husband provided care for Carol and Trevor after that.

   Carol tried to go back to work as a hair stylist, but was unable to stand on her injured ankle and she was unable to style hair while sitting down. Carol tried to find other employment when she was unable to style hair, but due to her husbands' scheduled reassignment to Tennessee, she was not able to find any work in Fairbanks during 1999. Carol delivered a healthy baby during June 1999.

03

Capt. Miller Letter
March 19, 2002
Page 4

    Upon her return to Kentucky, Carol found that her ankle pain did not allow her to stand for the long periods that were required for her to be able to return to hair styling. She searched for work and was eventually able to secure employment working as a teacher's aide for a small school district for $5.90 per hour, that does not require standing for long periods. Carol works 10 months per year.

    Carol reports that her life has changed since her ankle injury. She is unable to go for walks with her husband and son. She is unable to run. She is limited to ½ or less of walking. Ms. Bolt was very distressed at being unable to run to catch her daughter during an emergency involving an electric fence. She cannot wear shoes with any substantial heel.

    Carol has experienced continuing pain and swelling from her ankle and has been diagnosed with a permanent disability by Dr. David W. Gaw. Dr. Gaw diagnosed Carol Bolt with a 9 % permanent partial impairment of the right lower extremity and 4% PPI to the whole person. Dr. Gaw states that Carol's injury significantly increases the risk that she will suffer from arthritis in her ankle.

    Based on the diagnosis by Dr. Gaw, and other information concerning Ms. Bolt's income and vocational abilities, Dr. Gamboa and Mr. Tierney from Vocational Economics, Inc. in Louisville, Kentucky, have estimated Ms. Bolt's permanent disability will cause her to suffer a loss of future income of between $315,000 - $214,512.

    Ms. Bolt requests the following compensation from the U.S. Army for her injuries:

| | |
|---|---:|
| past medical:<br>    (most medical care provided by Army)<br>    evaluation by Dr. Gaw | $500 |
| past wage loss: 4/1/99 - 6/15/99<br>(based on average earnings 6 mo prior to injury) | 3,500 |
| future wage loss: | $315,771 |
| past pain and suffering: $25,000 | 25,000 |
| future pain and suffering: $50,000 | 50,000 |

04

Case 4:02-cv-00021-RRB   Document 37-10   Filed 03/07/2006   Page 9 of 17

Capt. Miller Letter
March 19, 2002
Page 5

```
loss of enjoyment of life: $25,000                          25,000

Total Damages claimed                                     $419,771
Rule 82 attorney's fees                                   $ 11,045
Total Damages and attorney's fees:                        $430,816
```

Please let me know if you have any questions or need any additional information. Please let me know when I can file a lawsuit on this case.

Sincerely,

THE LAW OFFICE OF ROBERT A. SPARKS

Robert A. Sparks

cc: Client

05

APVR-WPW-O                                              22 September 1998

MEMORANDUM FOR SEE DISTRIBUTION

SUBJECT: Fort Wainwright, Alaska Snow Removal Policy for 1998-1999.

1. **GENERAL:** Public Works staffing for snow removal operations has been cut by 48% from the staffing level of the 1997-1998 winter season. This is a result of the ongoing USARAK hiring freeze and the FY98 and FY99 work year restrictions imposed by higher headquarters. Snow removal operations will be conducted in accordance with the priority system as outlined in this plan however response times will be extended due to the staffing cut. Out of sequence plowing in support of special events will be considered on a case-by-case basis when requirements are identified two weeks in advance by submitting a DA Form 4283 through command channels to the Public Works Customer Service Representative at building 3015.

2. **RESPONSIBILITIES:**

   a. The Directorate of Public Works is responsible for the overall snow and ice control operations on the Fort Wainwright cantonment area in accordance with the USARAK Snow Removal Policy dated 21 January 1997. Other area and unit responsibilities are as designated in subparagraphs b through f below.

