DEBORAH M. SMITH
Acting United States Attorney

STEPHEN COOPER
Assistant United States Attorney
Federal Building and U.S. Courthouse
101 12th Avenue, Room 310
Fairbanks, Alaska 99701-6282
Phone: (907) 456-0245
Fax: (907) 456-0577
E-mail: Stephen.Cooper@usdoj.gov

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| CAROL BOLT, | ) | Case No. 4:02-cv-21-RRB |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | **REPLY TO OPPOSITION TO** |
| UNITED STATES OF AMERICA, | ) | **MOTION FOR SUMMARY** |
| | ) | **JUDGMENT** |
| Defendant. | ) | |
| _____ | ) | |

The United States replies as follows to plaintiff's Opposition to the pending motion of the United States for Summary Judgment, supported by the attached Exhibits 12, 13 and 14, consisting respectively of brief portions of the depositions or Rick Lowe, Paul DeHaven and John Albrecht, in numerical sequence following the 11 exhibits supporting the main Motion.

The statement of Facts in plaintiff's Opposition contains errors. The more important ones will be noted herein in the discussion of the related legal issues.

1.    <u>Issuance of Regulations and of the Snow Removal Policy, and Actions and Inaction Based thereon, Were Discretionary Functions.</u>

A.  <u>These Decisions Were Protected Discretionary Functions.</u>

Plaintiff argues (Opp., 34 et seq.) that the post commander's Snow Removal Policy, deciding not to clear snow from housing area parking lots but once a year and to leave to residents the responsibility otherwise to deal with snow and ice problems and to "sand hazardous areas," was either "not motivated by any legitimate policy" concerns, or it was a decision not entitled to protection as a discretionary function.  Both assertions are contrary to the undisputed evidence.

The sole evidence in the record on this issue, as to which plaintiff has offered no evidence at all, i.e., as to which there is no factual issue, is that the post Snow Removal Policy (defendant's Exhibit 7, Attachment A) implemented precisely the policies expressed in Defense Department directives and Army regulations:

DoD Directive 4001.1 (defendant's Exhibit 3) granting post commanders "broad authority to decide how best to accomplish the mission" of the post, and nullifying any conflicting regulations — clearly a grant of discretion to post commanders;

DoD Directive 4165.63M (Ex. 4) extending the "broad authority" to housing decisions, requiring "cost-effective" management and provision of "excellent" housing, "promoting" and "encouraging" the use of self-help performed by residents — the quoted terms require the use of discretion,  <u>compare</u> <u>Ayer v. United States</u>, 902

F.2d 1038, 1043-1044 (1st Cir. 1990); <u>Aragon v. United States</u>, 146 F.3d 819, 826-827 (10th Cir. 1998) — and stating the social policy reasons for promoting and encouraging self-help as well as the economic policy of cost-effective management;

Army Regulation 210-50 requiring post commanders to utilize self-help by residents "to the maximum extent practicable" – i.e., as determined in the commander's discretion –, so as to reflect the "prudent landlord concept" – an Army-wide social and political policy –, to "optimize the use of scarce resources" – an Army-wide economic policy –, and to give residents a feeling of "homeownership" – an Army-wide social and economic policy having military, i.e., political, policy ramifications;

Army Regulation 32 C.F.R. § 552.18(c) making the post commander responsible for "efficient and economical" operation of the post — words requiring the use of the commander's discretion to decide what is "efficient" and "economical."

It is neither appropriate nor practicable for a court to attempt to say how the post commander should apply his "broad authority" in housing management decisions; how to balance those needs with the military mission of the post; to determine what management method is most "cost-effective" or when housing is or is not "excellent"; to decide whether a commander has adequately "promoted" or "encouraged" the use of self-help or has utilized it "to the maximum extent practicable," or has acted in a manner that reflects the "prudent landlord concept," has "optimized" the use of resources, or has promoted the residents' sense of "homeownership," or has acted "efficiently" and "economically;" or to say that the post commander should have decided to clear the housing area parking lots more often, or whether the resources of the post would have permitted that without also

jeopardizing some part of the military mission of the post; or to decide whether the post commander had gotten the priorities out of order and should have cleared the parking lots before other areas of military or emergency concern, or whether self-help by residents was or was not a good way to serve the needs of those residents in this regard. Those judgments and balancing decisions are of the kind Congress intended to shield from tort liability. United States v. S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines) et al., 467 U.S. 797, 814 (1984); Dalehite v. United States, 346 U.S. 15, 36 (1953).

