IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

CAROL BOLT,

         Plaintiff,

vs.

UNITED STATES OF AMERICA,

         Defendant.

Case No. 4:02-cv-0021-RRB

**FINDINGS OF FACT,
CONCLUSIONS OF LAW,
AND ORDER**

## I.    INTRODUCTION

Before the Court is a complaint for negligence filed by Plaintiff Carol Bolt against the United States of America under the Federal Tort Claims Act. Plaintiff claims that the U.S. Army, which owns and operates the base at Fort Wainwright, Alaska, was negligent in its maintenance of the property. She further claims that this negligence was the proximate cause of injuries she sustained when she slipped and fell while carrying trash to the dumpster in the parking lot of her miliary housing unit on the morning of April 1, 1999.

More specifically, Ms. Bolt claims that the Army had a duty to remove snow from the parking lot prior to the date of her accident, and that the Army's breach of this duty resulted in unreasonably icy and dangerous conditions that precipitated her accident. According to Bolt, the Army's duty to remove snow prior to the date of the accident arose under both Army regulations and common law negligence. Therefore, in addition to common law negligence, she seeks relief under the doctrine of negligence per se.

The Government denies liability and raises the defense of comparative negligence. Trial took place on March 4-6, 2009. A final decision was extensively delayed due to Plaintiff's insistence that the Court address perceived discovery violations by Defendant before rendering its decision. This the Court did, finding no such violations occurred.

## II. TRIAL

Trial took place in Fairbanks, Alaska, on March 4 through 6, 2009. Pages 2 through 21 contain an overview of the trial testimony.

### A. Sajid Kahn

Plaintiff first called Sajid Kahn to the stand. At the time of Plaintiff's accident, Mr. Kahn was a Sergeant on active duty in the Army. In addition to his regular military duties, he had an

Case 4:02-cv-00021-RRB   Document 171   Filed 08/28/09   Page 2 of 35

additional assignment as the area coordinator for the housing unit in which Plaintiff was then living.

Plaintiff's Exhibit 49 is a copy of Mr. Kahn's appointment as area coordinator. The appointment memorandum specifically states that Mr. Kahn is "responsible for the safety, health and well being of the families within" his assigned area.[1] On the stand, Mr. Kahn agreed with Plaintiff's counsel that he had the "duty to coordinate building residents to ensure that all adjoining areas and common areas were clear of snow and ice."

Plaintiff's counsel questioned Mr. Kahn about statements that he made in November 1999 during an interview with a private investigator. At that time, Mr. Kahn said that the snow had not been removed from the dumpster area at the time that Ms. Bolt fell, and that the area would have been safer had the snow been removed by plowing. The reason the snow had not been removed is that there were residents' cars remaining in the parking lot, and the Army refused to plow parking lots with cars in the lot. He also said in the 1999 interview that the area near the dumpster was a tricky spot due to melting ice, which would pool in low spots and then refreeze, making the area slippery and dangerous to walk on.

---

[1]     Exhibit 49, p. 1.

FINDINGS, CONCLUSIONS, AND ORDER - 3
4:02-CV-0021-RRB

At trial, however, Mr. Kahn testified that he was no longer certain that the failure to remove snow prior to Ms. Bolt's accident made the area more dangerous. He stated that after living in Alaska for the last ten years, he now knows that snow plowing can sometimes make the ground more slippery in the short term by glazing over the ice. He attributed his prior contrary statements to the fact that he had only recently arrived in Alaska when he was interviewed back in 1999 and did not yet understand very well the effects of snow removal.

One common method used by the Army for making parking lots less slippery was to spread sand over icy areas. Mr. Kahn did not specifically recall, either during his trial testimony or during his prior deposition, whether he had "sanded" the area around the dumpster in the days leading up to Plaintiff's accident. He was insistent, however, that he was typically very vigilant about remedying dangerous situations. He also insisted that the residents shared in the obligation to spread sand over icy areas.

Mr. Kahn was aware prior to the accident that the area around the dumpster was a dangerous spot because it had a greater tendency to melt and refreeze than other areas in the parking lot. He later found out that this phenomenon was caused by a utility duct that ran underneath the dumpster area. Mr. Kahn did not report the conditions around the dumpster to anyone prior to Ms. Bolt's

accident. He did report the conditions to the Director of Public Works (DPW) after the accident.

Mr. Kahn did not recall at either the trial or his deposition whether there was a regular schedule for sanding the parking lot. He does remember that he had a schedule for inspecting common areas such as the parking lot. His regular practice was to sand if needed. As far as his responsibility for organizing the residents to remedy the icy conditions goes, he preferred to lead by example rather than specifically asking each resident to take part in the shoveling and sanding. According to Kahn, the icy areas were not too dangerous if sanded, although spreading sand is not a magic bullet.

On cross-examination, Mr. Kahn discussed the fact that the Resident's Handbook, Exhibit G, specifies that the residents have the responsibility to clear "snow and ice from steps, porches, driveways, mailboxes and sidewalks" near their quarters.[2] The Handbook also informed residents that they could obtain ice melt, shovels, and ice chippers from the base Self-Help center at no cost. He observed the residents shoveling snow and ice maybe "once or twice a week."