   (1) Removal of snow from streets, parking lots, airfield, and similar areas is the direct responsibility of Public Works in accordance with paragraph 3, PRIORITIES. Snow removal operations commence when the accumulation of snow since the last plowing has reached two inches on the Running Route or runway and four inches for all other areas.

   (2) Routine sanding of roads for ice control during duty hours will be scheduled as required. Other sanding requirements will be identified by the Provost Marshal's Office which will notify Public Works directly.

   b. The 864th Engineer Battalion, with fuel and repair parts support from Public Works, is responsible for snow and ice removal operations in the following areas:

   (1) The lower ammunition storage area (2200 area).

   (2) The range complex South of the Richardson Highway.

   (3) The upper ammunitions storage area including Kinney Road, the Bailey Bridge, River Road to Sage Hill Road and Sage Hill Road.

1

APVR-WPW-O
SUBJECT: **Fort Wainwright, Alaska Snow Removal Policy for 1998-1999.**

(4) Birch Hill Loop and Transmitter Site Road to the tower complex at the top of Birch Hill.

(5) Assistance, as mission permits, in the removal of snow from main post streets and parking lots.

c. Family housing occupants are responsible for removing snow and ice on steps, porches, fire hydrants, post office box drops, driveways, and sidewalks to a point at least halfway to adjoining quarters. Occupants will sand hazardous areas. Sand will be available for pickup from Public Works. For further information call 353-7870.

d. Housing area unit sponsors are responsible for the removal of snow and ice from sidewalks, post office drop boxes, bus stops, and mechanical room accesses within their areas of responsibility when it is not accomplished by area occupants.

e. Unit commanders and building custodians are responsible for the removal of snow and ice from window ledges, exterior fire ladders, porches, and all doorways and walkways. Personnel will not go on the roof of any building without the approval of Public Works.

f. Units and activities occupying maintenance facilities and motor pools are responsible for snow removal at their facilities, including parking lots and fenced yards.

3. **PRIORITIES:**

a. Snow removal operations are conducted on a sequential priority system which is subject to change during emergency situations, such as continuous heavy snowfall or high winds.

b. The Post sequential priorities are as follows:

(1) *Priority 1 - HEALTH AND SAFETY.*

(a) Major roadways for fire, ambulance and Military Police - Gaffney; Ketcham; Montgomery; Meridian; Santiago; Neely, including the South sidewalk between Arctic Light and Tanana Satellite Schools; Southgate; 600th St.; Whidden; 6th St.; Alder (6th St. to 9th St.); 9th St.; Apple to 100th St. to 1300 area to Dogwood at bldg. 1032 to 103rd St. to Gaffney; Trainer Gate; River (Gaffney to Trainer Gate).

(b) Fire Stations

(c) Hospital emergency area including helicopter pad.

APVR-WPW-O
SUBJECT: **Fort Wainwright, Alaska Snow Removal Policy for 1998-1999.**

    (d) Airfield fire lanes and MAST Operation area.

    (e) Provost Marshall Office.

  (2) *Priority 2 - MISSION RELATED.*

    (a) DRB related facilities and activities as described in Appendix A.

    (b) Running Route (North side of Hangar 2 to Fire Station No. 1, Northeast to taxi way, East down taxi way to Ketcham, North to Gaffney, and West to 102d Street. Santiago from Fire Station No. 1 to Rhineland, to Ile De France and East to Luzon, North on Luzon to Hangars 4 and 5, and North to taxi way).

    (c) Access routes for Post Headquarters, Power Plant, Water Plant, DOL Warehouse (3030), Public Works, Troop Issue Warehouse, Medical Supply Warehouse, Transportation Motor Pool, KAMISH Clinic (3406), Bassett Army Hospital, and Landfill..

    (d) Roads - Chippewa, Oak, Alder, Tamarack, and 602nd St.

    (e) Airfield:

      - Hangars.

      - South taxi way.

  (3) *Priority 3 - ROADS & AIRFIELD PHASE II*

    (a) Troop and residential area roads.

    (b) Airfield:

      - North runway and inner loop.

      - Taxi ways.