There can be no serious dispute, i.e., there is no genuine issue of fact, that the cited directives and regulations commit to the commander's discretion housing management decisions of the kind made in the post Snow Removal Policy. There is no conflicting evidence on that point. It is likewise beyond any genuine dispute that the post Snow Removal Policy, which implemented exactly those expressed Defense Department and Army policies, required exercise of the "broad authority" and discretion which the directives committed to the post commander, all as shown by Lt. Col. Curry's Declaration (Ex. 7, pp. 3-5, ¶¶ 4, 5). This fact also stands unrefuted by any other evidence.

The fact that the Snow Removal Policy was an implementation of the policies of the directives and regulations, both by utilizing the grant of broad authority and by balancing the various social, economic and political policies there stated, in an effort to serve the stated goals in the way the post commander thought best, implicates the holding of United States v. Gaubert, 499 U.S. 315 (1991). If a regulation allows the employee discretion, as the cited provisions explicitly and implicitly do, the very existence of the regulations creates a strong presumption that

a discretionary act authorized by the regulation, such as the commander's formulation of the post Snow Removal Policy, "involves consideration of the same policies which led to the promulgation of the regulations." Id., at 324. Plaintiff contends (Opp. at 38) that ARA Leisure Services v. United States, 831 F.2d 193, 195 (9th Cir. 1987), is in conflict with this principle. If so, that would not affect the validity of the Supreme Court's pronouncement, or its application to the instant case.

Hence, there is no factual basis, and no legal basis, to find other than that the Snow Removal Policy as it applies to this case, and the underlying regulations which it implemented, were discretionary policy judgments of the kind Congress intended to shield from tort liability by operation of 28 U.S.C. § 2680(a).

Plaintiff argues (Opp. at 35, 37) that under ARA, a discretionary decision may not be based on any economic issues, such as budget cuts and shortage of resources for post management and DPW operations, which are reflected in the Snow Removal Policy, in Curry's Declaration (Ex. 7,  ¶¶ 3, 4, 5b, c, d, f, g, & 8), and Meeks' Decl. (Ex. 8, ¶¶ 2, 3, 4, 5). ARA does not support that argument. It held that the discretionary policy decision had already been made in establishing safety standards for park roads, and accordingly the limited budget for carrying out that decision was not a discretionary policy decision that could justify failing to abide by the "established policy." Id., 195-196. No one in this case deviated from any established policy for budgetary reasons. The post commander "balanced the relevant policy considerations when [he] established" the post Snow Removal Policy, id., and in so doing he necessarily and properly weighed economic policy considerations. "Congress wished to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, *economic*, and political policy . . . ."

<u>Varig Airlines</u>, 467 U.S. at 814 (emphasis added).

Further, unlike <u>ARA</u> which involved a safety-based "standard" issued by the Park Service to which all park roads had to conform, nothing has been identified in this case in any regulation, policy statement or any other authority, which set a specific "standard" to which snow removal and traction control in plaintiff's parking lot had to conform. Instead, the commander was granted "broad authority to decide how best to accomplish the mission" of the post, and all regulations inconsistent with that broad authority were expressly nullified. Defense Department Directive 4001.1 (Ex. 3, p. 1).

This broad authority included the commander's determining the kind and degree of self-help to rely on. He was required to utilize self-help "to the maximum extent practicable" — a discretionary value judgement — AR 210-50, § 1-18$h$ (Ex. 5, p. 8). In doing this, he was aware of the long-established (since 1971 or before) responsibility of residents for taking care of "parking areas, walks, areas around garbage containers," in addition to "common grounds . . . as directed" for "those [housing] units which [as here] border common grounds," and their responsibility to remove snow and ice or apply sand or chemicals on all paved areas, which included private drives and similar areas giving direct access to quarters. DA PAM 210-2, §§ 6-1, 7-5 (Ex. 6, pp. 4 & 5). While these regulations placed on residents the responsibility for snow and ice control, the post commander was only required to "promote" and "encourage" residents' self-help "to the maximum extent practicable." No specific, mandatory regulation required him to decide that issue a particular way, such as by assigning those responsibilities to DPW or to any other entity. He acted under the grant of "broad authority to decide how best to accomplish the mission" of

the post.  If he had the resources, he could have increased the number of times DPW would clear the residential parking lot and could have required DPW to sand the lot. But for social, economic and political policy reasons he chose not to do so.  Instead he made maximum use of the kind of self-help reflected in the existing regulations on residents' responsibilities.  DPW was only to clear the lot once a year, and otherwise the responsibility for snow removal and sanding of hazardous areas rested upon the residents.  No one resident was expected to shovel out the entire common area parking lot (Exhibit 12 attached hereto, excerpts of Deposition of Richard Lowe, June 15, 2005, 2-4).  But the residents were required to sand hazardous areas (Ex. 7, Att. A at 1-2; Ex. 6, § 7-5).  That decision was embodied in the Snow Removal Policy.  It was a valid discretionary policy judgment.