---

[2]     Exhibit G, p. 17.

Mr. Kahn said that the amount of ice melt and sand that could be obtained for free from Self Help was not sufficient for an entire winter, and that he often used his own money to buy extra as a favor to the residents. He stated that he would not inform Post Services, DPW, or the mayor if there was a hazardous condition that he or the other residents could take care of themselves.

Mr. Kahn did not see Ms. Bolt fall and cannot say for certain where she fell.

**B.   Michael T. Meeks**

Mr. Meeks is the civilian Director of Public Works for Fort Wainright, a position which he held as an active duty member of the military at the time of Plaintiff's accident. He was a defense witness, but was called out of turn due to scheduling conflicts.

Exhibit E is the Fort Wainwright Snow Removal Policy that was effective in 1999. The Policy was approved by John Curry, the Post Commander at that time, after a series of public town hall meetings attended by servicemen and family members. Notice of these meetings was posted at the Post Exchange.

The first paragraph of the Snow Removal Plan states:

Public Works staffing for snow removal operations has been cut by 48% from the staffing level of the 1997-1998 winter season. This is a result of the ongoing USARAK hiring freeze and the FY98 and FY99 work year restrictions imposed by higher headquarters. Snow removal operations will be conducted in accordance with the

priority system as outlined in this plan[.] [H]owever[,] response times will be extended due to the staffing cut.[3]

The Plan provides for five different priority levels of snow clearing, with snow removal conducted in order of priority. The fifth and lowest level of priority includes "Family Hosing Parking Areas (cleared once per year in late February or March)."[4]

Mr. Meeks testified that the snow removal crew would annually list the order of snow removal for the various housing units. Public Works would then go down the list removing snow from the parking areas one by one. Residents would receive at least three days' notice before snow removal in order to give them time to remove all cars from the parking lot. If there were cars remaining in a parking lot on the list, it would be bumped to the bottom of the list. This information is also provided in the Snow Removal Policy.

The primary reason for not plowing parking lots with cars in them is one of safety; children may be in and around those vehicles. Also, Public Works was concerned about damage to the vehicles themselves. Additionally, because the housing units were at the bottom of the priority list for snow removal (behind roads and important military facilities such as the hospital and

---

[3]     Exhibit E, p. 1.

[4]     Exhibit E, p. 3, parentheses in original.

FINDINGS, CONCLUSIONS, AND ORDER - 7
4:02-CV-0021-RRB

airfield), any new snowfall during the regular snow removal period could result in a delay.

Mr. Meeks stated that the reason for removing snow once a year from the parking lots was to keep accumulated snow from melting and then refreezing during the early stages of the spring thaw. It was impractical based on their resources to plow more often.

Mr. Meeks believed that the snow removal policy represented a "goal" for Public Works to pursue, rather than a "statute" which was binding upon them. Every year that he has been employed with Public Works, there were delays due to residents' failure to remove cars from their parking lots.

In 1999, the winter of Plaintiff's accident, Public Works scheduled some snow removal for April 1, outside the "late February and March" time frame mentioned in the snow removal plan. Mr. Meeks also testified that even if all of the snow removal had been scheduled only through the end of March, it would be impossible to complete all of it before the end of March 31 due to delays, including residents' failure to remove cars, along with the requirement of three days' notice of any rescheduled snow removal. The February/March time frame was only a target, and time overruns into April were a practical certainty according to Mr. Meeks. The only reason for stating the February/March time frame in the Snow Removal Policy was so that residents would have some general idea

of when to expect snow removal. Had Public Works scheduled the snow removal any earlier in the winter, they ran the risk of having substantial snowfall after the plowing period.

With a 48% staffing cut for the winter of 1998-99, Public Works anticipated even worse problems with snow removal delays. Plaintiff's unit was scheduled for snow removal on March 9, 1999. Mr. Meeks does not know why her lot was not plowed on that date.

According to Mr. Meeks, gravel was freely available from Self-Help, although a resident or housing coordinator could only obtain a limited amount of ice-melt for free. Mr. Meeks agrees with Sgt. Kahn that it was Kahn's duty to oversee the residents in their remedying of hazardous, icy conditions, and that the residents also had a personal responsibility to participate if able to do so. The residents were not expected to remove all snow down to the asphalt, but rather were expected to remedy small problems around the common areas such as dumpsters, fire hydrants, and postal boxes. Even the snow plowing by Public Works was not meant to remove all snow, but merely to make the parking lot "passable."

Meeks said it was "bad form" to tow the vehicle of a soldier on deployment overseas in order to clear the parking lot.

//

//

FINDINGS, CONCLUSIONS, AND ORDER - 9
4:02-CV-0021-RRB

### C.    Paul DeHaven

Plaintiff next called Paul DeHaven, who at the time of Plaintiff's accident was employed by the Army as the Foreman of Roads and Grounds at Fort Wainwright.