  (4) *Priority 4 -PARKING AREAS FOR PUBLIC SERVICES & ADMIN.*

    (a) Post Headquarters (1555), One Stop Center (3401), Hospital (North & South lots), KAMISH Clinic, Bldg. 1064, Judge Advocate General (JAG) Parking, Telephone Exchange, Commissary/PX Mall, Physical Fitness Center, Malaven Gym, Unit Chapel (3430), Post Office, Child Development Center, Child Development Services (4176), Youth Center/Shoppette,

3

APVR-WPW-O
SUBJECT: **Fort Wainwright, Alaska Snow Removal Policy for 1998-1999.**

Chapel, ACS (3722), Education Center, Self-Help Facility, Laundry (3025), CPO, Sports Store, Burger King, Library/ Credit Union/Bowling Center, Thrift Shop, Auto Crafts, Arts and Crafts, Last Frontier Club, Arctic Oasis, Ski Lodge, Recreational Vehicle Storage Lot, and Outdoor Recreation Center, Vet. Clinic.

(b) Other Parking areas including Administrative Facilities (1031, 1050, 1053, 1558,1565, 1579,1580, 2077, 2079, 2085, 2106, 2109, 3000, 3004, 3005, 3008, 3010, 3028, 3030, 3407, 3409, 3424, 3438, 3450, 3489, 3490, 3491, 3566, 3567, 3570, 3591, 3597, 3599, 4069, 4070, 4161); Barracks (1001, 1004, 3400 area, 3700 area, 4075); Dinning Facilities (3416, 3451, 3728); Unaccompanied Personnel Housing and Billeting (1045, 1063, 4054, 4055, 4062, 4063, 4064).

(5) *Priority 5 - CLEANUP.*

(a) Roads cleared of snow berms.

(b) Family Housing Parking Areas (cleared once per year in late February or March). Lots will be posted in advance and will be worked as priorities permit between snow storms.

(c) Intersections cleared for visibility.

(d) Airfield cleanup; i.e., behind lights.

4. **NOTIFICATION AND IMPLEMENTATION OF PLAN:**

a. During normal duty hours, Public Works will monitor the snowfall and implement operations as required. Unusual conditions, such as large, continuous, or repetitive snowfalls will be handled on an individual basis at the discretion of the Director of Public Works.

b. After duty hours and on holidays, snow removal notification will be made by the Military Police to the Assistant Fire Chief on duty.

c. Sanding requirements will be identified by the Military Police duty officer; who will contact Public Works.

d. Special Notice: The time and date of snow removal operations in parking lots and other congested areas will be posted with distinctive signs three days in advance of clearing. Vehicles in areas to be cleared will be removed to facilitate snow removal. Areas in which vehicles have not been removed will be bypassed and moved to the bottom of the list due to the possibility of damage and Government liability.

APVR-WPW-O
SUBJECT: **Fort Wainwright, Alaska Snow Removal Policy for 1998-1999.**

5. <u>SNOW REMOVAL TECHNIQUES</u>:

   a. Snow is removed from roads and streets by splitting the roadways at center and moving the snow to either shoulder by successive passes of graders. In curbed areas snow is windrowed at the curb and either blown over the curb or removed.

   b. Snow is removed from parking and open storage areas by windrowing and blowing into unused areas where feasible. Otherwise it is removed by loaders and dump trucks. Storage of snow on "islands" in the family housing areas for later disposal is not authorized due to inherent danger to children.

   c. Removal of snow on runways and taxi ways is accomplished by splitting the area at the center and moving the snow to the marker lights by use of graders and rotary plows in echelon. Snow is blown over the lights by rotary plow. Dusting of threshold lights is the responsibility of Airfield Operations. Snow is not pushed or blown on previously cleaned area.

   d. Removal of snow at hangars and parking aprons is affected by clearing snow from hangar doors far enough for maneuvering equipment and then splitting the area so snow can be moved to the outside edges of aprons in two or more directions by graders and rotary plows.