Plaintiff (Opp. at 34 & 36) cites that Policy itself as a specific "mandatory regulation" precluding discretion in the formulation of the Policy.  The argument is circular.  The discretionary function operated when the Army issued the discretion-granting regulations and their policy statements, and also in formulation of the Snow Removal Policy based thereon.  Subsequent actions of maintenance personnel acting in accordance with the Policy are protected by that same discretion, not by any independent discretion leading them to act contrary to the Policy.  Dalehite 346 U.S. at 36.

Because Curry's Declaration (Ex. 7,  ¶ 4, 5, pp. 3-5) unquestionably shows that he considered nearly all, if not all, aspects of the matter at hand in reaching his policy judgments, it is immaterial whether or not he was required to consider all aspects.  Plaintiff (Opp. at 25-26) misreads Kennewick Irrigation District v. United States, 880 F.2d 1018 (9th Cir. 1989), as imposing such a requirement.  That

case holds the contrary, that negligent failure to consider all aspects of the matter does not nullify the discretionary character of the decision made. Id., 1028.

In light of the authorities showing the regulations and the Snow Removal Policy to be discretionary functions, plaintiff's proffered expert opinions of Robert Tilly on tort duty and what constitutes negligence – legal opinions offered by a civil engineer – are of no real help. Besides Tilly's misinterpretation of the factual record, discussed below, it is immaterial to the issue of discretionary function that the lot was more slippery in March and April; that the Army did not inspect residential parking lots in order to correct hazardous conditions; that it did no sanding; that it declined to remove the snow more than once per winter; that it refused to clear any lot until all vehicles had been removed; that it refused to remove vehicles in order to proceed with snow removal; or that slippery conditions were foreseeable. These expert opinions overlook the factor of the discretionary function, i.e., that some functions of government require Executive Branch officials at times to set aside what might be an undisputed duty under the tort law of the state and, as happened in this case, to completely re-arrange the duties, responsibilities and expectations of all parties concerned, for reasons based on social, economic and political policy. The official who makes that decision may even do so negligently. Section 2680(a) assumes negligence or a wrongful act in the process of making such a discretionary decision. That statute would have no reason to exist if only non-tortious discretionary decisions were protected by it. Dalehite makes this point. 346 U.S. at 33. In determining whether the decisions here to formulate, issue and execute the departmental directives, the Army regulations, and the Snow Removal Policy that implemented those requirements, were discretionary, it is immaterial whether any of those

decisions are deemed negligent, or on what grounds.

For the same reason, it is immaterial what duties state law places on landlords, assuming arguendo that such laws apply to the Army as a "landlord" in relation to plaintiff. The responsibility of landlords under Alaska law for common area maintenance, and whether that duty may ever be delegated, are not in issue. DoD directives, Army regulations, and the post commander all completely reversed the state law duties, in the exercise of discretionary functions which culminated in formulating the duties and responsibilities set forth in the Snow Removal Policy. These eliminated any role for the Army and its DPW at Ft. Wainwright regarding snow and ice control at family housing quarters and adjacent common areas beyond the once-a-year clearing of hard pack from the lot in late winter, and leaving all other responsibilities for snow and ice removal and sanding entirely to the residents. Only if plaintiff is correct that issuance of the regulations and the Snow Removal Policy were not discretionary functions, would landlords' state law duty of maintenance of common areas become material to this case. Because issuance of the regulations and Policy were discretionary functions, and because they are totally contrary to the state system, they displace entirely the state law duty of landlords. Neither do the Policy or the directives and regulations conform to the conditions of AS 34.03.100(d) for a valid contract with the resident to undertake such maintenance. The Policy simply sets the limits of DPW's duty, and the regulations and Policy together provide that residents are responsible for all the rest of the snow and ice removal and sanding in common areas. The discretionary nature of these actions, under the terms of §2680(a), renders the duties of landlords under state law are immaterial.

Thus, there is no genuine issue of material fact that issuance of the

directives, regulations and Snow Removal Policy were discretionary functions within the protection of 28 U.S.C. § 2680(a), and that the provisions thereof displaced any state law duties of the Army as a "landlord" with respect to plaintiff.