During Mr. DeHaven's tenure he kept records of when and where snow was plowed at Fort Wainwright, but has not seen those records since he left that office. There was no requirement for him to retain such documents.

DeHaven concurs with the previous witnesses that it was routine for plowing to run into April. The Army had previously tried to plow twice per winter, once in late autumn and once in spring, but it turned out to be pointless due to the heavy winter snowfall in Alaska, along with the Thanksgiving and Christmas vacations.

The three days' notice requirement for snow removal was imposed by the JAG office, which was concerned about liability for damage to vehicles. For the same liability reasons, towing the vehicles "never worked out."[5] Therefore, lots with cars in them simply had to be bumped to the end of the snow removal list.

---

[5]    DeHaven did testify that some residents would take matters into their own hands by pushing cars out of the lot so that it could be plowed.

FINDINGS, CONCLUSIONS, AND ORDER - 10
4:02-CV-0021-RRB

DeHaven testified that the February/March time frame was simply a plan that would only come to pass "in a perfect world." They couldn't start earlier than February because it was too cold (under 25 below) to run the equipment. The February/March deadline is simply "arbitrary" and doesn't address the possibility of time extensions due to cars in the parking lots or inclement weather. DeHaven testified that plowing has lasted into April for the last 26 years.

DeHaven has observed that the ground just above the utility ducts melted earlier than other areas. Placing gravel near the dumpster could help remedy the problem. The gravel was most effective when it was halfway sunk into the ice due to melting. It was ineffective when sunk completely into the ice, although DeHaven never observed the gravel sink into the ice so completely.

DeHaven testified that if Sgt. Kahn had called him about a dangerous condition in Plaintiff's parking lot, DeHaven would have inspected the area to determine whether the problem could be resolved by Sgt. Kahn and the residents themselves, or whether Public Works would need to remedy the condition.

Defense counsel showed Mr. DeHaven several photographs in Plaintiff's Exhibit 3, specifically the photographs labeled 2, 3, and 14. These photographs show the area surrounding the dumpster, which is where Plaintiff claims to have fallen, although there was

not yet any testimony as to when the photos were taken.[6] Defense counsel asked Mr. DeHaven what action he would take if he had been asked to inspect a parking lot in a condition such as that shown in the photos. DeHaven answered that the conditions were "the occupants' responsibility." He sees relatively little hard-pack snow on the ground, not enough to warrant plowing before the scheduled snow removal for the parking lot. He would advise the residents to put down sand if they did not feel the area was safe.

DeHaven testified that plowing could remove hard-pack snow, but it would not remove any black ice. It would "shine it up" instead. Sand could help with the black ice, but it would probably have to be applied every day in order to be effective.

### D.   John Cicilese

Plaintiff next called John Cicilese to the stand. At the time of Plaintiff's accident, Mr. Cicilese was the civilian Safety and Occupational Health Specialist at Fort Wainwright. Mr. Cicilese maintained the accident logs for injuries at Fort Wainwright and was the Government's 30(b)(6) deponent in this case. His department, the Safety Office, did not have an independent snow removal policy. That was the purview of Public Works. The Post

---

[6]     For reasons set forth below, the Court believes that the photos were taken on the morning of Plaintiff's accident, shortly after she fell.

Case 4:02-cv-00021-RRB   Document 171   Filed 08/28/09   Page 12 of 35

Commander would typically consult the Safety Office before approving the snow removal policy from Public Works.

Mr. Cicilese's job was to administer more general Army safety regulations, specifically Army Regulation 385-10. According to Mr. Cicilese, AR 385-10 requires the Safety Office to inspect the installation for hazards, but does not spell out any specific guidelines for when or how those inspections are supposed to take place. Mr. Cicilese testified that area coordinators have the primary duty to inspect hazardous conditions and then report any conditions that they or the residents cannot fix themselves.

**E.    John Curry**

John Curry was Plaintiff's next witness. Mr. Curry was the Garrison Commander of Fort Wainwright from 1997 to 1999. Mr. Curry authorized the Snow Removal Policy in effect on Fort Wainwright at the time of Plaintiff's accident.

Mr. Curry testified that housing tenants are responsible to do all the snow and ice removal from the apartment parking lots except for the once-yearly snow removal by Public Works. Area coordinators had a duty to make sure that the maintenance was done. However, an area coordinator did not necessarily need to actively organize the residents to remove the snow if the residents maintained the area on their own. Curry testified that he did not have any personal

knowledge as to whether Sgt. Kahn had carried out his duties as an area coordinator.

With regard to the effectiveness of snow removal, Mr. Curry's testimony was substantially the same as the prior witnesses. That is, springtime thawing of snow and ice can result in overnight refreezing that can create dangerous conditions. Melting occurs earliest on the ground over utility ducts. Gravel often helps, but not always, and plowing may make ice more slippery in the short term. He expressed his opinion that during the spring thaw and refreeze cycle, snow removal by means other than plowing (shovels, etc.) would not likely be as effective as putting down sand and gravel in remedying hazardous conditions. He believes that it would be appropriate to lay down sand or gravel without shoveling in such a situation.