                                       JOHN J. CURRY
                                       LTC, IN
                                       Post Commander

DISTRIBUTION:
A (FWA)

## APPENDIX A

SUBJECT: Snow Removal at Fort Wainwright During DRB Window.

1. Prior to Fort Wainwright's assumption of the DRB status, the areas listed below will be cleared of snow and their status will be upgraded to Priority 2 in the Snow Removal Plan for the duration of the DRB mission.

2. The areas requiring snow removal during the DRB window are:

   a. Melaven Gym, primary PHA, building 3452: all parking and traffic areas in the immediate vicinity of the building.

   b. Physical Fitness Center, secondary PHA, building 3709: all parking and traffic areas in the immediate vicinity of the building.

   c. Hangar #4, primary VHA, building 2106: traffic access routes and airfield apron areas on sides of the building.

   d. Sage Hill Road access to the upper ASP.

   e. Access to the lower ASP.

3. Areas cordoned off with concertina wire and/or occupied by parked vehicles (either government or privately owned) will not be plowed due to the high potential for damage to the snow removal equipment.

4. In the event of an unusually severe storm at the time of deployment, the Public Works representative at the Command Operations Center will contact the State of Alaska Department of Transportation & Public Facilities to determine if convoys to the Eielson AFB point of departure will require an escort by Public Works snow removal equipment. The Winter Road Condition Recording at 456-7623 indicates whether or not the Richardson Highway is open to traffic. Point of contact at DOT&PF is Mr. Ronald T. Reitano, Fairbanks Maintenance Manager, at 451-2205, if the road is closed.

5. This SOP will remain in effect whenever a unit at Fort Wainwright is in DRB status.

8. Do you know if a snow removal service that was scheduled for the area near the dumpster was canceled immediately prior to Ms. Bolt's fall?
    Yes, they canceled it due to a car or cars left parked in the parking lot. The removal service will not clean a parking lot if any vehicles are left there.

9. Do you know why the snow removal service that was scheduled for the area was canceled?
    Per answer to #8.

10. Do you believe that the area near the dumpster where Ms. Bolt fell would have been safer if the snow removal service had been performed as scheduled instead of canceled? Why or why not? Please explain?
    Yes. This was a tricky area, a low spot. Any snow would hold the water back during spring thaw and would freeze at night causing slippery conditions.

11. It was our understanding that you were the area coordinator for Ms. Bolt's building. Can you explain what your duties were as area coordinator?
    To make sure people keep their yards clear, that snow was removed from their side walks. To organize social gatherings. To insure a safe invironment.



INTERVIEW of Sajid Khan

CASE:           Carol Bolt – Slip & Fall

TELEPHONE:      377-2498 work

ADDRESS:        Eielson Air Force Base.
                Eielson, AK

OCCUPATION:     Military

DATE:           11/15/99

RECORDED:       yes

1. Do you know Carol Bolt?
   Yes, a resident neighbor at one time while he was stationed at Ft. Wainwright, Alaka.

2. Ms. Bolt fell on the ice near the dumpster at her housing unit on or about April, 1, 1999, were you aware that this occurred?
   Yes.

3. How were you aware that this had occurred?
   Thinks he heard it from her husband.

4. Are you aware of any one else who had fallen in this area or in the rest of the parking lot during the time period prior to Ms. Bolt's fall or after her fall?
   Later he heard a couple of people had fallen in the parking area, not in the specific same area, but in the parking lot.

5. Had there been any snow removal services in the area near the dumpster during the spring of 1999?
   Yes, they had come to remove the snow, but they wouldn't due to some leaving their cars in the parking lot. They finally got everyone together, the cars were removed and the lot was cleared.

6. Do you recall if the area near the dumpster was icy at the time of Ms. Bolt's fall?
   Yes, definitley.

7. Prior to Ms. Bolt's fall, had there been any complaints from Ms. Bolt or any other tenants about the conditions in the parking lot?
   Yes. He had called up the mayor for the area and reported the slippery conditions.



ATTACHMENT 4 DEFENDANT'S
REQUESTS FOR ADMISSIONS