### B.  DPW Acted in Full Conformity to the Snow Removal Policy.

Further there is no genuine issue of material fact that DPW's one-time snow removal at plaintiff's parking lot on a later date after the scheduled date of March 9 due to cars having been left in the lot that day, was all that was required of DPW by the Snow Removal Policy and was in compliance with that Policy.  The only evidence plaintiff offers against this is a statement in the deposition of John Cicilese, a specialist in the Post Safety office, who was aware of the Snow Removal Policy but was not shown a copy of it.  He thought it provided for DPW to clear housing area parking lots after a snowfall rather than once a year, and that DPW routinely sands those parking lots on request (Plaintiff's App. 11, p. 16).  He qualified his statements by referring plaintiff to DPW for the information.  Id.  What Cicilese thought the Policy required does not alter its actual requirements.

Nor are those requirements put in issue by any testimony of Paul DeHaven, the former Roads and Grounds supervisor at DPW.  Plaintiff cites his testimony (App. 14, pp. 4-5) that DPW could have sanded the "entrances" to the parking lot if requested.  Plaintiff overlooks DeHaven's testimony that DPW "wouldn't have gone into the lot" (id., p.7).  The same is evident from the DeHaven deposition pages that plaintiff has omitted, showing that DPW would not go into a parking lot with cars in it (Ex. 13 attached hereto, p. 4).  The most they would do

would be to cut down the ledge caused by plowing the street and not the lot, just to eliminate the "big drop-off in and out of the lot." Id., p. 5. This reveals that sanding the "entrances" meant dropping sand on the street in front of the driveway entrance, and did not mean going into the lot. This is corroborated by Operations Support supervisor Rick Lowe's Declaration stating that DPW did not do the hand work required for sanding localized icy patches but operated large equipment not suited to that task, and could not and would not respond to a call by attempting to sand in the parking lot or at the dumpster (Ex. 9, ¶¶ 4, 5). The same is testified to in Meeks Decl. (Ex. 8, ¶¶ 4, 5). See also Lowe Dep. excerpts attached hereto (Ex. 12, p. 5):

> If I had trouble getting cars out of there for snow removal, picture going in there with a broadcast spreader and peppering their cars. I'm sure you'd be one to complain that your car has just been sand-blasted. I don't have a sander that just puts it right here. It throws it.

There is no genuine issue of a material fact in any of this evidence. Even if DPW could or would have gone into plaintiff's parking lot on request and hand-sanded the dumpster area for her, that would not alter the requirements of the Snow Removal Policy which do not impose any such duty. The requirements are not genuinely in issue, and there is no genuine issue of fact that DPW fully complied with those requirements. No evidence has been or can be produced that alters this fact.

Therefore, there is no genuine issue about the fact that plaintiff's fall and injury resulted from conditions for which neither DPW nor any other entity — except plaintiff herself and her fellow residents — had responsibility under the controlling Snow Removal Policy.

2.    No Liability May Be Founded on Acts or Omissions of Residents.

Plaintiff contends further (Opp. at 29-33) that her fellow tenants owed her a duty to take care of snow and ice problems in the parking lot, that they negligently violated that duty, and that their negligence caused her injury. Plaintiff acknowledges that all these elements are required to state a cause of action in tort (see Opp. at 39), i.e., that failure of any one of these elements negates the cause of action. In addition, in order to state a federal tort claim, plaintiff must show that the actor was an employee of the Government acting within the scope of employment. 28 U.S.C. § 1346(b)(1).

While plaintiff claims she had no idea that she had any responsibility for snow and ice removal or sanding in common areas and thought the area coordinator had that responsibility (App. 15, pp. 2-3), she admits (Opp. at 28-33) that the Snow Removal Policy and the Residents' Handbook (and by implication the regulations upon which these are based) created duties in "the apartment residents" of plaintiff's housing area "to perform snow removal in Carol Bolt's parking lot" and "to make the area near the dumpster safe;" that the United States is vicariously liable for their negligent failure to do so; and further that Sgt. Khan negligently failed to require the residents to do this work (id. at 32-33).

Lack of any one of the required elements is fatal to a federal tort claim. Plaintiff's theory is meritless as to nearly all of the required elements:

1. Plaintiff fails to show the existence of any tort duty owed to her under state law by any of these residents or by Sgt. Khan.

2. Plaintiff fails to offer any evidence of the employment status of any such

resident, except that of Sgt. Khan and her own husband Kevin Bolt.

3. Plaintiff fails to offer any evidence that could support a finding that in their alleged failure to perform their duties, any of these persons were acting in the scope of their employment.

4. Plaintiff fails to offer evidence sufficient to create a genuine issue of fact as to the residents' or Sgt. Khan's negligent failure to perform these duties.