When shown the area near the dumpster where Ms. Bolt allegedly fell as depicted in photographs 2 and 3 of Exhibit 3, Mr. Curry said that he believed that Sgt. Kahn and the residents were obligated to maintain that particular area. When asked whether he would be willing to walk across the area depicted in photographs 2 and 3, Mr. Curry said that based on his five years of living in Fairbanks, he "didn't hesitate" to walk in such areas as long as he had proper footwear and there was "grit," meaning sand or gravel, laid down.

FINDINGS, CONCLUSIONS, AND ORDER - 14
4:02-CV-0021-RRB

On cross-examination, Mr. Curry testified that residents would have responsibility to maintain the area near the dumpster unless and until they were unable to remedy a hazard, at which point they could request assistance from DPW.

With regard to the February/March time frame outlined in the Snow Removal Policy (Exhibit E), Curry testified that it was not a deadline. He said that it was rather "a kind of a window that's established kind of based on knowledge of past winters as to when the conditions are right to go in to start doing that final snow removal." According to Curry, the time window for snow removal would vary based on the length of the particular winter, the need to use equipment and manpower on more strategically important areas of the base, and the residents' cooperation (i.e., moving their vehicles for the snow plows). Curry noted that the Snow Removal Plan for 1998-99 specifically said that "response times will be extended due to the staffing cut."[7] He said that this policy represented a "change in expectations that year for show removal."

Exhibit A (the Department of Defense Directive regarding installation management), Exhibit B (the DOD Housing Management manual), Exhibit C (the Handbook for Family Housing Occupants), and Exhibit D (the Army regulation for Housing Management) were

---

[7]    Exhibit E, p. 1.

admitted into evidence. These regulations and orders give an outline of the responsibilities of both the Army and its housing residents and were considered during the formulation of the snow removal policy.

**F. Kevin Bolt**

Plaintiff's ex-husband, Kevin Bolt, was the next witness for Plaintiff. Mr. Bolt was a Mechanic in the Army at the time of Plaintiff's injury. He was married to Plaintiff at that time. He and Plaintiff moved into the housing at Fort Wainwright in 1996. He said that the parking lot was "rough" when they first arrived, partly because they were not used to the winter conditions. He also said that there "wasn't very much removal" of snow during the first year and that this made the parking lot "relatively slick and hard to walk on, hard to drive on."

For the Bolt family's second winter at Fort Wainwright, the residents of their housing unit jointly purchased a snow plow attachment for a four-wheel ATV so that they could do some plowing on their own. Mr. Bolt said that he and the other residents did some plowing for a while, but were told that they had to stop because it wasn't their responsibility. Mr. Bolt does not remember who told them to stop. He said that conditions in the parking lot worsened after they stopped plowing.

FINDINGS, CONCLUSIONS, AND ORDER - 16
4:02-CV-0021-RRB

During the winter of 1998-99, Mr. Bolt said that he took responsibility for removing snow in the area around his car, around the mailboxes, and on the sidewalk near his apartment. He testified that Sgt. Kahn never asked him to participate in snow removal that winter. Mr. Bolt also testified that he informed Sgt. Kahn about how slippery the parking lot was and Sgt. Kahn told him that other people had complained as well. Mr. Bolt said that he spoke with Kahn about the parking lot conditions at least once every other week, but that he had never seen Kahn take any corrective measures.

There were signs posted for snow clearing in Plaintiff's housing area in March of 1999, but they did not take place as scheduled. At that time, Mr. Bolt said there were two to three inches of ice on the ground. He said that he was told the ice was not removed because of two vehicles that he claims were never moved all winter, to the point that they were completely covered in a whole winter's worth of snow.

Mr Bolt said there was no "major build-up" of snow in the parking lot due to the consistent traffic of the residents' vehicles. He said that the warmth of vehicle exhaust would cause icy spots behind the cars in the lot.

On April 1, 1999, Ms. Bolt left the apartment just before 8:00 a.m. to take some trash to the dumpster. Mr. Bolt was inside the apartment helping their son get dressed. When Mr. Bolt took his

son outside to put him in a car seat, he heard his wife scream from across the parking lot. She was screaming, "Somebody help me." Mr. Bolt found his wife sitting on the ground; she said that she thought she had broken her ankle. Mr. Bolt testified that there was at least one to two inches of hard pack ice on the ground where she fell.

Mr. Bolt identified the shoes identified as Plaintiff's Exhibit 26 as the shoes worn by his wife on the day of the fall. The shoes are rubber-soled casual shoes. Mr. Bolt took off her shoes and saw that her ankle was broken, based on its unnatural position. A neighbor volunteered to take Plaintiff to the hospital while Mr. Bolt took their child to daycare.

After visiting his wife at the hospital, Mr. Bolt testified that he returned to the parking lot to take pictures of the spot where his wife fell. He did so with an eye toward establishing responsibility for the accident. Of the photos found in Exhibit 3, he recalls having taken photos 15 and 16 that afternoon.