5. Plaintiff fails to offer any evidence of a causal link between any alleged omission of these duties and her injury.

### A. Lack of State Law Duty

It is fundamental to a federal tort claim that the duty must be found in state law. Delta Savings Bank v. United States, 265 F.3d 1024-1025 (9th Cir. 2001). In Lutz v. United States, 685 F.2d 1178 (9th Cir. 1982), the duty of a dog owner to control his dog to prevent injury to another was found in a military regulation, for which there was an analogous duty under the law of the state where the military base was located. The Ninth Circuit held that the duty must arise from state law, and that where a state law duty is found to exist, the military regulation may provide the standard of care. Id. at 1184.

Here, military directives, regulations, the Snow Removal Policy and the Residents' Handbook, did not parallel any state laws but contravened the state law duties of landlords to maintain common areas, assuming the Army was a "landlord" in this instance, and created new duties unknown in state law. These military provisions, based on clearly articulated social, economic and political (military)

policies, eliminated the responsibility of the Army for snow and ice removal and sanding in residential parking lots beyond the once-a-year plowing of the lot, and otherwise placed the entire responsibility for those tasks on the housing residents themselves, including plaintiff.

Plaintiff is correct in asserting (Opp. at 29-33) both that these duties were "created" by the military regulatory provisions, and also that the duties applied to all residents of the military apartments without regard to military or non-military status. Plaintiff refers to those persons sometimes as "soldiers" (<u>id.</u> at 30) and "Army employees" (<u>id.</u> at 31), and sometimes as "residents" (<u>id.</u> at 32) and "apartment residents" (<u>id.</u> at 33). The cited regulations, the Snow Removal Policy, and the Residents Handbook assign these duties to all "residents" and "occupants" without distinction based on military status. This meaning is corroborated by the Conditions of Occupancy signed by plaintiff's husband upon assignment to these quarters (Ex. 1, Att. A, p. 2). The paragraph on "General Maintenance" places the duty of snow and ice removal on all the residents of the apartment, but makes the "resident" (singular) liable for property damage caused by negligence of any of the "residents" of that apartment. This distinction between the "resident" (also called "sponsor" on p. 3) and the "residents" of the apartment appears throughout the document. It would be unreasonable to conclude that these maintenance responsibilities fell solely on the sponsor and not on other residents. Maintenance tasks are no less needed whether the military member is present or is absent on a dependent-restricted tour of duty such as, for example, Iraq.

The duty of all residents to conduct winter maintenance in common areas and the duty of Sgt. Khan to organize the residents to accomplish that duty, therefore,

are federally created duties.  But they are duties for which no analogous state law duty exists.  This is unlike <u>Lutz</u> where the state law applied to the dog owner in the same way the military regulation applied.  No state law requires tenants to maintain common areas adjacent to their leasehold, or to organize other tenants to do so.  There being no state law duty, there can be no FTCA recovery for their alleged negligence.

If, as plaintiff contends, the residents who failed to conduct winter maintenance in the parking lot or who failed to organize other residents to conduct such maintenance, violated a "specific mandatory regulation" in the form of the Snow Removal Policy, that fact would simply remove the protection that otherwise applies to "acts of subordinates in carrying out the operations of government in accordance with official direction."  <u>Dalehite</u>, 346 U.S. at 36.  Even then, tort liability would attach to their negligent acts or omissions only if such residents were employees acting in the scope of employment, which they were not (see below), and then only if an analogous state law duty existed, which it does not.  <u>See</u> <u>Lutz</u>, 685 F.2d at 1184.

There is no state law duty, and no Federal Tort Claims Act liability.

## B.  <u>No Federal Employees Except Sgt. Khan and Plaintiff's Husband</u>

"Employee" includes members of the military.  28 U.S.C. § 2671. Plaintiff does not contend the definition includes herself.  Aside from plaintiff's own husband Kevin Bolt, Sgt. Khan is the only person identified as a federal employee who allegedly failed to perform the duty plaintiff claims the residents owed to her. There is no evidence that any other soldier was present and obligated to sand the parking lot, rather than being, for example, on a dependent-restricted tour of duty

while the family remained at Ft. Wainwright.  Plaintiff's husband was required to sand hazardous common areas and failed to do so, according to plaintiff's evidence. But the duties of Khan as area coordinator were to coordinate the duties of the residents, not to carry out those duties himself, although he did both.  Plaintiff's action based on the residents' neglect of duty, therefore would limited to her own husband's and Sgt. Khan's alleged omissions, if any actionable duty existed, and if there were proof of scope of employment, negligence and causation.