Mr. Bolt and Plaintiff later divorced and Mr. Bolt acquired a 30% interest in any judgment in her favor at that time.

The Army removed the snow from Plaintiff's parking lot two days after her accident according to Mr. Bolt.

Other than photos 15 and 16, Mr. Bolt does not recall having taken any of the pictures found in Plaintiff's Exhibit 3. All of

the pictures were apparently taken with the same camera, judging by the erroneous "'94 1 1" time stamp that appears in each photo. Nonetheless, when asked who took the other photos, Mr. Bolt testified that he did not know. He said, "I can't recall if I gave the camera to someone else, but I do know that there were other people taking pictures." He said that the pictures were sent to him in an envelope a few weeks before trial, although he does not know from whom.

The pictures which Mr. Bolt says he took on the afternoon of April 1, 1999, numbers 15 and 16, were clearly taken in sunny conditions. The high for April 1, 1999, in Fairbanks was 46 degrees Fahrenheit.[8] Bolt testified that the bare patches of asphalt visible in photos 15 and 16 were covered with ice on the morning of the accident.

Mr. Bolt did not believe that conditions were especially icy around the dumpster as compared to the rest of the parking lot. He testified that "the dumpster area is part of the parking lot. The whole parking lot was a hazard, not just around the dumpster. It just so happened that the incident took place at the dumpster. [...] There is no difference."

---

[8]     Exhibit 1.

Mr. Bolt also said that he did not believe that putting down sand or gravel in the parking lot would have made the surface any less slippery.

### G. Richard Lowe

Richard Lowe succeeded Paul DeHaven as a Foreman of Roads and Grounds at DPW. He worked at Fort Wainwright for 30 years. Mr. Lowe testified that the daily job sheets on which DPW kept records of snow removal work that was to be performed on a given day were periodically destroyed. Mr. Lowe testified that the job sheets for the winter of 1998-99 were destroyed at some point, although he is unsure when.

According to Mr. Lowe, DPW had discretion as to when and where they would lay down sand in residential parking lots. He said that DPW did not regularly inspect parking lots unless prompted by residents.

### H. Carol Bolt

Plaintiff next testified in her own behalf. Plaintiff echoed the testimony of her ex-husband regarding the parking lot conditions that prevailed in their first two winters at Fort Wainwright. Like Mr. Bolt, she testified that the whole parking lot was hazardous, not just the area around the dumpster. She said that there were "lots of ruts and ice" in the parking lot. She also testified that while the whole parking lot was dangerous, the area

around the dumpster "was a little more dangerous than most other places" in the lot.

Plaintiff testified regarding the effort that the residents in her unit had made to remove snow on their own with the four-wheeler plow. She testified that she never met Sgt. Kahn until after the accident, but also said that she knew her husband had spoken with Mr. Kahn. She testified that she never saw Sgt. Kahn putting down sand or gravel in the parking lot.

On the morning of her injury, Plaintiff walked around the front of the dumpster as usual. She testified that it was "very slick" that morning. She slipped on a patch of ice near the dumpster. She knew immediately that she was injured. Her neighbor Billie took her to the hospital in her van, since they realized that Plaintiff would not likely be able to get herself into the Bolt's Ford Bronco.

Plaintiff was unaware of who took the photos in Exhibit 3, but she knows they were taken with her camera. She said that the photo on page 6 of Exhibit 3 shows the parking lot as it appeared on the morning of her accident.

It was unclear from Plaintiff's testimony whether she knew prior to the accident that the area in front of the dumpster was any more or less dangerous than the rest of the parking lot. She also testified that putting down sand in front of the dumpster

FINDINGS, CONCLUSIONS, AND ORDER - 21
4:02-CV-0021-RRB

would not have made the area safer for more than a few minutes because the sand was "gone in no time." Plaintiff did see sand laid down on the sidewalks sometimes. She said that she personally never laid sand down in the common areas she used. She testified that she did not know that she could get sand or gravel.

### I.    Robert Tilly

The final witness was Plaintiff's expert witness, Robert Tilly. Mr. Tilly is a registered professional engineer.

Mr. Tilly testified that without snow removal, the spring melting and re-freezing process causes the hard-pack snow to become "uneven and soft in spaces." He believes that the Army's failure to remove snow during February or March of 1999 increased the hazard of walking in the parking lot.

On cross-examination, Mr. Tilly agreed that plowing could actually make the lot slicker and more dangerous in the short term, which made the sanding of the area after plowing more crucial.

### III. LEGAL STANDARDS

A party seeking to prevail in a standard negligence action must establish by a preponderance of the evidence a duty on the part of the defendant, a breach of that duty, and an injury which was proximately caused by the breach.[9]

---

[9]    <u>Richey v. Oen</u>, 824 P.2d 1371, 1374 (Alaska, 1992).