### C.  Lack of Proof of Scope of Employment

For military members, acting in the "scope of employment" means acting "in the line of duty."  28 U.S.C. § 2671.  The meaning of this is determined by the state law of *respondeat superior*.  Williams v. United States, 350 U.S. 857 (1955). In Alaska the employer is liable for torts of the employee if the tortious conduct "arises out of and is reasonably incidental to the employee's legitimate work activities."  Doe v. Samaritan Counseling Center, 791 P.2d 344, 348 (Alaska 1990). Lutz found an Air Force member to be acting in the scope of employment under Montana law, in negligently failing to keep his dog from biting plaintiff, because the base regulation he violated was a delegation to him of a base security function which was a duty assignment enforceable by the threat of military discipline.  685 F.2d at 1183.  Lutz relied on Craft v. United States, 542 F.2d 1250 (5th Cir. 1976), where a soldier was found to be in the line of duty when he negligently struck a child while he was mowing the grass at his on-post quarters.  He was acting in compliance with highly detailed regulations prescribing the manner and method of grass cutting,

including specification of equipment and the minimum number of inches to which grass may be cut depending on what species of grass it is and the type of location it is in, all enforced by the threat of military discipline.  Id., at 1255.

Regarding the dumpster area in the present case, there were no such highly detailed regulations, merely a statement that residents will remove snow and ice from their "driveways" (Ex. 7, Att. A at 1) and common areas which included the parking areas, walkways and dumpster areas (Ex. 7, ¶ 2, p. 2, and ¶ 7, p. 6) and that "occupants will sand hazardous areas."  Ex. 7, Att. A, ¶ 2c, p. 2.  Nor were any of these provisions enforced by military discipline.  The residents performing the duties were apparently in large part non-military dependents having no employment relationship with the government.  Rather, they were tenants of government housing.  Virtually no enforcement was evident, but merely supervising and "coordinating" residents' maintenance of these common areas by an area coordinator (Ex. 1, Att. C, p. 6), and a system of paper "citations" that stayed in a file, never went to any court and were eventually destroyed, that were issued by Sgt. Albrecht of Post Services "mainly to let the occupant know the areas they're deficient in and how to correct them."  Deposition of Sgt. John Albrecht, June 28, 2005 (excerpts), attached hereto as Ex. 14, pp. 2-4.  The evidence does not show that these citations might potentially lead to expulsion from quarters in an extreme case.  But even if they could, this system lacks the necessary elements of "employment" based on the threat of military discipline found in Lutz.  The court there observed, at 1183:

> We do not suggest that every act of a base resident is within the scope
> of his employment.  Such a rule would impose upon the military a
> liability far broader than that of a private employer, contrary to the

limited waiver intended by the FTCA.

Whether the actor was Sgt. Khan, plaintiff's husband, plaintiff herself, or any of her unidentified neighbors, no one was acting in the scope of federal employment in sanding or failing to sand the area of the parking lot near the dumpster. Their acts or omissions therefore are not actionable under the FTCA.

### D.  Lack of Proof of Negligence

Plaintiff alleges negligence consisting of (a) failure of residents to clear snow and ice from the parking lot and sand the area where she fell (Opp. at 28-33, 39), (b) failure of Sgt. Khan to "enforce" the responsibility of the residents to do this (id., and 44), (c) the failure of Sgt. Khan to report the hazardous condition in the parking lot so DPW could correct it (id., 42-43), (d) failure of the Army to comply with state law duties of landlords to maintain common areas (id., 39-40), (e) failure of the Army to correct slippery conditions of which it had notice from prior accidents in the four preceding years (none of them in this lot or any housing area lot) (id., 30, 47); (f) failure of the Army to conduct inspections for the purpose of correcting slippery conditions (id., 43-44); (g) failure of the Army to remove snow from the lot more than once a year, or sooner than April (id., 44, 45); (h) failure to remove cars from the lot to clear the snow (id., 45).

It is immediately apparent that the last five grounds, d, e, f, g and h are immaterial because even if they arguably would demonstrate negligence in a normal case, the cited actions and inaction of the Army in this case resulted from discretionary policy decisions that were made on the basis of all the reasons stated

above, and are not actionable under the Tort Claims Act.

In ground a, above, plaintiff cites "residents", which includes herself and her husband, for failing to carry out winter maintenance of the area where she fell. She says she knew, apparently before the accident, that the area was "particularly dangerous" and had not been "adequately addressed" (Opp., App. 15, ¶ 7). She and her husband say there was no sand on the ice where she fell (id., ¶ 13, App. 17, ¶ 9). As often as she must have used that dumpster, the alleged lack of sand must have been a very recent development. Otherwise plaintiff would have fallen sooner or would have noticed the extraordinary hazard and reported it.