In order to show negligence per se, the plaintiff must prove that the defendant violated a statute or regulation which is designed "(a) to protect a class of persons which includes the one whose interest is invaded, and (b) to protect the particular interest which is invaded, and (c) to protect that interest against the kind of harm which has resulted, and (d) to protect that interest against the particular hazard from which the harm results."[10]

Under Alaskan law, a landlord has the duty to "'act as a reasonable person in maintaining his property in a reasonably safe condition in view of all the circumstances, including the likelihood of injury to others, the seriousness of the injury, and the burden on the respective parties of avoiding the risk.'"[11]

## IV. FINDINGS OF FACT AND CONCLUSIONS OF LAW

It is the Court's conclusion, based on a preponderance of the evidence, that Defendant is partially responsible for Plaintiff's injuries.

//

//

---

[10] <u>Cable v. Shefchik</u>, 985 P.2d 474, 477 (Alaska, 1999) (quoting Restatement (Second) of Torts § 286 (1971)).

[11] <u>Coburn v. Burton</u>, 790 P.2d 1355, 1357 (Alaska, 1990) (quoting <u>Webb v. City and Borough of Sitka</u>, 561 P.2d 731, 733 (Alaska, 1977)).

FINDINGS, CONCLUSIONS, AND ORDER - 23
4:02-CV-0021-RRB

**A. The Law of the Case Requires this Court to Find Defendant Negligent Per Se**

Plaintiff argues that the Army's failure to plow the parking lot before April 1, 1999, constitutes negligence per se. According to Plaintiff, the Snow Removal Policy imposes a statutory duty on the Army to remove snow from all residential parking lots by March 31. Plaintiff bases this assertion on the provision found on page 3 of the Snow Removal Policy, Exhibit E, which states that Family Housing Parking Areas are "cleared once per year in late February or March." If this provision sets a hard and fast deadline for snow removal by March 31, then plainly the Army failed to comply with that provision.

Defendant has contended throughout this litigation that the snow removal policy does not specifically require removal by March 31, but rather sets forth those months as a goal or guideline. Indeed, this view was echoed by Mr. Meeks, Mr. DeHaven, and Mr. Curry in their testimony at trial. Alternatively, Defendant argues that even if the snow removal policy provides a firm deadline for removal, it also sets forth the grounds for extending that deadline in its first paragraph, which reads in part:

> Public Works staffing for snow removal operations has been cut by 48% from the staffing level of the 1997-1998 winter season. This is a result of the ongoing USARAK hiring freeze and the FY98 and FY99 work year restrictions imposed by higher headquarters. Snow removal operations will be conducted in accordance with the

priority system as outlined in this plan[.] [H]owever[,]
response times will be extended due to the staffing
cut.[12]

As Plaintiff has continually noted, this Court must follow the
Ninth Circuit's ruling in Bolt v. United States, 509 F.3d 1028 (9th
Cir. 2007). In Bolt, the Ninth Circuit upheld this Court's ruling
that the "discretionary function" exception to liability under the
Federal Tort Claims Act did not apply in this case. At the summary
judgment stage of proceedings, this Court had originally concluded
that "Plaintiff has demonstrated that the Fort Wainwright Post
Commander failed to comply with his own policy requiring snow
removal, i.e., he failed to provide Plaintiff with the once per
year snow removal that he promised would occur in late February or
March."[13] This Court also held that the Snow Removal Policy was
"clear and unambiguous" in requiring the Army to clear Plaintiff's
lot by March 31, 1999.

In Bolt, the Ninth Circuit affirmed that portion of the
Court's ruling and indeed went further by examining some portions
of the Snow Removal Policy which might arguably give the Army
discretion to delay snow removal past March 31, 1999. The Ninth
Circuit concluded that neither the residential parking lots' place

---

[12]     Exhibit E, p. 1.

[13]     Docket 48 at 6.

at the bottom of the sequential priority system for clearing nor the "Special Notice" that "[a]reas in which vehicles have not been removed will be bypassed and moved to bottom of the list" gave the Army discretion not to clear snow from Plaintiff's parking lot until after the deadline.[14]

Although a court's prior decisions are "the law of the case," the court may revisit those decisions if the fact-finding process shows that the court "actually made a mistake," as may have been the case here.[15] After having had an opportunity to examine all the evidence at trial, and considering the wording of the snow removal policy in that context, the Court would normally be inclined to overturn its own prior ruling as to whether the Army had discretion under the Snow Removal Policy to extend the deadline beyond March 31, especially considering the qualifications set forth in the first paragraph of the policy. It seems likely that the Army did not intend for the "late February or March" provision to be a firm deadline. The provision is vague; it is not even phrased as a complete sentence: "Family Housing Parking Areas (cleared once per year in late February or March)." The Army could just as easily

---

[14]     Bolt, 509 F.3d at 532-33.

[15]     In re Wiersma, 483 F.3d 933, 941 (9th Cir. 2007).

have said that removal "must be completed before March 31st" if that really were the intended policy.