In plaintiff's August 2001 interview by the claims officer (attached to defendant's Motion as Ex. 11, p. 2), she says she complained to Sgt. Khan earlier in the winter "about the snow and ice." Now, however, plaintiff's and her husband's affidavits (Opp., App. 15 and 17) avoid saying that either of them ever complained. If they had complained, the Army would have been on notice of the condition. But then, so would plaintiff; and she as well as her neighbors were the ones solely responsible to deal with it. If any resident called DPW to complain of a slippery area in their parking lot, they would be advised where to get sanding chips and shovels to deal with it themselves. Ex. 12, pp. 2-4; Ex. 9, ¶ 5; Ex. 8, ¶ 5. Plaintiff now claims to have been ignorant of this duty of the residents. If she had truly called in a complaint either to DPW or to Sgt. Khan, she would have learned of her duty to pitch in and deal with the problem herself, and would have been advised of where to obtain the sand and shovels. Either she did complain and was so advised, contrary to her present claim of ignorance, or she never complained as she at first claimed she did. Hence her present silence about ever having complained. And hence the

unreasonableness of her present assertion that Sgt. Khan never solicited her or Kevin Bolt's cooperation in sanding the walkways and dumpster area, and that she believed Khan alone had that responsibility.

If plaintiff had simply looked at the Residents' Handbook, without more, she could not have held the state of mind she now claims she had. She says she knew of residents' responsibility to shovel their own walks, etc. She must have learned that duty from the same source that also states the rest of her responsibilities. Only selective reading or no reading of the Residents' Handbook could have kept her ignorant of the residents' duty to ensure that "common areas are clear of trash, snow and ice" (Ex. 1, Att. B, p. 4, Att. C, p. 3), to police "postal pads and dumpsters" as well as the "driveways" and the "parking area" where the dumpster was situated (id., Att. B, pp. 3, 5, 7; Att. C, pp. 4, 5, 6), that supplies for snow and ice removal are available at the self-help center (id., Att. B & C, p. 4), and that "coordination of building residents is necessary" to keep the common areas clean and free of snow and ice (id., Att. B, p. 4, Att. C, p. 3).

What Robert Tilly offers is solely commentary on other evidence. As a civil engineer, he is familiar with roads and winter conditions. But the Court hardly needs an expert to advise that a parking lot may become slippery in interior Alaska in the winter, and moreso during March and April, and that if the lot had been cleared sooner, it might have been less slippery. For the rest, Tilly offers opinions and misstatements of Khan's testimony. He claims that Khan's testimony shows he did not perform his duty to require residents to assist in winter maintenance of the lot (App. 9, ¶¶ 6, 12), that he knew of the hazardous area near the dumpster and failed to report it (id.) or to obtain the residents' cooperation in correcting it (¶ 7), etc. He

provides no citations to the record to support these mischaracterizations of the testimony. Beyond this, Tilly offers the legal opinion that Khan was negligent for not reporting the slick spot near the dumpster so that DPW could correct it (¶ 10). Alternatively, he opines that if Khan had no duty to report the condition for DPW action, the Army was negligent for failing to inspect so as to find the problem (id.). He condemns as negligent the plan which was promulgated in the Snow Removal Policy, completely rearranging these duties (¶ 11, 13-18).

This is plaintiff's offer of proof and constitutes no evidence at all that Khan failed to obtain the residents' cooperation and that the residents failed to sand the slippery areas. Khan was the best area coordinator of the year, and worked conscientiously at obtaining the residents' cooperation in these duties (Ex. 10, p. 29). And he succeeded, by sanding and observing other residents sand the common areas including the dumpster area (id., 13, 16, 18-21, 25, 26, 29, 32, 36). He knew the area was slick but it was not so dangerous that an injury should be expected (id., 31, 24).

No one complained before plaintiff's fall (id.,16, 19, 29, 30). If anyone, including Khan, had complained, DPW would have informed them where to get the supplies to remedy the problem themselves, as was their duty (Ex. 9, ¶ 5, Ex. 12, pp. 2-5). Negligence, if any, would arise from failure to remedy the problem, not failure to report it. A report could not alter anyone's responsibility. Khan's report to the mayor after the accident was not an effort to get someone to sand the slippery spots, but to get DPW to plow out the lot as soon as possible (Ex. 10, p. 19). Likewise, the supposed duty to report hazards to Post Safety, referred to by the safety specialist John Cicilese (Opp., App. 11, p. 12), could not shift responsibility from the residents. In any event, Cicilese's basis for such duty was Army Regulation 385-10, but that

regulation (available on internet) only requires Department of the Army employees to report unsafe working conditions, id., §§ 2-4 and 4-4, and does not apply here.