Nonetheless, the Ninth Circuit had the entire policy before it and addressed this issue head on in its ruling in <u>Bolt</u>. The Ninth Circuit had an opportunity to review the Snow Removal Policy, and concluded unambiguously that it required removal prior to March 31st. Because the policy is a statute or regulation, the Ninth Circuit's construction of it is a legal conclusion which is properly within its purview as a court of appeals. This Court is bound by its decision.

Therefore, this Court must reluctantly adopt the Ninth Circuit's conclusion for this case only that "the Snow Removal Policy expressly imposes a specific and mandatory duty to clear Family Housing Parking Areas of snow and ice once a year, before the end of March."[16] As it is clear that Defendant did not perform this duty, Plaintiff has established that Defendant was negligent per se.

**B. Defendant's Negligence Was a Proximate Cause of the Plaintiff's Accident**

Assuming that Defendant was negligent for failing to plow Plaintiff's parking lot prior to April 1, 1999, the Court must now determine whether Defendant's negligence was the proximate cause of

---

[16]     <u>Bolt</u> at 1033.

Plaintiff's injury. Alaska follows the "substantial factor test" of causation, which generally requires the plaintiff to show that the accident would not have happened "but for" the defendant's negligence, and that the negligent act was so important in bringing about the injury that reasonable individuals would regard it as a cause and attach responsibility to it.[17]

Even after hearing all the evidence, determining what precisely caused Plaintiff's slip on the ice is no easy task. The only evidence directly on point is Plaintiff's own testimony about how she fell, the pictures of the area where she fell, and the shoes she wore that day, which were entered into evidence.

With regard to how her fall happened, Plaintiff has said little more than that she slipped on a very slick patch of ice while walking to the dumpster. The Court cannot expect her to give much more detail than that since the fall was a split-second event.

In order to determine how slick the surface was on the day of her fall, the best evidence is the collection of photos in Exhibit 3. Mr. Bolt claims that he took the photographs on pp. 15-16 of Exhibit 3 on the afternoon of the accident. Those photographs show the parking lot in a partially melted state, consistent with

---

[17]    <u>Winschel v. Brown</u>, 171 P.3d 142, 148 (Alaska, 2007) (citations omitted).

FINDINGS, CONCLUSIONS, AND ORDER - 28
4:02-CV-0021-RRB

Mr. Bolt's assertion that he took them on the relatively warm afternoon of April 1.

Although Mr. and Mrs. Bolt claim not to know when the other photos were taken, the Court can make an educated guess by comparing them to the photos on pp. 15 and 16. Several of the photos show the parking lot in lower light, probably morning time, with a pattern of wear on the ice that appears to be what the lot would look like shortly before the afternoon melting seen on pp. 15-16. Specifically, the photos on pp. 2-3, 6-9, 14, the top photos on pp. 4 and 10, and the bottom photo on p. 1 all appear to have been taken prior to the melting seen on pp. 15-16, but without an intervening snowfall.

The Court finds that it is more likely than not that the above-named photos were taken by Mr. Bolt in the moments shortly after Plaintiff's accident. The pictures themselves look like they were taken that morning, and the large number of photos taken of the otherwise unremarkable dumpster area indicates that someone, probably Mr. Bolt, took them shortly after the accident with an eye toward establishing liability. The Court attributes Mr. Bolt's contrary testimony to either a fault in memory or a desire not to appear overly litigious. Plaintiff herself testified that the photo on p. 6 accurately depicts what the area in front of the dumpster looked like when she fell.

It is clear from the photographs that there was a substantial layer of ice remaining on the ground in the spot where Plaintiff fell. She did not, according to the testimony at trial, slip on the more bare and slippery spots over the utilidor. There would likely have been less hard-pack ice and snow over the area if the Army had plowed prior to April 1.

Defendant has made the argument that if the lot had been plowed on March 31, for example, the remaining ice in the parking lot might not have had a chance to melt and that, for a short period of time, the surface would actually be smoother and more slippery after plowing than it was before. A number of witnesses echoed this view. Even if this argument is technically correct, the Court finds it unavailing. The whole point of plowing during late February and March is to make it safer for residents. If the Army had plowed the lot during the 1½ month window for snow removal, there is only about a 1 in 45 chance that the removal of snow from Plaintiff's lot would have taken place right on March 31. Even if the plowing had taken place on that date, the Army had a duty to make the lot reasonably safe, which likely would have required the laying down of sand or gravel after plowing and smoothing out the lot. Either way, the Court believes it is very likely that plowing and/or sanding during the February-to-March window would have made the lot safer, all things considered.

That is not to say that Plaintiff's behavior was not a contributing cause in her fall. The Court will address the parties' comparative negligence below. But while "the issue of comparative negligence [is] closely tied to the issue of causation,"[18] the Court finds that Plaintiff's negligence was not so great that it eliminates Defendant's failure to plow as a "substantial factor" in the accident. It is more likely than not that Plaintiff would not have fallen if Defendant had plowed the lot prior to April 1, 1999. Therefore, Plaintiff has established "but for" causation, and the Court further concludes that a reasonable person would regard the failure to plow as a "cause" of Plaintiff's injuries.