Plaintiff does not create a genuine issue of fact by offering an expert to read Khan's testimony inaccurately and in a negative and grudging manner, rather than fairly and according to its plain meaning, or by claiming ignorance of what Khan and the other residents were doing and what plaintiff was obligated to do. None of this is evidence of negligence by Khan and the other residents. It cannot discharge plaintiff's burden of proof. And none of it overcomes the affirmative evidence of Khan regarding what he and the other residents did to maintain the area.

Nor is a genuine issue created by simply asserting that plaintiff and Kevin Bolt did not see any sand on the ice where she fell, at that moment. The assertion does not prove negligence on the part of those who, like Khan, were busy trying to keep up with such problems as break-up was approaching. Everyone's eyes, including plaintiff's, were needed to effectively meet the demands of traction control in common areas. She had a like duty with all the residents, and was in a better position to see the problem. It was broad daylight when she fell. On April 1 in Fairbanks, 8:00 a.m. is after sunrise. Also, it was still winter in Alaska. Slip and fall accidents can happen without anyone's negligence. This is not a case of *res ipsa loquitur*. It requires proof of negligence, to be provided by plaintiff. If, as is probable, the area had periodically been sanded as Khan testified, that is no guarantee that no one will slip and fall.

This accident could easily happen without negligence. The fact of the fall is about the only reliable event put forward by plaintiff's evidence. And that does not create a genuine issue of fact for trial as to negligence. Plaintiff has shown that

she and Kevin neglected their responsibilities, but she has no evidence of any else's neglect.

### E.  Lack of Proof of Causation

As shown above, plaintiff's own negligence, more than anyone else's, caused the injury.  Other than Khan as to whom proof of negligence is entirely wanting, no person other than plaintiff herself and her husband has been identified and shown to have acted or failed to act in a manner causing the injury.  The allegation that Khan failed to make some required report, as also shown above, bears no causal relationship to the accident because the responsibility for remedying the hazard remained upon plaintiff and other residents, whether or not it was reported.

### 3.    Even in the Absence of Discretionary Function, Hale Applies.

Plaintiff's only objection to applicability of Hale v. City of Anchorage, 389 P.2d 434 (Alaska 1964), and Morrison v. City of Anchorage, 390 P.2d 782 (Alaska 1964), is the claim that Ft. Wainwright is more comparable to a grocery story than to a municipality.  In addition to the obvious facts of this case, Hollinger v. United States, 651 F.2d 636 (9th Cir. 1981), settles the issue by recognizing Hale's applicability on a military base, implicitly accepting its analogy to a municipality.

Conclusion

[T]here is no issue for trial unless there is sufficient evidence favoring

the nonmoving party for a jury to return a verdict for that party.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  Further, "discredited

testimony is not [normally] considered a sufficient basis" to defeat a properly

supported motion for summary judgment.  Id., at 257.

Rule 56(c), F.R.C.P., does not merely permit the entry of summary

judgment, it

mandates the entry of summary judgment, after adequate time for

discovery and upon motion, against a party who fails to make a showing

sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at

trial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Plaintiff bears the burden of

proof of all the essential elements of a federal tort claim, and has plainly failed to

meet that burden.

As the Court in Celotex further explained, the burden is not on the party

moving for summary judgment to produce evidence showing the absence of a genuine

issue of material fact.

Instead, as we have explained, the burden on the moving party may be

discharged by "showing" – that is, pointing out to the district court –

that there is an absence of evidence to support the nonmoving party's

case.

Id., at 325.  Defendant here has done that, and a good deal more, by producing evidence showing the absence of virtually every element of a federal tort claim. Plaintiff has failed to make a showing sufficient to establish the existence of at least one, and virtually all, elements essential to plaintiff's case, and on which plaintiff will bear the burden of proof at trial.  Celotex, 477 U.S. at 322.  Therefore, summary judgment dismissing this action is required.  Rule 56(c), F.R.C.P.

RESPECTFULLY SUBMITTED this 21st day of March, 2006, at Fairbanks, Alaska.

DEBORAH M. SMITH
Acting United States Attorney

s//STEPHEN COOPER
STEPHEN COOPER
Assistant United States Attorney
Federal Building and U.S. Courthouse
101 12th Avenue, Room 310
Fairbanks, Alaska 99701-6282
Phone: (907) 456-0245
Fax: (907) 456-0577
E-mail: Stephen.Cooper@usdoj.gov
Alaska #6911028