### C. Plaintiff's Comparative Negligence Was Partially Responsible For Her Injuries

Alaska is a pure comparative negligence state.[19] Therefore, Defendant's liability is limited by the percentage of fault attributable to Plaintiff's own negligence. Defendant has advanced a number of theories as to why Plaintiff might have been negligent.

Plaintiff and Mr. Bolt both testified that they believed the whole parking lot was a hazardous area. Mr. Bolt testified that there was no difference between the dumpster area and the rest of

---

[18]    General Motors Corp. v. Farnsworth, 965 P.2d 1209, 1222 (Alaska, 1998).

[19]    Sowinski v. Walker, 198 P.3d 1134, 1149 (Alaska, 2008); AS § 09.17.060.

FINDINGS, CONCLUSIONS, AND ORDER - 31
4:02-CV-0021-RRB

the parking lot, whereas Plaintiff herself testified that the area around the dumpster was somewhat more dangerous. Under Alaska tort law, Plaintiff had a duty to "use reasonable efforts to avoid or prevent" injury to herself.[20] If the area around the dumpster was of particular concern to Plaintiff, there are several ways she could have mitigated her risk. The Residents' Handbook outlines procedures for self-help, informing residents how to obtain equipment and materials for small-scale snow removal. The Handbook also informs residents that they had a shared responsibility for ensuring the common areas were clear of snow and ice, including "driveways" like the area where Plaintiff fell.

Other than the residents' abortive attempt to remove snow with a four-wheeler the previous winter, Plaintiff does not claim to have engaged in snow removal efforts. Neither she nor Mr. Bolt ever tried to remove snow or lay down grit in front of the dumpster. While the ultimate responsibility for snow removal lies with Defendant and its agents, Plaintiff was not helpless. She bears some responsibility for ensuring that the common areas she used were safe, especially if she knew that the area around the dumpster was a particular hazard.

_____

[20]    Anchorage Independent School Dist. v. Stephens, 370 P.2d 531, 533 (Alaska, 1962).

FINDINGS, CONCLUSIONS, AND ORDER - 32
4:02-CV-0021-RRB

Since no one saw Plaintiff fall, the question of how careful Plaintiff was when she walked to the dumpster is a difficult one. Plaintiff was carrying trash at the time she fell; she expected to go to work thereafter and was very likely in a hurry. She was very familiar with the area and with the conditions. Why she chose the route she did or precisely what happened is unclear.

Nonetheless, by examining the photos of the parking lot on the morning of her accident, the Court concludes that Plaintiff's failure to take due care was at least partly responsible for her fall. Although there is ice on the ground, the parking lot does not appear, on the whole, to be any more dangerous than a typical parking lot in Fairbanks (or anywhere else in Alaska) during wintertime. The Court does not see the sort of deep, dangerous ruts in the ice that Plaintiff described in her testimony. Nor does the court see in the area where Plaintiff fell any of the "black ice" mentioned by Plaintiff's counsel repeatedly during the trial.

Ice on the ground is a fact of life in Alaska. This was Plaintiff's third winter in Alaska and she surely knew that utmost caution must be taken while walking across an icy parking lot. Moreover, Plaintiff was very familiar with the location where she fell and its slippery condition. She, more than anyone else, had the best chance to ensure her safety. The surface which is visible in the photos is the sort of surface that is ubiquitous and

unavoidable in most places in Fairbanks in winter. The fact remains that most people are able to navigate icy pavement without falling down. The Court believes after taking into account all of the evidence at trial that Plaintiff could have avoided her fall by taking greater care in walking to the dumpster, which is not to say that she deserved her injury in any way.

While Plaintiff's injury may likely not have happened without the ice in the parking lot, that does not mean that Defendant's failure to remove the ice was the sole cause of her accident. Plaintiff failed to take certain steps that could have prevented her injury, including walking more carefully, choosing a safer route, wearing better shoes, and using the prescribed self-help measures, such as laying sand or gravel, shoveling, and ice chipping. The Court finds that Plaintiff was comparatively negligent in this case and her negligence was 50% responsible for her injuries, while Defendant's negligence was 50% responsible.

## V. CONCLUSION

For the reasons set forth above, the Court finds, by a preponderance of the evidence, that Defendant United States of America is liable for 50% of the damages resulting from Plaintiff Carol Bolt's injuries. Pursuant to this ruling, the Court will schedule a separate trial on the issue of damages. Given that the Court has already observed Plaintiff and Mr. Bolt, and given the

distances involved, and in order to reduce expenses and expedite a final resolution, the Court believes that the damages portion of this trial can and should be held telephonically. There is no good reason for Defendant or her physicians to fly to Alaska to conclude this matter.

The parties shall confer in a polite and rational fashion, with the goal of obtaining an expeditious resolution of this matter, and notify the Court thereafter when the damages portion of the dispute can be concluded. A status report shall be filed by the parties by **September 18, 2009.**

**IT IS SO ORDERED**.

ENTERED this 28th day of September, 2009.

                    S/RALPH R. BEISTLINE
                    UNITED STATES DISTRICT JUDGE